**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| TEXAS HEALTH RESOURCES, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BLUE CROSS BLUE SHIELD ASSOCIATION, | ) ) ) | |
| | ) | PLAINTIFF'S COMPLAINT |
| BLUE CROSS AND BLUE SHIELD OF ILLINOIS, | ) ) | |
| | ) | |
| ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| ELEVANCE HEALTH, INC. F/K/A ANTHEM, INC., | ) ) | |
| | ) | |
| HEALTH CARE SERVICE CORPORATION, AN ILLINOIS MUTUAL LEGAL RESERVE COMPANY, | ) ) ) ) | |
| | ) | |
| CAMBIA HEALTH SOLUTIONS, INC., | ) ) | |
| | ) | |
| CAREFIRST, INC., | ) ) | |
| | ) | |
| CAREFIRST BLUECHOICE, INC. | ) ) | |
| | ) | |
| PREMERA BLUE CROSS, | ) ) | |
| | ) | |
| PREMERA, | ) ) | |
| | ) | |
| BLUE CROSS AND BLUE SHIELD OF ALABAMA, | ) ) ) | |
| | ) | |
| PREMERA BLUE CROSS d/b/a PREMERA BLUE CROSS BLUE SHIELD OF ALASKA, | ) ) ) | |
| | ) | |
| PROSANO, INC., | ) ) | |
| | ) | |
| BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC., | ) ) ) | |
| | ) | |

USABLE MUTUAL INSURANCE COMPANY )
  d/b/a ARKANSAS BLUE CROSS AND )
  BLUE SHIELD AND AS )
  BLUEADVANTAGE ADMINISTRATORS )
  OF ARKANSAS, )
  )
BLUE CROSS OF CALIFORNIA d/b/a )
  ANTHEM BLUE CROSS, )
  )
CALIFORNIA PHYSICIANS' SERVICE, INC. )
  d/b/a BLUE SHIELD OF CALIFORNIA, )
  )
ROCKY MOUNTAIN HOSPITAL AND )
  MEDICAL SERVICE, INC. d/b/a ANTHEM )
  BLUE CROSS AND BLUE SHIELD, )
  )
ANTHEM HEALTH PLANS, INC. d/b/a )
  ANTHEM BLUE CROSS AND BLUE )
  SHIELD, )
  )
HIGHMARK, INC. f/k/a HIGHMARK )
  HEALTH SERVICES, )
  )
HIGHMARK BCBSD, INC., )
  )
GROUP HOSPITALIZATION AND )
  MEDICAL SERVICES, INC., )
  )
GUIDEWELL MUTUAL HOLDING )
  CORPORATION, )
  )
BLUE CROSS AND BLUE SHIELD OF )
  FLORIDA, INC. (FLORIDA BLUE), )
  )
BLUE CROSS BLUE SHIELD HEALTHCARE )
  PLAN OF GEORGIA, INC. D/B/A ANTHEM )
  BLUE CROSS AND BLUE SHIELD, )
  )
HAWAII MEDICAL SERVICE )
  ASSOCIATION d/b/a BLUE CROSS AND )
  BLUE SHIELD OF HAWAII, )
  )
BLUE CROSS OF IDAHO HEALTH )
  SERVICE, INC., )
  )
REGENCE BLUESHIELD OF IDAHO, INC., )

ANTHEM INSURANCE COMPANIES, INC.
  d/b/a ANTHEM BLUE CROSS AND BLUE
  SHIELD,

WELLMARK, INC. d/b/a WELLMARK BLUE
  CROSS AND BLUE SHIELD OF IOWA,

BLUE CROSS AND BLUE SHIELD OF
  KANSAS, INC.,

ANTHEM HEALTH PLANS OF KENTUCKY,
  INC. d/b/a ANTHEM BLUE CROSS AND
  BLUE SHIELD,

LOUISIANA HEALTH SERVICE &
  INDEMNITY COMPANY d/b/a BLUE
  CROSS AND BLUE SHIELD OF
  LOUISIANA,

ANTHEM HEALTH PLANS OF MAINE, INC.
  d/b/a ANTHEM BLUE CROSS AND BLUE
  SHIELD,

CAREFIRST OF MARYLAND, INC.,

BLUE CROSS AND BLUE SHIELD OF
  MASSACHUSETTS, INC.,

BLUE CROSS BLUE SHIELD OF MICHIGAN
  MUTUAL INSURANCE COMPANY,

BCBSM, INC. d/b/a BLUE CROSS AND
  BLUE SHIELD OF MINNESOTA,

BLUE CROSS & BLUE SHIELD OF
  MISSISSIPPI, A MUTUAL INSURANCE
  COMPANY,

HMO MISSOURI, INC. d/b/a ANTHEM BLUE
  CROSS AND BLUE SHIELD,

RIGHTCHOICE MANAGED CARE, INC.
  D/B/A RIGHTCHOICE BENEFIT
  ADMINISTRATORS,

HEALTHY ALLIANCE LIFE INSURANCE
  COMPANY D/B/A ANTHEM BLUE CROSS
  AND BLUE SHIELD,

BLUE CROSS AND BLUE SHIELD OF
  KANSAS CITY, INC.,

BLUE CROSS AND BLUE SHIELD OF
  MONTANA,

CARING FOR MONTANANS, INC. f/k/a
  BLUE CROSS AND BLUE SHIELD OF
  MONTANA, INC.,

GOODLIFE PARTNERS, INC.,

BLUE CROSS AND BLUE SHIELD OF
  NEBRASKA,

ANTHEM HEALTH PLANS OF NEW
  HAMPSHIRE, INC. d/b/a ANTHEM BLUE
  CROSS AND BLUE SHIELD,

HORIZON HEALTHCARE SERVICES, INC.
  d/b/a HORIZON BLUE CROSS AND BLUE
  SHIELD OF NEW JERSEY,

BLUE CROSS AND BLUE SHIELD OF NEW
  MEXICO,

HIGHMARK WESTERN AND
  NORTHEASTERN NEW YORK, INC. F/K/A
  HEALTHNOW NEW YORK INC.

ANTHEM HEALTHCHOICE ASSURANCE,
  INC.,

EXCELLUS HEALTH PLAN, INC. d/b/a
  EXCELLUS BLUECROSS BLUESHIELD,

BLUE CROSS AND BLUE SHIELD OF
  NORTH CAROLINA, INC.,

BLUE CROSS BLUE SHIELD OF NORTH
  DAKOTA F/K/A NORIDIAN MUTUAL
  INSURANCE COMPANY,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

HEALTHYDAKOTA MUTUAL HOLDINGS )
)
COMMUNITY INSURANCE COMPANY )
  d/b/a ANTHEM BLUE CROSS AND BLUE )
  SHIELD, )
)
BLUE CROSS AND BLUE SHIELD OF )
  OKLAHOMA, )
)
REGENCE BLUECROSS BLUESHIELD OF )
  OREGON, )
)
CAPITAL BLUE CROSS, )
)
HIGHMARK HEALTH, )
)
INDEPENDENCE BLUE CROSS, LLC, )
)
INDEPENDENCE HEALTH GROUP, INC. )
)
INDEPENDENCE HOSPITAL INDEMNITY )
  PLAN, INC. f/k/a INDEPENDENCE BLUE )
  CROSS, )
)
QCC INSURANCE COMPANY, )
)
TRIPLE-S SALUD, INC., )
)
TRIPLE-S MANAGEMENT CORPORATION, )
)
BLUE CROSS & BLUE SHIELD OF RHODE )
  ISLAND, )
)
BLUECROSS BLUESHIELD OF SOUTH )
  CAROLINA INC., )
)
WELLMARK OF SOUTH DAKOTA, INC. )
  d/b/a WELLMARK BLUE CROSS AND )
  BLUE SHIELD OF SOUTH DAKOTA, )
)
BLUECROSS BLUESHIELD OF )
  TENNESSEE, INC., )
)
BLUE CROSS AND BLUE SHIELD OF )
  TEXAS, )
)
)

REGENCE BLUECROSS BLUESHIELD OF
   UTAH,

BLUE CROSS AND BLUE SHIELD OF
   VERMONT,

ANTHEM HEALTH PLANS OF VIRGINIA,
   INC. d/b/a ANTHEM BLUE CROSS AND
   BLUE SHIELD,

REGENCE BLUESHIELD,

HIGHMARK WEST VIRGINIA, INC.,

BLUE CROSS BLUE SHIELD OF
   WISCONSIN d/b/a ANTHEM BLUE CROSS
   AND BLUE SHIELD,

COMPCARE HEALTH SERVICES
   INSURANCE CORPORATION

BLUE CROSS AND BLUE SHIELD OF
   WYOMING,

               Defendants.

## TABLE OF CONTENTS

Page

I.    STATEMENT OF THE CASE ................................................................... 3

II.   JURISDICTION AND VENUE ............................................................. 14

III.  INTERSTATE COMMERCE ............................................................... 16

IV.  THE PARTIES ...................................................................................... 16

    A.   Plaintiff ....................................................................................... 16

    B.   Defendants ................................................................................. 18

V.   FACTUAL ALLEGATIONS ................................................................ 39

    A.   Overview of the Industry .......................................................... 39

    B.   History of the Blue Cross and Blue Shield System .................... 49

         1.   *Before the Long-Term Business Strategy* ........................... 49

         2.   *The Long-Term Business Strategy and Assembly of Plans* ................ 55

         3.   *Defendants Enter Into Unlawful Agreements* ..................... 61

         4.   *The Blue Card and National Accounts Programs* ................ 70

         5.   *Protecting and Increasing "Differentials"* ........................ 78

         6.   *Differences Between Modern Blues and Other Insurers* ................ 80

    C.   Specific Examples of Defendants' Unlawful Conduct ................ 81

         1.   *The Leading Example: Alabama* ...................................... 81

             a.   *BCBS-AL Stifled Competition Promoted by the Alabama Health Care Council* .......................................... 84

             b.   *BCBS-AL Uses Market Power to Extract Money From Providers Through "Tiering"* ............................... 86

             c.   *BCBS-AL Lowers Reimbursements Using "Cost Reporting" Requirements* ............................................ 90

             d.   *BCBS-AL Interferes With Competitive Bidding in Birmingham* ................... 91

             e.   *BCBS-AL Spends Heavily on Executive Compensation and Lobbying* .......... 92

         2.   *Allowing and Restricting Competition Among the Blues* ................... 93

             a.   *Allowing and Restricting Competition in Pennsylvania* ............................... 93

             b.   *Allowing and Restricting Competition in Ohio* ................ 97

             c.   *Allowing and Restricting Competition in Maryland* ................ 99

         3.   *Improper Use of Trademarks to Restrict Competition for Providers* .............. 100

         4.   *The Market Allocation Agreement* .................................. 102

         5.   *The Price Fixing and Boycott Agreement* ........................ 106

6. *Other Abuses* ................................................................................................ 110

7. *Defendants' Unlawfully Gained and Supra-competitive Profits* ..................... 112

8. *The Unlawful Agreements Reduce Healthcare Quality and Increase Healthcare Costs* ........................................................................................... 116

D. Market Power and Related Considerations ............................................................. 118

1. *Sale of Health Insurance and Related Products and Services* ........................ 119

2. *Purchase of Products and Services from Healthcare Providers* ..................... 124

3. *State-Specific Market Share Information* ...................................................... 129

4. *Other Relevant Considerations* ..................................................................... 144

E. Antitrust Injury .................................................................................................... 149

F. Necessity of Injunctive Relief and Judicial Oversight ............................................ 155

VI. PUTATIVE PROVIDER CLASS ACTION SETTLEMENT ........................................... 156

VII. STATUTE OF LIMITATIONS AND TOLLING ............................................................ 157

VIII. VIOLATIONS OF LAW ............................................................................................... 158

COUNT I Claim for Injunctive Relief, 15 U.S.C. § 26 ..................................................... 158

COUNT II Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (*Per Se* Market Allocation) ............................................................................................................... 158

COUNT III Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (*Per Se* Price Fixing and Boycotting) ............................................................................................. 159

COUNT IV Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (Quick Look Claim for Market Allocation) ............................................................................. 161

COUNT V Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (Quick Look Claim for Price Fixing and Boycotting) ............................................................. 162

COUNT VI Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (Rule of Reason Claims for Market Allocation) ...................................................................... 163

COUNT VII Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (Rule of Reason Claims for Price Fixing and Boycotting) ........................................................ 164

COUNT VIII Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (Monopsonization) .................................................................................................. 165

COUNT IX Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (Attempted Monopsonization) .................................................................................................. 166

COUNT X Claim for Threefold Damages and Interest, 15 U.S.C. § 15 (Conspiracy to Monopsonize) .................................................................................................... 167

IX. REQUEST FOR RELIEF .............................................................................................. 168

X. JURY DEMAND .......................................................................................................... 169

## PLAINTIFF'S COMPLAINT

Plaintiff Texas Health Resources ("THR"), for its Complaint against Defendants Blue Cross Blue Shield Association ("BCBSA" or the "Association") and Defendants Blue Cross and Blue Shield of Illinois, Anthem Blue Cross Life and Health Insurance Company, Elevance Health, Inc., Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, Cambia Health Solutions, Inc., CareFirst, Inc., CareFirst BlueChoice, Inc., Premera, Premera Blue Cross, Blue Cross and Blue Shield of Alabama, Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska, Prosano, Inc., Blue Cross and Blue Shield of Arizona, Inc., USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and as BlueAdvantage Administrators of Arkansas, Blue Cross of California d/b/a Anthem Blue Cross, California Physicians' Service, Inc. d/b/a Blue Shield of California, Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield, Highmark, Inc. f/k/a Highmark Health Services, Highmark BCBSD, Inc., Group Hospitalization and Medical Services, Inc., GuideWell Mutual Holding Corporation, Blue Cross and Blue Shield of Florida, Inc. (Florida Blue), Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield, Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii, Blue Cross of Idaho Health Service, Inc., Regence BlueShield of Idaho, Inc., Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield, Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, Blue Cross and Blue Shield of Kansas, Inc., Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield, Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield, CareFirst of Maryland, Inc., Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross Blue Shield of Michigan Mutual Insurance Company, BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota, Blue

Cross & Blue Shield of Mississippi, a Mutual Insurance Company, HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield, RightCHOICE Managed Care, Inc. d/b/a RightCHOICE Benefit Administrators, Healthy Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield, Blue Cross and Blue Shield of Kansas City, Inc., Blue Cross and Blue Shield of Montana, Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana, Inc., Goodlife Partners, Inc., Blue Cross and Blue Shield of Nebraska, Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey, Blue Cross and Blue Shield of New Mexico, Highmark Western and Northeastern New York Inc. f/k/a HealthNow New York Inc., Anthem HealthChoice Assurance, Inc., Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield, Blue Cross and Blue Shield of North Carolina, Inc., Blue Cross Blue Shield of North Dakota f/k/a Noridian Mutual Insurance Company, HealthyDakota Mutual Holdings, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, Blue Cross and Blue Shield of Oklahoma, Regence BlueCross BlueShield of Oregon, Capital Blue Cross, Highmark Health, Independence Blue Cross, LLC, Independence Health Group, Inc., Independence Hospital Indemnity Plan, Inc. f/k/a Independence Blue Cross, QCC Insurance Company, Triple-S Salud, Inc., Triple-S Management Corporation, Blue Cross & Blue Shield of Rhode Island, BlueCross BlueShield of South Carolina, Inc., Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, BlueCross BlueShield of Tennessee, Inc., Blue Cross and Blue Shield of Texas, Regence BlueCross BlueShield of Utah, Blue Cross and Blue Shield of Vermont, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield, Regence BlueShield, Highmark West Virginia, Inc., Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield, Compcare Health Services Insurance Corporation, and Blue Cross and Blue Shield of Wyoming

(these independent Blue Cross Blue Shield licensees are referred to herein collectively as the "Blues"), (collectively "Defendants"), hereby allege under the antitrust laws as follows:

## I.     <u>STATEMENT OF THE CASE</u>

1.     This case concerns powerful and wealthy commercial health insurers who have entered into unlawful agreements to allocate markets for healthcare financing, including the markets for healthcare insurance and healthcare services, and thereby reduce reimbursements they pay to U.S. healthcare providers, including THR. THR is among the nation's most prominent hospital systems, and it and other healthcare providers depend on fair and appropriate reimbursement to deliver high-quality healthcare to their patients. THR brings this action to vindicate its rights and recoup the funds that wrongfully lined Defendants' already full pockets.

2.     Since at least 2008 and continuing to the present (the "relevant time period"), Defendants have engaged and continue to engage in an unlawful horizonal market allocation and price-fixing and boycotting agreement in violation of the Sherman Act. Specifically, Defendants, which are independent companies, have agreed with each other to carve the United States into "Service Areas" in which only one Blue, or an agreed-upon and limited number of Blues, can sell insurance, administer employee benefit plans, or contract with healthcare providers (the "Market Allocation Agreement"). This constitutes a horizontal market allocation that is illegal under a *per se*, quick look, or rule of reason analysis. The *quid pro quo* for this illegal Market Allocation Agreement is a horizontal Price-Fixing and Boycott Agreement under which every other Blue gets the benefit of the artificially reduced prices that each Blue pays to healthcare providers. The Blues get those benefits through the national programs that the Blues have collectively established, including the Blue Card Program and the National Accounts Programs. The Market Allocation Agreement reduces the competition that each Blue faces and allows it to reduce the prices that it

pays to healthcare providers. The Price Fixing and Boycott Agreement fixes those prices for all Blues, gives them the benefit of those reduced, fixed prices, and further provides that participating Blues will collectively boycott providers outside of their Service Areas.

3. THR provides healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed. Many of THR's patients are insured by the Blues or included in employee benefit plans administered by the Blues.

4. Defendants are BCBSA and the Blues, their owners and affiliated companies, as well as companies through which they are conducting their unlawful agreements. The Blues provide health insurance coverage for approximately 115 million people—or one in three Americans across all fifty states, the District of Columbia, and Puerto Rico. (To eliminate any possible ambiguity, administrative services for employee benefit plans are included within the meaning of health insurance coverage for purposes of this Complaint.)

5. Defendants also have developed and operate the most extensive provider networks in the United States. According to Defendants' own estimates, more than 92% of professional providers and more than 96% of hospitals in the United States contract directly with the Blues. Defendants have agreed they will not compete with each other in terms of their provider networks. Even when Defendants have significant subscribers in another Blue's Service Area, Defendants have agreed they will not contract with providers outside of their Service Areas except in limited circumstances. BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities, and it committed numerous overt acts in substantial furtherance of Defendants' collective unlawful objectives and actions.

6. In the claims related to the Market Allocation Agreement, THR challenges the explicit agreement reached by Defendants to divide the United States into what Defendants term

Service Areas and allocate those geographic areas among the Blues, free of competition. In the claims related to the Price Fixing and Boycott Agreement, THR also challenges the agreement reached by Defendants to fix prices for goods, services, and facilities rendered by healthcare providers such as THR and to boycott healthcare providers outside of their Service Areas.

7.      In furtherance of the Market Allocation Agreement, Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed that each Blue's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted. Accordingly, Defendants have agreed to an allocation of markets and have agreed not to compete with each other within those markets.

8.      The Blues, which are organized and operated independently, constitute potential competitors and, absent the Market Allocation Agreement, the Blues would, in fact, compete. The BCBSA readily admits on its website that the Blues are "independent community-based and locally operated BCBS companies" that use Blue Cross and Blue Shield trademarks and names in "exclusive geographic areas." About Us, The Blue Cross and Blue Shield System, bcbs.com/about-us/blue-cross-blue-shield-system (last visited July 21, 2025). In a trial brief filed with the U.S. District Court for the District of Columbia, Anthem, the predecessor to Elevance (the largest Blue) stated that "the various Blues are not a single firm; notwithstanding their participation in the BCBSA, they are separate firms that at times compete with one another and that at all times separately seek to maximize their own profits." *United States v. Anthem, Inc.*, No. 16-cv-1493, ECF No. 324 at 10 (filed Nov. 10, 2016) ("Anthem Br."). Defendants' agreement to allocate markets is, therefore, a horizontal restraint in violation of Section 1 of the Sherman Act.

9.      The Market Allocation Agreement has significantly decreased competition in the markets for healthcare financing, including the markets for healthcare insurance and healthcare

services, all of which are discussed more fully below. For example, Defendant Blue Cross Blue Shield of Illinois ("BCBS-IL"), which is operated by Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is the largest health insurance provider in Illinois and controls access to approximately 63% of privately insured or administered patients (this Complaint uses "subscribers" to refer to administered as well as insured patients, unless otherwise indicated) in Illinois. *See* Am. Medical Assoc., "Competition in Health Insurance: A Comprehensive Study of U.S. Markets, 2024 Update," *available at* https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf (last visited July 21, 2025). Healthcare providers who operate, and provide services to patients, in Illinois must contract with BCBS-IL if they want access to the BCBS-IL subscribers, and cannot contract with other Blue plans, except in very limited circumstances. As a result, Illinois-based healthcare providers are paid much less than they would be absent the Market Allocation Agreement. These healthcare providers are also subjected to less favorable terms than they would be absent the arrangement. Due to the Market Allocation Agreement, this same scenario exists in each state in which a Blue plan operates, with healthcare providers, including THR, being limited to contracting with the Blue plan in their Service Area and, as a result, being paid less and receiving less favorable contract terms. The Market Allocation Agreement is a *per se* violation, as well as a violation under the quick look and rule of reason analysis, of Section 1 of the Sherman Act.

10. Defendants have further exploited the market dominance they have secured through the Market Allocation Agreement by entering into a Price Fixing and Boycott Agreement, under which Defendants divide the excess profits that they achieve through their illegal anti-competitive conduct. In furtherance of the Price Fixing and Boycott Agreement, Defendants have established and agreed to participate in each national program that the Blues adopt, including the Blue Card

Program and the National Accounts Programs.

11.     The Blue Card Program applies when a subscriber of one Blue receives healthcare services within the Service Area of another Blue. In the Blue Card Program, the subscriber's Blue is the "Home Plan" and the Blue controlling the Service Area where the healthcare goods, services or facilities are provided is the "Host Plan." The Blue Card Program is managed by a group of Blues sitting on BCBSA's Inter-Plan Programs Committee.

12.     The National Accounts Programs function in a similar manner. National Accounts Programs generally apply to employee benefit plans with subscribers in multiple states. The Blue that administers the employee benefit plan is the "Control Plan," and the other Blues in whose Service Areas the subscribers receive healthcare goods, services, or facilities are "Participating Plans." The National Accounts Programs are either established through horizontal agreements between the Blues or managed through the Blue Card Program.

13.     The excess profits from the Defendants' national programs are then divided among the Blues. The national programs, including the Blue Card Program and the National Accounts Programs, lock in the fixed, discounted reimbursement rates that each Defendant achieves through market dominance in its Service Area, and makes those sub-competitive rates available to all other Blues without the need for negotiation or contracting with healthcare providers outside their home Service Area.

14.     These fixed prices are then enforced through a horizontal agreement between the Blues. Under that horizontal agreement, the Blues collectively enforce the fixed prices; the Host Plans and the Participating Plans recoup any payments the Home Plans or Control Plans make above the fixed prices. Part of the agreement for participation in the National Accounts Program is that each Control Blue will not negotiate directly with providers outside its Service Area except

in a contiguous area. As a result, a healthcare provider who renders services or supplies goods or facilities to a patient who is insured or administered by a Blue in another Service Area receives significantly lower reimbursement rates than that healthcare provider would receive absent the Price Fixing and Boycott Agreement.

15.     The other national programs add to the Blues' market power and/or are anti-competitive. Many Blues have large numbers of subscribers or members outside of their Service Area. Rather than forming competing networks in other Service Areas, the Blues pay the Home Plan a kickback, called an Access Fee, and thereby share the excess profits they achieve through the sub-competitive prices the Blues pay to healthcare providers.

16.     Accordingly, Defendants have fixed the prices for healthcare reimbursement in each Service Area. The Price Fixing and Boycott Agreement is a violation of Section 1 of the Sherman Act under a *per se*, quick look, and/or rule of reason analysis.

17.     To create and maintain both their individual and collective economic power, the Blues have entered into a series of agreements adhering to one basic rule, repeated over and over during a federal trial challenging the proposed merger of Anthem and Cigna. That rule is simple: We will not compete. The Blues will not compete in the establishment of healthcare provider networks, where they could develop meaningful innovation through collaboration with providers to improve our healthcare system and diminish overall costs. The Blues will not compete in the administration of healthcare plans, including regional and national accounts. The Blues will not compete in the sale of health insurance.

18.     The first anti-competitive agreement is that the Blues will not compete with each other with respect to healthcare provider networks. With limited exceptions, the Blues have agreed not to contract with providers in other Blues' Service Areas. Many Blues have large numbers of

members in other Service Areas, but because of the Blues' anti-competitive agreement, they cannot develop innovative, collaborative arrangements with providers in those Service Areas that would improve quality and decrease overall costs of healthcare. Instead, the Blues operate through the Blue Card System, which creates numerous inherent inefficiencies, such as the fact that providers have to become aware of and deal with the coverage and payment rules of all Blues.

19.     The Blues have also created other barriers to innovation, including through their discount payment system. In their effort to increase their "differentials" as compared to other health insurers, the Blues pay healthcare providers like THR less than other insurers. The evidence in the Anthem merger trial demonstrates that the Blues are generally the lowest paying health insurer in each state.

20.     Moreover, innovative collaborative arrangements require coordination involving patients and providers. As Cigna executives testified in the Anthem merger trial, reducing reimbursement rates to healthcare providers like THR makes it more difficult to have collaborative, innovative arrangements. Defendants have organized and coordinated the Blues in such a way as to stifle innovation by creating additional barriers and inefficiencies. Defendants' anti-competitive agreements and conduct in furtherance thereof have and continue to reduce competition in healthcare networks, add to inefficiencies, reduce the quality of healthcare facilities, equipment, technology, and outcomes, and ultimately increase costs in healthcare.

21.     The second anti-competitive agreement is that the Blues will not compete in the administration of employee health benefit plans that are self-insured. Many Blues conduct more business in the administration of employee health benefit plans or administrative services than they do in the underwritten health insurance business. The Blues have agreed that they will not bid for the contract to provide administrative services for employee health benefit plans located or

headquartered outside of their Service Areas unless the Blue controlling that Service Area cedes the right to make the bid to another Blue.

22.     When there is a cede, only the Blue receiving the cede, and no other Blue, may bid for a contract to provide administrative services for the employee health benefit plan. In other words, by way of example, for a self-insured employer located in Chicago, unless BCBS-IL cedes the unilateral Blue right to bid to another Blue, only BCBS-IL can bid to provide administrative services to that employer's health benefit plan, even if the plan has members throughout the country. Elevance, the second largest company in the business, cannot bid. And when the employer located in a non-HCSC state has employees in Illinois, Texas, or another HCSC Service Area, the employer's health benefit plan must pay, for each provider service or goods claim, the Blue Card access and administration fees, in addition to the administrative service fees charged by the Home Plan. Likewise, when an employer located in a non-Elevance state has employees in Georgia, New York City, or another Elevance Service Area, the employer's health benefit plan must pay, for each provider service or goods claim, the Blue Card access and administration fees, in addition to the administrative service fees charged by the Home Plan.

23.     The Blues use this anti-competitive agreement to extract higher administrative service fees from employee health benefit plans. This anti-competitive agreement results in reduced competition, reduced choices for the administration of health benefit plans, increased costs for employers, and less innovation and efficiency. The anti-competitive agreement also results in lower reimbursement rates to healthcare providers, including THR.

24.     The third anti-competitive agreement is that the Blues will not compete in the sale of health insurance, based around state borders. For example, five different Blues sell health insurance immediately across Illinois state borders. Four of them are Elevance—which owns Blue

- 10 -

Cross Blue Shield of Wisconsin, HMO Missouri, Inc., Anthem Blue Cross Blue Shield, and Anthem Health Plans of Kentucky—and is the second largest health insurer in the country. The Blues have agreed that none of those Blues, or any other Blues for that matter, will cross the state line to compete for the sale of health insurance in Illinois. Defendants are able to maintain this anti-competitive agreement because they have the Blue Card Program. This anti-competitive agreement also results in lower reimbursement rates to healthcare providers, including THR.

25.     The fourth anti-competitive agreement is the Blue Card Program agreement, which reinforces the other agreements by allowing the Blues not to compete and provides the *quid pro quo* to the tune of billions of dollars each year that the Blues pay to each other and charge to their customers. In numerous ways, the Blue Card Program is highly inefficient. It places significant administrative burdens and expenses on healthcare providers by each Blue having different sets of coverage and payment rules the providers must learn and comply with, often without access to those rules, because only the Blues plan with which they contract has a contractual obligation to make its coverage and payment rules known to the providers. Because patients are often covered by different Blues plans than those that contract with the providers, the Blues make it highly inefficient, and often impossible, for providers to follow the appropriate rules and also to have value-based payment models or other innovative, efficient arrangements for the delivery and administration of healthcare services.

26.     The fifth anti-competitive agreement is the non-Blue revenue restriction agreement, which the Blues called "Best Efforts Rules" to hide the obvious anti-competitive effects of this agreement. The non-Blue revenue restriction agreement, which existed until 2021, reinforced the Blues' other agreements and prevented the Blues from engaging in meaningful competition. The non-Blue revenue restrictions were adopted by the Blues to prevent Anthem (now Elevance) and

others from competing with other Blues, even outside of the Blue-branded area. Those restrictions prevent any Blue license holder from receiving more than 20% of its revenue from non-Blue business in a Service Area or more than one-third of its revenue company-wide from non-Blue business. The anti-competitive effects of the non-Blue revenue restriction agreement became apparent during the Anthem merger trial in Washington, DC. If Anthem had been successful in carrying out the anti-competitive merger with Cigna, the non-Blue revenue restriction agreement, at the state-wide and company-wide level would have forced Anthem to convert innovative, collaborative Cigna-administered health plans into less innovative and efficient Blue plans. This anti-competitive agreement results in less efficient and more costly health insurance and administrative services, less innovation, and lower reimbursement rates for healthcare providers.

27.     Each of these five agreements separately has anti-competitive effects, and each reinforces the anti-competitive effects of Defendants' other agreements. Defendants entered into each of the agreements for anti-competitive reasons. Each of the agreements has injured consumers and healthcare providers, including THR.

28.     The Blues are the major source of potential competition in health insurance and financing in the United States. Two of the largest five health insurance companies in the country are Blues, as are five of the largest ten. Many Blues have developed substantial non-Blue brands that, in a well-functioning market, could compete with other Blues. Defendants' territorial limitations severely limit their ability to compete—among themselves or with others—outside of their geographic areas, even under their non-Blue brands. But for the unlawful agreements not to compete with one another at issue in this Complaint, these entities could and would use their Blue and non-Blue brands to compete with each other throughout their respective Service Areas, resulting in greater competition and competitive pricing for providers like THR.

29.     One goal of the Blues' actions is to create or maintain monopsony power in the markets for healthcare services, facilities, and goods, and thus the Blues have agreed to monopsonize those markets. In many geographic areas, the Blues have successfully created or maintained monopsony power through their anti-competitive conduct, or have created a dangerous probability of achieving monopsony power. This conduct violates Section 2 of the Sherman Act.

30.     Defendants have repeatedly attempted to deny the existence of the anti-competitive conduct alleged here and the reality that their horizontal agreements are *per se* unlawful. But a federal district court has held otherwise after careful analysis, writing on summary judgment: "Provider and Subscriber Plaintiffs argue that the geographic market allocations constitute *per se* anti-competitive conduct . . . . [And] Plaintiffs have presented evidence of an aggregation of competitive restraints . . . which, considered together, constitute a *per se* violation of the Sherman Act." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018). The court also found that "the Rule 56 evidence in the record supports the proposition that the allocation of areas was the result of" the alleged anti-competitive conduct. *Id.* at 1268. Indeed, the court noted, "an attorney representing [Blue] Anthem's predecessors expressed 'significant doubt whether, under the antitrust laws, an association like BCBSA could lawfully bar members from engaging in unbranded business outside their exclusive territories.' . . . In light of [the governing Sherman Act precedent], that attorney's doubts were well founded." *Id.* at 1269. "[T]here is little question," the court held, "that, properly analyzed, [Defendants' conduct] is an output restriction. . . . Output restrictions have been called one of the 'most important per se categories.'" *Id.* at 1272. "The undisputed evidence before the court establishes that, in 2005, Defendants adopted . . . an output restriction on a Plan's non-Blue business" through the non-Blue revenue restriction agreement. *Id.* at 1273. This "constitutes a *per se* violation of the Sherman Act, particularly when

- 13 -

layered on top of other restrictions Defendants have placed on competition." *Id.*

31. Defendants' actions have significantly injured THR and other healthcare providers. It is textbook economics that, when there is more competition among insurers to create provider networks, including competition among the Blues, providers will be paid more. Defendants' agreements have also harmed competition by decreasing the options available to health insurance consumers. Fewer health insurance companies are competing in each Service Area for the business of self-insured employers and individuals purchasing health insurance. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices that the Blues pay. Their output has been diminished. In many markets, the healthcare professionals are employees of hospitals, which lose money employing the healthcare professionals and only continue the employment relationship because the alternative would be to close the hospital or reduce services. In addition, as a result of Defendants' conduct, the lower-than-competitive services, goods and facilities prices are resulting in many hospitals and other healthcare providers closing, reducing services, or having diminished capacity to maintain and improve their equipment, technology, and facilities and to provide the same level of healthcare to their patients that they would have absent Defendants' unlawful conduct.

32. The only beneficiaries of Defendants' antitrust violations are Defendants themselves, whose revenues and profits have skyrocketed for decades off the backs of struggling hospitals and other healthcare service providers. Absent injunctive relief, Defendants' antitrust violations will continue unabated to the detriment of competition and to the harm of healthcare providers like THR.

## II. JURISDICTION AND VENUE

33. Plaintiff's federal antitrust claims are instituted under Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

34.     Several allegations in this Complaint support this Court's personal jurisdiction over Defendants. First, one or more Defendants, including BCBS-IL, BCBSA, and HCSC, reside in this District, are licensed to do business in this District, or do business and/or transact affairs and carry out interstate trade and commerce, in substantial part, in this District, and/or has an agent and/or can be found in this District. Second, all Defendants have entered into relevant contracts either with healthcare providers, healthcare customers, or healthcare federations in this District. Third, all Defendants have significant business in and contacts with Illinois through the national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program, both in terms of Defendants' subscribers who receive healthcare goods, services and facilities in Illinois, and in terms of subscribers from BCBS-IL, who receive treatment in their Service Areas with all Defendants dividing revenue resulting from those goods, services, and facilities. Fourth, all Defendants have significant business in and contacts with Illinois through their ownership, control, funding, and operation of BCBSA, a company organized under the laws of and having its principal place of business within Illinois, which served as the primary means by which Defendants orchestrated and executed their anti-competitive agreements. Fifth, a substantial portion of the anti-competitive conduct described below, including the licensing contracting and meetings and other overt acts in furtherance of the unlawful agreements, occurred within Illinois and/or was effectuated through contracts with an Illinois-based party and that contained Illinois choice-of-law or venue provisions.

35.     Therefore, this Court has personal jurisdiction over each Defendant under Section

12 of the Clayton Act, 15 U.S.C. § 22, and under Illinois's long-arm statute, 735 Ill. Comp. Stat. 5/2-209(a). Defendants each have minimum contacts with the State of Illinois, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

36.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, because Defendants transact business in this District, and 28 U.S.C. § 1391, because one or more of Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District; and because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

### III.     INTERSTATE COMMERCE

37.     The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

38.     The national programs and rules described herein, including but not limited to the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program, are involved in interstate commerce and transactions for healthcare services.

### IV.     THE PARTIES

#### A.     Plaintiff

39.     Plaintiff Texas Health Resources ("THR") is a Texas non-profit corporation with its principal place of business in Arlington, Texas. THR is one of the largest faith-based non-profit hospital systems in the United States and the largest hospital system in North Texas. THR operates 29 hospitals in North Texas with 4,390 licensed hospital beds, in addition to 400 points of access, such as outpatient facilities, freestanding emergency rooms, surgical centers, and physician groups. THR employs over 450 primary care providers in 130 locations and over 380 specialists in 80 locations. In total, THR has 29,000 employees. THR also operates 29 urgent care centers and 35 surgery centers.

40.     During the relevant time period, THR has provided medically necessary, covered services to patients insured by the Blues or included in employee benefit plans administered by the Blues pursuant to in-network contracts, and billed the Blues for the same. THR was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. THR has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan subscribers through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anti-competitive conduct. As set forth herein, THR has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

41.     THR was and is a provider of healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed, to patients who are insured by a Blue or who are included in an employee benefit plan administered by a Blue. THR is entitled to payment for services, equipment, supplies, or for use of its facilities, either pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from patients who are covered by a plan that is insured or administered by a Blue. THR's services include, but are not limited to, services of physicians who first became licensed after January 31, 2009, Advanced Practice Providers, and/or other non-physician providers.

42.     THR has been paid less than it would have been paid absent Defendants' violation of the antitrust laws. But for Defendants' agreements not to compete, out-of-network providers (those not contracted with a plan) would have been offered the ability to contract with out-of-Service-Area Blues at more competitive rates for providing services, goods, and facilities for subscribers and members living, working, or traveling outside their Home Plan's Service Area. Accordingly, THR has standing and has sustained antitrust injury.

43.    The Agreements between various Defendants and THR may contain what Defendants will likely argue are binding arbitration provisions. If so, THR does not believe that these arbitration provisions can or would govern the claims brought in this lawsuit. Nevertheless, for purposes of this Complaint, if THR has arbitration provisions covering the claims at issue in this litigation, it expressly only brings suit against those Defendants who are not parties to the arbitration provisions in their Agreements.

## B.    Defendants

44.    Defendant BCBS-IL is a division of Defendant HCSC with its principal place of business located at 300 East Randolph Street, Chicago, Illinois 60601. It is the parent of a number of subsidiaries that provide healthcare financing to approximately 9 million subscribers in various healthcare plans in Illinois. Blue Cross and Blue Shield of Illinois, its subsidiaries and affiliated companies are collectively referred to as "BCBS-IL" in this Complaint. Defendant Elevance Health, Inc. (formerly Anthem, Inc.) is an Indiana corporation with its corporate headquarters located at 220 Virginia Avenue, Indianapolis, Indiana 46204. Elevance, Inc., together with its subsidiaries and its healthcare insurance companies, are collectively referred to as "Elevance" in this Complaint. Elevance, the successor to Anthem and currently largest licensee within the BCBSA, is a publicly-traded, for-profit company. Elevance is the second-largest health benefits company in the nation with more than 45 million subscribers in its affiliated health plans. According to its website, one in nine Americans is an Elevance member. Elevance, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. In the majority of these states, Elevance does business as Anthem Blue Cross or Anthem Blue Cross and Blue Shield. Elevance is licensed to conduct insurance operations in all fifty states.

45.     Defendant Anthem Blue Cross Life and Health Insurance Company is a California company with its headquarters located at 21215 Burbank Blvd, Woodland Hills, California 91367. It is a subsidiary of Defendant Elevance Health, Inc. Anthem Blue Cross Life and Health Insurance Company, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in California.

46.     Defendant Anthem, Inc. (formerly Wellpoint, Inc.) is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. Anthem, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its healthcare insurance companies, are collectively referred to as "Anthem" in this Complaint. Anthem, the predecessor to Elevance and formerly largest licensee within the BCBSA, is a publicly-traded, for-profit company. According to its website, one in nine Americans is an Anthem/Elevance member, and Anthem/Elevance contracts with 92% of the physicians and 96% of hospitals nationwide through the Blue Card Program. Anthem/Elevance, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

47.     Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099. With more than 22 million subscribers, Health Care Service Corporation is the largest customer-owned health insurer in the United States. Health Care Service Corporation does business as BCBS-IL, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue

Shield of Montana. In each of its five Blue Service Areas, Health Care Service Corporation exercises market dominance. Health Care Service Corporation, its subsidiaries and healthcare plans are collectively referred to as "HCSC" in this Complaint.

48.     Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 200 SW Market Street, Portland, OR 97201. Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011. Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or Intermountain Region, serving more than 2 million subscribers through its subsidiaries and affiliated health plans. Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueCross BlueShield of Oregon, Regence BlueShield, Regence BlueCross BlueShield of Utah, and Regence BlueShield of Idaho, exercises market dominance as a Blue in its states of operation or within areas of those states. Cambia Health Solutions, Inc., its subsidiaries, and affiliated companies are collectively referred to as "Cambia" in this Complaint.

49.     Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters located at 1501 South Clinton Street, Baltimore, MD 21224. With approximately 3.2 million subscribers, CareFirst, Inc., through its subsidiaries Defendants CareFirst of Maryland, Inc., Group Hospitalization and Medical Services, Inc., and CareFirst BlueChoice, Inc. is the largest not-for-profit healthcare insurer in the Mid-Atlantic Region. Through its subsidiaries and affiliated companies, CareFirst, Inc. exercises market dominance as a Blue in Maryland, the District of Columbia, and Virginia, or within areas of those states. CareFirst, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst" in this Complaint.

50.     Defendant Premera is a Washington nonprofit corporation with its headquarters located in Washington. It is the sole voting member of Defendant Premera Blue Cross, which is

- 20 -

registered as a health care service contractor in Washington, with its corporate headquarters located at 7001 220th SW, Building 1, Mountlake Terrace, WA 98043. Premera Blue Cross is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 2 million subscribers in Washington. Premera and Premera Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

51.     Defendant Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska with its principal place of business located at 3800 Centerpoint Drive, Suite 940, Anchorage, AK 99503. Premera Blue Cross Blue Shield of Alaska, its subsidiaries and affiliated companies are collectively referred to as "BCBS-AK" in this Complaint.

52.     Defendant Blue Cross and Blue Shield of Alabama is the health insurance company operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare insurance and administrative services for health plans in Alabama, providing coverage to more than three million people. The principal headquarters for Blue Cross and Blue Shield of Alabama is located at 450 Riverchase Parkway East, Birmingham, Alabama 35244. Blue Cross and Blue Shield of Alabama is referred to as "BCBS-AL" in this Complaint.

53.     Defendants Prosano, Inc. and Blue Cross and Blue Shield of Arizona, Inc. are Arizona corporations with their corporate headquarters located at 2444 W. Las Palmaritas Dr., Phoenix, AZ 85021. Blue Cross and Blue Shield of Arizona is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 2 million subscribers in various healthcare plans in Arizona. Prosano, Inc. and Blue Cross and Blue Shield of Arizona, Inc., and their subsidiaries and affiliated companies are collectively referred to as "BCBS-AZ" in this

Complaint.

54.     Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and as BlueAdvantage Administrators of Arkansas is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas 72201. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 860,000 subscribers in various healthcare plans in Arkansas, or approximately one-third of Arkansans, making it the largest health insurer in the state. Arkansas Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "BCBS-AR" in this Complaint.

55.     Defendant Blue Cross of California d/b/a Anthem Blue Cross is a California corporation with its corporate headquarters located at 21555 Oxnard Street, Woodland Hills, CA 91367. It is a subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant Anthem. Blue Cross of California is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 9.3 million subscribers in various healthcare plans in California, more than any other carrier in the state. Blue Cross of California, its subsidiaries and affiliated companies are collectively referred to as "BC-CA" in this Complaint.

56.     Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco, CA 94105-1808. It is the parent corporation of a number of subsidiaries that provide healthcare financing to over 4 million subscribers in various healthcare plans in California. California Physicians' Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "BS-CA" in this Complaint.

57.     Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield is a subsidiary of Defendant Anthem and is a Colorado corporation with its

corporate headquarters located at 700 Broadway, Suite 600, Denver, CO 80203. It is the parent corporation of a number of subsidiaries that provide healthcare financing to subscribers through various healthcare plans in Colorado, collectively referred to as "BCBS-CO" in this Complaint.

58.     Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield is a subsidiary of Defendant Anthem. It is a Connecticut corporation with its corporate headquarters located at 108 Leigus Road, Wallingford, Connecticut 06492 and is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 1.5 million subscribers in various healthcare plans in Connecticut. Anthem Blue Cross and Blue Shield , its subsidiaries and affiliated companies are collectively referred to as "BCBS-CT."

59.     Defendant Highmark, Inc. f/k/a Highmark Health Services is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222. Highmark, Inc. is the parent corporation of a number of subsidiaries that provide healthcare financing to 5.2 million subscribers in New York, Pennsylvania, West Virginia and Delaware. In 2021, Highmark acquired HealthNow, which operated as BlueCross BlueShield of Western New York and as BlueShield of Northeastern New York until it changed its name to Highmark Western and Northeastern New York Inc. Highmark, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Highmark" in this Complaint.

60.     Defendant Highmark BCBSD, Inc. is a subsidiary of Highmark, Inc. It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801. Highmark Blue Cross and Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware. It became affiliated with Highmark, Inc. on December 30, 2011, and changed its name to Highmark Blue Cross and Blue Shield Delaware in July 2012. Highmark Blue Cross and Blue Shield Delaware provides healthcare financing to

approximately 460,000 subscribers in various healthcare plans in Delaware. According to 2007 HealthLeaders-Interstudy figures, the Blue held a 56% market share in the state of Delaware. Highmark Blue Cross and Blue Shield Delaware, its subsidiaries and affiliated companies are collectively referred to as "BCBS-DE" in this Complaint.

61.    Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") shares the business name CareFirst BlueCross BlueShield with fellow Defendant CareFirst of Maryland, Inc. and provides healthcare financing in the District of Columbia, Maryland and areas of Virginia. It is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc. Its principal place of business is located at 840 First Street, N.E., Washington, DC 20065. Group Hospitalization and Medical Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "GHMSI" in this Complaint.

62.    Defendants GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, Inc. (Florida Blue) are Florida corporations with their corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 7.7 million subscribers in various healthcare plans in Florida. GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, and their subsidiaries and affiliated companies, are collectively referred to as "BCBS-FL" in this Complaint.

63.    Defendant Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. d/b/a Anthem Blue Cross and Blue Shield, a health maintenance organization, is a subsidiary of Defendant Anthem and is a Georgia corporation with corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326. Anthem Blue Cross and Blue Shield, by and through its subsidiaries, controls the majority of the state's healthcare financing market. Anthem Blue Cross and Blue

Shield is the parent corporation of a number of subsidiaries that provide healthcare financing to 3.2 million subscribers in various healthcare plans in Georgia. Anthem Blue Cross and Blue Shield, its affiliates, including Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., subsidiaries and healthcare plans are collectively referred to as "BCBS-GA" in this Complaint.

64. Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, Hawaii 96814. It is the parent corporation of a number of subsidiaries that provide healthcare financing to 722,000 subscribers in various healthcare plans in Hawaii. Hawaii Medical Service Association, its subsidiaries and affiliated companies are collectively referred to as "BCBS-HI" in this Complaint.

65. Defendant Gemstone Holdings, Inc. is an Idaho nonprofit mutual holding company with its headquarters located in Idaho. It is the parent company of Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho. Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, Idaho 83642. It is the parent corporation of a number of subsidiaries that provide healthcare financing to 600,000 subscribers in various healthcare plans in Idaho. Gemstone Holdings, Inc., Blue Cross of Idaho Health Service, Inc., and its subsidiaries and affiliated companies are collectively referred to as "BC-ID" in this Complaint.

66. Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health and is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue, Lewiston, Idaho 83501. Regence BlueShield of Idaho is the parent corporation of a number of subsidiaries that provide healthcare financing to more than 150,000 subscribers in various healthcare plans in Idaho. Regence BlueShield of Idaho, Inc., its subsidiaries and affiliated companies are collectively

referred to as "BS-ID" in this Complaint.

67.     Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield is a subsidiary of Defendant Anthem. It is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. It is the parent corporation of a number of subsidiaries that provide healthcare financing to subscribers in various healthcare plans in Indiana. Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "BCBS-IN" in this Complaint. Under BCBSA's rules, BCBS-IN can and does contract with healthcare providers in Illinois counties adjacent to Indiana.

68.     Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309. It is the parent of a number of subsidiaries that provide healthcare financing to 1.8 million subscribers in Iowa. Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and affiliated companies in Iowa are collectively referred to as "BCBS-IA" in this Complaint. Under BCBSA's rules, BCBS-IA can and does contract with healthcare providers in Illinois counties adjacent to Iowa.

69.     Defendant Blue Cross and Blue Shield of Kansas is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629. Blue Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries, including Premier Health, Inc., that provide healthcare financing to approximately 950,000 subscribers in various healthcare plans in Kansas. Blue Cross and Blue Shield of Kansas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

70.     Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield

is a subsidiary of Defendant Anthem and is a Kentucky corporation with its corporate headquarters located at 13550 Triton Boulevard, Louisville, KY 40223. It provides healthcare financing in Kentucky. Anthem Health Plans of Kentucky, Inc., its subsidiaries and affiliated companies are collectively referred to as "BCBS-KY" in this Complaint. Under BCBSA's rules, BCBS-KY can and does contract with healthcare providers in Illinois counties adjacent to Kentucky.

71. Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809. It is the parent corporation of a number of subsidiaries that provide healthcare financing to more than 1.9 million subscribers in various healthcare plans in Louisiana. Louisiana Health Service & Indemnity Company, its subsidiaries and affiliated companies are collectively referred to as "BCBS-LA" in this Complaint.

72. Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield is a subsidiary of Defendant Anthem. It is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016. It is the parent corporation of a number of subsidiaries that provide healthcare financing to subscribers in various healthcare plans in Maine. Anthem Health Plans of Maine, its subsidiaries and affiliated companies are collectively referred to as "BCBS-ME" in this Complaint.

73. Defendant CareFirst of Maryland, Inc. is a subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters located at 1501 S. Clinton St., Baltimore, MD 21224. CareFirst of Maryland, Inc. is the parent corporation of a number of subsidiaries that provide healthcare financing to subscribers in various healthcare plans in Maryland. CareFirst of Maryland, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst of Maryland" in this Complaint.

74.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts corporation with its corporate headquarters located at 101 Huntington Ave., Suite 1300, Boston, MA 02199. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 3 million subscribers in various healthcare plans in Massachusetts. Blue Cross and Blue Shield of Massachusetts, its subsidiaries and affiliated companies are collectively referred to as "BCBS-MA" in this Complaint.

75.     Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 4.5 million subscribers in various healthcare plans in Michigan. Blue Cross Blue Shield of Michigan Mutual Insurance Company, its subsidiaries and affiliated companies are collectively referred to as "BCBS-MI" in this Complaint.

76.     Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul, Minnesota 55164. Blue Cross and Blue Shield of Minnesota is a wholly owned subsidiary of BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota) is the parent corporation of a number of subsidiaries that provide healthcare financing to 2.6 million subscribers in various healthcare plans in Minnesota. BCBSM Inc. and Blue Cross and Blue Shield of Minnesota, and their subsidiaries and affiliated companies are collectively referred to as "BCBS-MN" in this Complaint.

77.     Defendant Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company, is a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 1 million subscribers in various healthcare plans in

Mississippi. Blue Cross & Blue Shield of Mississippi, its subsidiaries and affiliated companies are collectively referred to as "BCBS-MS" in this Complaint.

78.    Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield is a subsidiary of Anthem. It is a Missouri corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 2.8 million subscribers in various healthcare plans in Missouri, including Defendants Healthy Alliance Life Insurance Company and RightCHOICE Managed Care, Inc. Defendant Anthem Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "BCBS-MO" in this Complaint. Under BCBSA's rules, BCBS-MO can and does contract with healthcare providers in Illinois counties adjacent to Missouri.

79.    Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri corporation with its corporate headquarters located at One Pershing Square, 2301 Main Street, Kansas City, Missouri 64108. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 900,000 subscribers in various healthcare plans in Kansas City and its suburbs in Kansas and Missouri. Blue Cross and Blue Shield of Kansas City, its subsidiaries and affiliated companies are collectively referred to as "BCBS-Kansas City" in this Complaint.

80.    Defendant Blue Cross and Blue Shield of Montana is a division of Defendant HCSC with its principal place of business at 3645 Alice Street, Helena, Montana 59604-4309. It is the parent of a number of subsidiaries that provide healthcare financing to approximately 240,000 subscribers in various healthcare plans in Montana. Blue Cross and Blue Shield of Montana, its subsidiaries and affiliated companies are collectively referred to as "BCBS-MT" in this Complaint.

For purposes of this Complaint, references to Blue Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue Cross and Blue Shield of Montana, Inc.

81.     Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc. is a Montana corporation with its corporate headquarters located at 3645 Alice Street, Helena, Montana 59604-4309. When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the corporation now known as Caring for Montanans, Inc.

82.     Defendants Goodlife Partners, Inc. and Blue Cross and Blue Shield of Nebraska are Nebraska corporations with their corporate headquarters located at 1919 Aksarben Drive, Omaha, Nebraska 68180. It is the parent corporation of a number of subsidiaries that provide healthcare financing to over 700,000 subscribers in various healthcare plans in Nebraska. Goodlife Partners, Inc. and Blue Cross and Blue Shield of Nebraska, and their subsidiaries and affiliated companies are collectively referred to as "BCBS-NE" in this Complaint.

83.     Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Nevada has a principal place of business in Nevada located at 9133 West Russell Rd., Suite 200, Las Vegas, NV 89148. Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant Anthem that offer healthcare financing in Nevada. Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries and affiliated companies, which provide healthcare financing to more than 700,000 subscribers, are collectively referred to as "BCBS-NV."

84.     Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross

and Blue Shield is a subsidiary of Defendant Anthem. It is a New Hampshire corporation with its corporate headquarters located at 1155 Elm Street, Suite 200, Manchester, NH 03101. Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of subsidiaries that provide healthcare financing to over 600,000 subscribers in various healthcare plans in New Hampshire. Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "BCBS-NH" in this Complaint.

85.     Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105. It is the parent corporation of a number of subsidiaries that provide healthcare financing to 3.3 million subscribers in various healthcare plans in New Jersey. Horizon Healthcare Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "BCBS-NJ" in this Complaint.

86.     Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113. Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide healthcare financing to 680,000 subscribers in various healthcare plans in New Mexico. Blue Cross and Blue Shield of New Mexico, its subsidiaries and affiliated companies are collectively referred to as "BCBS-NM" in this Complaint.

87.     Defendant Highmark Western and Northeastern New York Inc. f/k/a HealthNow New York, Inc. is a New York corporation with its corporate headquarters located at 257 West Genesee Street, Buffalo, NY 14202. Highmark Western and Northeastern New York Inc. does business as Blue Cross Blue Shield of Western New York, Inc. and Blue Shield of Northeastern

New York. Highmark Western and Northeastern New York Inc. is the parent corporation of a number of subsidiaries that provide healthcare financing to subscribers in various healthcare plans in New York. Highmark Western and Northeastern New York Inc., its subsidiaries and affiliated companies are collectively referred to as "HealthNow" in this Complaint.

88.     Defendant Anthem HealthChoice Assurance, Inc. f/k/a Empire HealthChoice Assurance, Inc. or Empire BlueCross BlueShield is a subsidiary of Defendant Anthem. It is a New York corporation with its corporate headquarters located at One Liberty Plaza, New York, NY 10006. Anthem HealthChoice Assurance, Inc. is the parent corporation of a number of subsidiaries that provide healthcare financing to nearly 6 million subscribers in various healthcare plans in New York. Anthem HealthChoice Assurance, Inc., its subsidiaries and affiliated companies are collectively referred to as "Empire" in this Complaint.

89.     Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate headquarters located at 165 Court Street, Rochester, New York 14647. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 1.5 million subscribers in various healthcare plans in the state of New York. Excellus Health Plan, Inc., its subsidiaries and affiliated companies are collectively referred to as "Excellus" in this Complaint.

90.     Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North Carolina corporation with its corporate headquarters located at 4615 University Drive, Durham, North Carolina 27707. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 4.3 million subscribers in various healthcare plans in North Carolina. Blue Cross and Blue Shield of North Carolina, Inc., its subsidiaries and affiliated companies are collectively referred to as "BCBS-NC" in this Complaint.

91.     Defendant HealthyDakota Mutual Holdings is a North Dakota company with its headquarters in North Dakota. It is the parent of Defendant Blue Cross Blue Shield of North Dakota f/k/a Noridian Mutual Insurance Company, a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue South, Fargo, ND 58121. Blue Cross Blue Shield of North Dakota is the parent company of a number of subsidiaries that provide healthcare financing to nearly 500,000 subscribers in the midwestern and western United States. Blue Cross Blue Shield of North Dakota is the parent of a number of subsidiaries that provide healthcare financing to approximately 390,000 subscribers in various healthcare plans in North Dakota. HealthyDakota Mutual Holdings and Blue Cross Blue Shield of North Dakota, and its subsidiaries and affiliated companies are collectively referred to as "BCBS-ND" in this Complaint.

92.     Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield is a subsidiary of Defendant Anthem. It is an Ohio corporation with its headquarters located at 4361 Irwin Simpson Rd, Mason, OH 45040. Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield is the parent corporation of a number of subsidiaries that provide healthcare financing to more than 3 million subscribers in various healthcare plans in Ohio. Community Insurance Co., its subsidiaries and affiliated companies are collectively referred to as "BCBS-OH."

93.     Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant HCSC with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119. Blue Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide healthcare financing to more than 835,000 subscribers in various healthcare plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and affiliated companies are collectively referred to as "BCBS-OK" in this Complaint.

94.     Defendant Regence BlueCross BlueShield of Oregon is a subsidiary of Defendant Cambia. It is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201. Regence BlueCross BlueShield of Oregon is the parent corporation of a number of subsidiaries that provide healthcare financing to more than 750,000 subscribers in various healthcare plans in Oregon. Regence BlueCross BlueShield of Oregon, its subsidiaries and affiliated companies are collectively referred to as "BCBS-OR" in this Complaint.

95.     Defendant Capital BlueCross is a Pennsylvania corporation with its corporate headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 1.3 million subscribers in various healthcare plans in Pennsylvania. Capital BlueCross, its subsidiaries and affiliated companies are collectively referred to as "Capital BlueCross" in this Complaint.

96.     Defendant Highmark Health is a subsidiary of Defendant Highmark and is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, Pennsylvania 17011. Highmark Health is the parent of a number of subsidiaries that provide healthcare financing to approximately 4.2 million subscribers in various healthcare plans in Pennsylvania. Highmark Health, its subsidiaries, and affiliated companies are collectively referred to as "Highmark Health" in this Complaint.

97.     Defendant Independence Health Group, Inc. is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103.  It is the parent corporation of a number of subsidiaries that provide healthcare financing to 2.5 million subscribers in Pennsylvania and 8 million nationwide. Independence Health Group, Inc., its subsidiaries and affiliated companies, including Defendants Independence Hospital Indemnity

- 34 -

Plan, Inc., its subsidiary or division, Independence Blue Cross, LLC, and QCC Insurance Company, which are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

98.     Defendant Triple-S Salud, Inc. is a subsidiary of Defendant Triple-S Management Company (collectively referred to as "Triple-S of Puerto Rico" in this Complaint). Triple-S of Puerto Rico is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. It is the parent corporation of a number of subsidiaries that provide healthcare financing to 1.6 million subscribers in Puerto Rico.

99.     Defendant Blue Cross & Blue Shield of Rhode Island is a Rhode Island corporation with its corporate headquarters located at 500 Exchange Street, Providence, Rhode Island 02903. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 600,000 subscribers in various healthcare plans in Rhode Island. Blue Cross & Blue Shield of Rhode Island, its subsidiaries and affiliated companies are collectively referred to as "BCBS-RI" in this Complaint.

100.    Defendant BlueCross BlueShield of South Carolina, Inc. is a South Carolina corporation with its corporate headquarters located at I-20 East at Alpine Rd., Columbia, SC 29219. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately one million subscribers in various healthcare plans in South Carolina. BlueCross BlueShield of South Carolina, its subsidiaries and affiliated companies are collectively referred to as "BCBS-SC" in this Complaint.

101.    Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601 W. Madison, Sioux Falls, South Dakota 57104. Wellmark of South Dakota, Inc. is a

subsidiary of Defendant Wellmark, Inc. Wellmark of South Dakota, Inc. is the parent corporation of a number of subsidiaries that provide healthcare financing to 325,000 subscribers in South Dakota. Wellmark of South Dakota, its subsidiaries and affiliated companies are collectively referred to as "BCBS-SD" in this Complaint.

102. Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee corporation with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is the parent corporation of a number of subsidiaries that provide healthcare financing to nearly 3 million subscribers in various healthcare plans in Tennessee. BlueCross BlueShield of Tennessee, Inc., its subsidiaries and affiliated companies are collectively referred to as "BCBS-TN" in this Complaint.

103. Defendant Blue Cross and Blue Shield of Texas is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, Texas 75082. Blue Cross and Blue Shield of Texas is the parent of a number of subsidiaries that provide healthcare financing to nearly 8 million subscribers in various healthcare plans in Texas. Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "BCBS-TX" in this Complaint.

104. Regence BlueCross BlueShield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121. Regence BlueCross BlueShield of Utah is the parent corporation of a number of subsidiaries that provide healthcare financing to more than 700,000 subscribers in various healthcare plans in Utah. Regence BlueCross BlueShield of Utah, its subsidiaries and affiliated companies are collectively referred to as "BCBS-UT" in this Complaint.

105. Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with

its corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602. Blue Cross and Blue Shield of Vermont was acquired by BCBS-MI in 2023. It is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 200,000 subscribers in various healthcare plans within the state of Vermont. Blue Cross and Blue Shield of Vermont, its subsidiaries and affiliated companies are collectively referred to as "BCBS-VT" in this Complaint.

106.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield is a subsidiary of Defendant Anthem. It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, Virginia 23230. Anthem Blue Cross and Blue Shield, is the parent corporation of a number of subsidiaries that provide healthcare financing to approximately 3.4 million subscribers in various healthcare plans in Virginia. Anthem Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "BCBS-VA" in this Complaint.

107.    Defendant Regence BlueShield in Washington is a subsidiary of Defendant Cambia Health and is a Washington corporation with its corporate headquarters located at 1800 9th Avenue, Seattle, WA 98101. Regence BlueShield in Washington is the parent corporation of a number of subsidiaries that provide healthcare financing to 770,000 subscribers in various healthcare plans in Washington. Regence BlueShield in Washington, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield (WA)" in this Complaint.

108.    Defendant Highmark West Virginia, Inc. is a subsidiary of Defendant Highmark and is a West Virginia corporation with its corporate headquarters located at 614 Market Square, Parkersburg, West Virginia 26101. Highmark West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is the parent corporation of a number of subsidiaries that provide healthcare financing to nearly 493,000 subscribers in various healthcare plans in West Virginia

and one county in Ohio. Highmark West Virginia, its subsidiaries and affiliated companies are collectively referred to as "BCBS-WV" in this Complaint. BCBS-WV exercises market dominance in the states of West Virginia and Ohio or within areas of those states.

109.     Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield is a subsidiary of Defendant Anthem and is a Wisconsin corporation with its corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203. Blue Cross Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including Defendant Compcare Health Services Insurance Corporation, that provide healthcare financing to approximately 1.3 million subscribers in various healthcare plans in Wisconsin. Blue Cross Blue Shield of Wisconsin, its subsidiaries and affiliated companies are collectively referred to as "BCBS-WI" in this Complaint. Under BCBSA's rules, BCBS-WI can and does contract with healthcare providers in Illinois counties adjacent to Wisconsin.

110.     Defendant Blue Cross and Blue Shield of Wyoming is a Wyoming corporation with its company headquarters located at 4000 House Avenue, Cheyenne, WY 82001. It is the parent corporation of a number of subsidiaries that provide healthcare financing to over 100,000 subscribers in various healthcare plans in Wyoming. Blue Cross and Blue Shield of Wyoming, its subsidiaries and affiliated companies are collectively referred to as "BCBS-WY" in this Complaint.

111.     Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 200 E. Randolph Street, Chicago, Illinois 60601. It is owned and controlled by 34[1] Blues that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA

---

[1] An October 2024 settlement agreement in which Defendants have settled antitrust claims brought by a putative class of healthcare providers reflects 32 current Blues. BCBSA's website continues

was created by the Blues and operates as the licensor. Health insurance companies operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for nearly 105 million—or one in three—Americans. BCBSA itself does not provide healthcare financing and does not contract with healthcare providers, but it operates to create consistency and cooperation among its 34 members. It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members. The 34 Blues fund Defendant BCBSA.

## V.    FACTUAL ALLEGATIONS

### A.    Overview of the Industry

112.    Defendants are independent health insurance companies that operate and offer healthcare coverage in all 50 states, the District of Columbia and Puerto Rico, and provide healthcare insurance coverage to approximately 115 million Americans. Defendants also operate the most extensive provider network in the United States. According to multiple Defendants, more than 96% of hospitals and 92% of professional providers contract with one of the Blues nationwide—"more than any other insurer."

113.    The Blues include many of the largest potentially competitive health insurance companies in the United States. Indeed, Elevance is the second largest health insurance company in the country by total medical enrollment, with approximately 46 million subscribers. HCSC is the largest mutual health insurance company in the country and the fifth largest health insurance company overall, with approximately 22 million subscribers. Similarly, 5 of the 10 largest health insurance companies in the country are Blues. Absent the restrictions that the independent Blue

---

to list 33 Blues, and a supplement to its most recent Form 990 indicates that it has "THIRTY-FOUR (34) INDEPENDENT HEALTH CARE PLAN LICENSEES." Regardless, Plaintiff intends to and has sought to identify all relevant Blue entities offering commercial health insurance plans as Defendants in this Complaint.

Cross and Blue Shield licensees have imposed on themselves as discussed below, these companies would compete against each other in the markets for healthcare financing and health services.

114.    Elevance is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, portions of Virginia, California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (in the New York City metropolitan area and upstate New York), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, Wellpoint. Elevance also operates in a number of additional states through its Medicaid subsidiary, Wellpoint. But for the illegal territorial restrictions summarized above, Elevance would be likely to offer its healthcare financing throughout the United States in competition with the other Blues. Elevance admitted its desire to compete nationwide in its trial brief supporting its predecessor Anthem's attempt to merge with Cigna: "a prime reason for the proposed merger is to provide Anthem with Cigna's nationwide network so that Anthem may for the first time become a true nationwide competitor." Anthem Br. at 10. Elevance also stated that its membership in BCBSA "will not diminish Anthem's incentives to compete through the Cigna brand in the 36 states where Anthem does not hold a Blue license. Anthem will have powerful incentives to win business through Cigna in those states because the margins on such business far exceed any BlueCard fees to be earned if another Blue happens to win the business." *Id.* at 12.

115.    HCSC, which operates BCBS-IL, BCBS-NM, BCBS-OK, BCBS-TX, and BCBS-MT, is the largest mutual health insurance company in the country and the fifth largest health insurance company overall. But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its healthcare financing throughout the United States in competition with the other Blues.

116.    BCBS-FL is the seventh largest health insurer in the country by total medical enrollment, with approximately 7.7 million subscribers in its Service Area of Florida. But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payments to providers in those areas.

117.    BCBS-MI is the eighth largest health insurer in the country by total medical enrollment, with approximately 4.5 million subscribers in its Service Area of Michigan. BCBS-MI already operates in other states on a limited basis through its Medicare subsidiary. But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payments to providers in those areas.

118.    BS-CA is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.8 million subscribers in California. BS-CA already operates in other states on a limited basis through its Medicare subsidiary. But for the illegal territorial restrictions summarized above, BS-CA would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payments to providers in those areas.

119.    Highmark is one of the largest health insurers in the country by total medical enrollment, with approximately 7 million subscribers. Its affiliated Blues include Highmark BCBS in Western Pennsylvania, Highmark BS throughout the entire state of Pennsylvania, BCBS-WV, BCBS-DE, and Blue Cross of Northeastern Pennsylvania. But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions. Such competition would

result in higher payments to providers in those areas.

120.    BCBS-AL is one of the largest health insurers in the country by total medical enrollment, by some measures, with approximately 2.8 million subscribers. But for the illegal territorial restrictions summarized above, BCBS-AL would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payments to providers in those areas.

121.    CareFirst, which operates the Blues in Maryland, the District of Columbia, and parts of Virginia, is one of the largest health insurers in the U.S. and the largest not-for-profit healthcare insurer in the Mid-Atlantic region, with approximately 3.5 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payments to providers in those areas.

122.    BCBS-MA is one of the largest health insurers in the country by total medical enrollment, with approximately 3 million subscribers in Massachusetts. But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its healthcare financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payments to providers in those areas.

123.    The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another.

124.    BCBSA is a separate legal entity that purports to promote the common interests of the Blues. BCBSA describes itself as "a national federation of 34 independent, community-based and locally operated Blue Cross and Blue Shield companies." BCBSA refers to the 34 Blue Cross

and Blue Shield companies as Member Plans.

125.    BCBSA serves as the epicenter for Defendants' communications and arrangements in furtherance of their agreements not to compete. As BCBSA's then-general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 34] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One Defendant has admitted in a Form 10-K that "[e]ach of the [34] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

126.    Every Blue is a member of BCBSA, every Blue CEO is on the Board of Directors of BCBSA, and every Blue participates in numerous BCBSA Committees.

127.    The Blues govern BCBSA. BCBSA and its Board of Directors are entirely controlled by its members, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

128.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

129.    In a pleading it filed during the *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n* litigation in the Northern District of Illinois, Civil Action No. 09-cv-5619, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current Chairman of the Board of Directors, Brian D. Pieninck, is also the President and CEO of CareFirst. The Board of Directors

of BCBSA meets at least annually.

130. BCBSA meetings provide a forum for representatives of Defendants to share information on management of Defendants and specific health insurance issues common to Defendants, and this information is disseminated to all 34 members, including reimbursement rates for providers. The BCBSA includes numerous committees governed by Defendants and sponsors various meetings, seminars, and conferences Defendants attend. All of these activities are in furtherance of Defendants' unlawful agreements.

131. The Blues also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine Member Plan CEOs and three independent members. This Committee has the power to enforce the requirements of the license agreements.

132. The Blues control the entry of new members into BCBSA. In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue marks will not fall into the hands of a stranger the Association has not approved." *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross Blue Shield Assoc.*, Br. of Appellee, 1997 WL 34609472, at *7, *21 (filed Jan. 9, 1997) ("Sixth Circuit Brief").

133. The Blues control the rules and regulations that all BCBSA members must obey. According to the Sixth Circuit Brief, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). *Id.* at n.4.

134. The License Agreements state that they "may be amended only by the affirmative

- 44 -

vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, every Blue "agrees . . . to comply with the Membership Standards." In the Sixth Circuit Brief, BCBSA described the provisions of the License Agreements as something the Blues "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the Blues most recently met to adopt amendments, if any, to the licenses on September 19, 2024. The License Agreements are entered into between BCBSA and the individual Blues and are governed by and construed and interpreted in accordance with Illinois law.

135.    The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

136.    The Blues themselves police the compliance of all members of BCBSA with the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the License Agreements and Membership Standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's

CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

137.    The Blues control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a Member Plan's failure to comply—"Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a Member Plan's license.

138.    The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that, based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In its Sixth Circuit Brief, BCBSA admitted that the procedure for terminating a License Agreement between BCBSA and a Member Plan includes a "double three-quarters vote" of the Member Plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

139.    A number of Blues also serve on the Inter-Plan Programs Committee ("IPPC"), which controls the national or Inter-Plan Programs of the Blues. In each of their licensing

agreements, the Blues agree to participate in the national programs and to comply with the terms established by the IPPC. Therefore, the Blues are collectively agreeing to the terms of the national programs and their implementation.

140.    The Blues are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed by the BCBSA on the Member Plans are in truth imposed by the Member Plans on themselves.

141.    In furtherance of the anti-competitive agreements alleged herein, the Blues also exchanged granular, current, and competitively sensitive claims data using Blue Health Intelligence ("BHI"), a licensee of BCBSA that is managed by a Board of Managers entirely comprised of BCBS executives—currently, executives of Highmark, HCSC, BCBS-MI, BCBS-AL, BCBS-MN, BCBS-MA, and BCBS-NC. In 2013, BHI acquired Intelimedix, which licensed a claims database comprised of 140 million subscribers' in-network pricing data contributed by BCBS companies. Designed to lower healthcare reimbursement to providers, Intelimedix has explicitly stated that "we all share information."

142.    BHI receives pricing and claims data from BCBSA, which in turn receives these data from each of its Blues Member Plans. BHI uses the BCBSA claims data, called the BCBSA National Data Warehouse Core, to perform analytic reports on in-network pricing for the benefit of Blues Plans. Typically, insurance companies and providers consider these data proprietary and highly confidential. Yet, BHI provides a mechanism for the sharing of such pricing data among all the Blues. These data are used for the purpose, and with the effect, of lowering reimbursements to providers, stabilizing the Blues' pricing for healthcare services provided by hospitals and professionals in various markets, and managing the various anti-competitive national BCBSA programs.

143. Prior to the time period in which Plans submitted claims data directly to BCBSA, Plans submitted data directly to BHI. Among those entities that BHI transmitted claims data to was Consortium Health Plans, Inc., discussed further below.

144. Each BCBSA licensee is an independent legal organization. The BCBSA has never taken the position that the formation of BCBSA changed the fundamental independence of the individual Blues. The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

145. In the Sixth Circuit Brief, BCBSA admitted that the Blues formed the precursor to BCBSA when they "recognized the necessity of national cooperation." 1997 WL 34609472, at *3. The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior to publication, describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other - and each other's parent Blue Plans - in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

146. BCBSA is a vehicle used by admittedly independent health insurance companies to plan, coordinate, and enter into agreements that restrain competition. Because BCBSA is owned and controlled by its Member Plans, any agreement between BCBSA and one of its Member Plans constitutes a horizontal agreement between and among the Member Plans themselves.

147. As detailed herein, the BCBSA not only enters into anti-competitive agreements with the Blues to allocate markets, but also facilitates the cooperation and communications between Defendants to suppress competition. BCBSA is a convenient organization through which

Defendants enter into illegal territorial restraints between and among themselves.

### B. History of the Blue Cross and Blue Shield System

148.    The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently. Later, the plans jointly conceived of using the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand with each plan operating within its local area. While originally structured as non-profit organizations, since the 1980s, these local Blue plans have increasingly operated as for-profit entities either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

149.    BCBSA was created by Blues to support this endeavor and is entirely controlled by the Blues. The history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blues, and to ensure that each Blue would be unimpeded by other Blues within its local Service Area.

#### 1.    *Before the Long-Term Business Strategy*

150.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were separate and distinct and were developed to meet differing needs. The Blue Cross plans were designed to provide a mechanism for covering the cost of hospital care. The Blue Shield plans provided a mechanism for covering the cost of physicians. The plans were all nonprofit entities with limited purposes, and they acknowledged obligations to treat all healthcare providers fairly.

151.    In 1946, the Associated Medical Care Plans ("AMCP") was established as a national body intended to coordinate and "approve" the independent Blue Shield plans. The AMCP was controlled by the Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a plan was "approved," the American Medical Association ("AMA") responded, "[i]t is inconceivable to us that any group of state medical society Plans should band

together to exclude other state medical society programs by patenting a term, name, symbol, or product."

152.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Likewise, there were no restrictions on the ability of a Blue Shield plan to compete with or offer coverage in an area already covered by a Blue Cross plan.

153.    Despite BCBSA's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist. The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the heated competition at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

154.    By 1947, Blue Cross and Blue Shield plans coexisted in most states, setting the stage for competition between them as Blue Cross plans expanded their offerings to include insurance for medical services traditionally insured by Blue Shield plans, and Blue Shield plans expanded their offerings to include insurance for hospital services traditionally insured by Blue Cross plans. Competition in the same geographic areas under the Blue Cross name, as well as the Blue Shield name, has been a feature of the system since the 1930s, and it continues to this day. For example, the Durham and Chapel Hill plans competed with each other under the Blue Cross

name from 1938 until 1968, and these plans continued to compete under the Blue Shield name for six years after that. Plans that are now part of Excellus and Elevance have been competing under the Blue Cross and Blue Shield names since 1947, and plans that are now part of HealthNow and Excellus have been competing under the Blue Cross and Blue Shield names since 1952. Cross-on-Cross competition, Shield-on-Shield competition, or both, exist or have existed in California, Idaho, Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, Virginia, Washington, and Wisconsin. Moreover, not all of this competition is based on historical practices; Premera and Regence BlueShield of Idaho began competing under the Blue Shield name in Washington in 1995, and they continue to compete there.

155.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's opposition because of its fear that a restraint-of-trade action might result from such cooperation.

156.    According to an affidavit of C. Rufus Rorem, who was the Director of the Blue Cross Commission, a goal of the Commission was to "prohibit[] the operation of multiple Plans in a single service area to reduce healthcare costs." The manner of reducing healthcare costs was to eliminate competition among the Blue Cross plans to induce hospitals to participate with the plans at reimbursement rates favorable to the plans: "One of several Plans operating in the same area with an enrollment of only a small fraction of the area's eligible subscribers had substantially less influence with and therefore success in convincing the area's hospitals to participate in the Plan . . . . The operation of only one Plan per service area helped the Plan obtain the participation of hospitals on terms which were favorable to the Plan and its subscribers, thereby enhancing the Plan's attractiveness in the marketplace."

157.    In the 1950s, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

158.    In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services . . . to [the American Hospital Association ("AHA")]" (the "1954 Agreement"). Notably, the 1954 Agreement specifically acknowledged the limited scope of these service marks, stating that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services." The 1954 Agreement also noted limitations specifying that only "certain Individual Plans . . . developed certain territorial rights with respect to the words BLUE CROSS and the design of a blue cross in particular areas served by such PLANS" and that the plan had the right to use the license "within the area served by the INDIVIDUAL PLAN on the date of these presents."

159.    The 1954 Agreement also placed an obligation on Plans to treat providers fairly. In this regard, the 1954 Agreement specified that a plan must comply with certain requirements as a condition of the grant of the license, including, among other things, that "[e]very qualified general hospital in the area served by the INDIVIDUAL PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

160.    Finally, the 1954 Agreement prevented the AHA from having control over the Blue Cross plans. The agreement specified that the Blue Cross Plans needed only a majority vote to revoke the agreement, while the AHA could revoke it only prior to January 1, 1956, upon a three-fourths vote of the AHA House of Delegates.

161.     With respect to the Blue Shield entities, the 1952 license agreement between the National Organization (the agreement's term for the AMCP) and its member medical care plans (the "1952 Agreement") was similarly limited in scope. That agreement specified that the words "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical care plans owned, controlled or sponsored by county medical societies or state, district, territorial or provincial medical associations."

162.     The 1952 Agreement further specified that "[e]ach member plan that is a party hereto is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the public its nonprofit medical care plan and its membership in the National Organization." In 1976, it again changed its name to the "Blue Shield Association." Throughout these name changes, the entity continued to be controlled by the Blue Shield plans.

163.     The 1952 agreement did not contain any provision relating to Plans developing territorial rights. Instead, it provided that "[t]he National Organization hereby grants to each of its member plans that are parties to this Agreement, subject to the terms of this agreement, permission to use said service mark in commerce among the several states or in foreign commerce."

164.     In 1972, a new license agreement was entered into between the Blue Cross Association (the "BCA") and the Blue Cross Plans (the "1972 Agreement"). This agreement stated that, at that point in time, the BCA was "the owner of the term 'BLUE CROSS' and the design of a Blue Cross as service marks for prepayment plans for hospital care and related services ('BCA Marks')." The 1972 Agreement then sought to expand the scope of the service marks by providing that the Blue Cross Plan "desires to use the BCA Marks and any revisions and variations hereafter developed (collectively called 'Licensed Marks')" and then grants such Plan the right to use the

new Licensed Marks "as service marks, in the sale and advertising of programs for healthcare and related services operated on a non-profit basis."

165.    The 1972 Agreement t also included territorial restrictions in the license: the "rights hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the effective date of this License Agreement."

166.    Notably, however, like the 1954 Agreement, the 1972 Agreement provided that a plan must treat providers fairly. In this regard, the 1972 Agreement continued to specify that a plan must comply with certain requirements as a condition of the grant of the license including, among other things, that "[e]very qualified general hospital in the area served by the PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

167.    In prior litigation, BCBSA has stated that local plans transferred their rights in the Blue Cross and Blue Shield names and marks to precursors of BCBSA because those plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

168.    In the 1970s, the Blue Cross Association and the Blue Shield Association began consolidating. In an annual report to the associations in 1979, President Walter McNerney said his focus was on the "need for the Plans, within the framework of the Associations, to work together in today's challenging environment and to do so with a renewed sense of common mission."

169.    Mr. McNerney further noted that "problems" existed, "particularly where cooperative action among 2 or more Plans is required." He called for "mutual respect" among plans, decrying the "hazards" of competition across Service Areas and the submission of "highly competitive" prices by an out-of-area plan. With respect to one Blue plan encroaching on the territory of another Blue plan, he said "[t]he home Plan may resent the intrusion openly or covertly

- 54 -

and add more fuel to antagonism within the system with the potentially perverted result of weakening mutual support and heightening the type of anxiety that leads to destructive competition." He added that "national accounts can only be served by coordinated action, and because national accounts are growing in importance, so is coordinated action." He concluded with a call for "coordinated action."

170. This "coordinated action" raised antitrust concerns. In 1980, when the two associations were considering a joint National Government Market Strategy, it was noted that "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust aspects of what is being proposed, as well as the manner in which it is being considered."

171. By 1982, the process of the merger to form BCBSA had been completed. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks, trade names, and service marks that had previously been owned by the local plans.

## 2. *The Long-Term Business Strategy and Assembly of Plans*

172. In the early 1980s, the Blues fundamentally changed the way they conducted business. The Blues, through a work group organized by the BCBSA to create a set of mandates that became known as the "Long-Term Business Strategy." Edwin R. Werner, the President of Blue Cross and Blue Shield of Greater New York (now Defendant Empire, which is a part of Elevance), led the effort.

173. Prior to the Long-Term Business Strategy, each Blue Cross and Blue Shield Plan was an autonomous company with a local presence, but often with strategic plans to compete in other Service Areas—whether within a state or across state lines. Some plans saw the importance of national accounts and wished to compete for all of these accounts, notwithstanding their territorial basis.

174. Competition across Service Areas was so common among the Blues that it had a

- 55 -

name: "Blue Sharking." Some plans saw themselves as competing with other commercial health insurers who had a national presence and national provider networks. These plans, in particular, were not interested in other Blue plans and the BCBSA telling them what they could and could not do with their capital, that they must coordinate with anyone, and that they must cede any authority to an association. Yet this was the direct and lasting outcome of the Long-Term Business Strategy.

175. Werner presented the Long-Term Business Strategy to the Blues at the Blue Cross and Blue Shield Annual Meeting on November 11, 1982. In his presentation, Werner described the Long-Term Business Strategy as a "fundamental change" that would result in "a concentration of power." The Blues approved the Long-Term Business Strategy the next day.

176. According to the Long-Term Business Strategy itself, two of the three "measures of success" for the Blue Cross and Blue Shield organization were market share and profit. The mandates of the Long-Term Business Strategy were designed to further these goals in part by reducing competition among BCBSA Member Plans.

177. Two of the mandates contained in the Long-Term Business Strategy reduced competition among the Blues by reducing the number of Blues who could compete with each other. Proposition 1.1 required all Blue Cross plans and Blue Shield plans to become joint Blue Cross Blue Shield plans by the end of 1984, "except where the Association Board of Directors agrees that business needs dictate otherwise." Proposition 1.2 required further consolidation so that there would be only one Blue per state by the end of 1985, "except where the Association Board of Directors agrees that business needs dictate otherwise."

178. When he presented these propositions, Werner described a "significant reduction in the number of corporations which make up our collective effort" as "wise," questioning why "it makes good business sense for four corporations in one state to chase a total market potential of

677,000 employed people." He asked, "Can we really justify 12 member corporations in one state‰ —even though it is a large one?"

179.    Although the Blues approved these propositions, some Blue plans disagreed with this strategy as antithetical to competition and plan autonomy. William Flaherty, the President of BCBS-FL, sent a letter to Werner in 1982 expressing reservations about portions of the Long-Term Business Strategy. With respect to the consolidation of plans, he said that "[t]he large market share of the system of plans would have precipitated anti-trust actions were it not for the insurance industry exemptions and the community-service orientation." Blue Cross of Central New York stated in a position paper, "Blue Cross of Central New York is opposed to statewide merger or consolidation. Such a move would destroy virtually everything our community leaders have built in our 10-county service area in the 47 years we have functioned as a community organization. . . . Home rule and local autonomy were the key reasons for the Plan's creation." Similarly, in 1983 the Presidents of Blue Cross of Western New York and Blue Shield of New York sent a letter to each of the Chief Executive Officers of the Blue plans voicing their dissent. They argued that the Long-Term Business Strategy was a threat to the autonomy of individual plans "and [to] transform Plans into branch offices," a disguised program to strengthen the BCBSA, and "a concerted effort to establish a corporate entity."

180.    The Blues carried out Propositions 1.1 and 1.2, dramatically reducing the number of Blues in the years after they adopted the Long-Term Business Strategy. In 1980, there were 114 Blues. By 1989, there were 75, and now there are 34. Competition between Blue Cross plans and Blue Shield plans ended in all but a few states.

181.    Another important mandate of the Long-Term Business Strategy was Proposition 3.4: "Launch an intensified program to retain, acquire and expand provider and professional

payment differentials." "Differentials" referred to the difference between healthcare providers' billed charges and what the Blues paid, which was an advantage for the Blues because its competitors generally paid the providers' billed charges. (Later, the Blues sometimes used "differentials" to mean the difference between what the Blues pay a healthcare provider and what their competitors pay.) In other words, the Blues unlawfully agreed to reduce the payments they were making to providers. Among the steps for implementing Proposition 3.4 was for the "Association to survey all Plans by March 1, 1983, to determine status to their efforts to protect/secure payment differentials."

182. Proposition 3.4 was designed to acquire and maintain dominant market power for the Blues. Commenting on the Long-Term Business Strategy, Flaherty wrote to Werner, "[P]lans with cost-based reimbursement have evolved into dominant (virtually monopolistic) positions due to the rapid growth in the hospital differential." Flaherty also wrote, "The insurance industry believes it is 'closed out' of the markets for hospitalization when large differentials exist and has challenged them politically." Thus, the Blues were aware that by using their market power to secure large differentials, they could "close out" other insurers.

183. Another mandate of the Long-Term Business Strategy was Proposition 1.4, "Continue study of Blue Cross and Blue Shield organization and make further recommendations for change." A Proposition 1.4 Work Group was established, and it wrote in 1985,

> One deterrent to Plan support for common cohesive effort was quickly identified and is the subject of the balance of this report. A common effort requires a common bonding. The bond in our case is the use of the Blue Cross and Blue Shield names and marks. Yet as we analyzed the current provisions of the basic agreements with plans, that bond seems unduly weak for the current environment. As will be developed, a strengthened license agreement is deemed essential.

The Proposition 1.4 Work Group identified as a problem the possibility that a plan could hold a license to use the Blue marks but not be a member of BCBSA, imperiling cooperation and coordination among plans. The solution was to tie the terms of the license agreement to membership in BCBSA.

184.   The Proposition 1.4 Work Group also recommended a series of meetings among the Blues, known as the "Assembly of Plans." The Board of Directors of BCBSA approved this proposal in 1986. On April 4, 1986, an Assembly of Plans work group issued a report focusing on coordinated and unified action among Blues plans, including actions that plans should do collectively. In June 1986, John Larkin Thompson, the CEO of BCBS-MA, agreed to Chair the Ad Hoc Committee on the Assembly of Plans, which was comprised of nine plan CEOs. The Committee's charge was to interview other CEOs and prepare a paper for discussion among each of the plan CEOs. This became known as the "White Paper."

185.   The focus of the White Paper was "when it might be in a Plan's self-interest to forego some of its prerogatives in the name of the 'system' or to promote a common purpose," as well as "continued exclusive use of the service marks, service areas, and inter-Plan cooperative agreements." The White Paper advocated collective action among the Blues, as well as exclusive use of the Blue service marks within the plans' Service Areas.

186.   It acknowledged, however, that exclusive Service Areas were not essential to the Blue marks, and that they were subject to challenge under the antitrust laws:

> During the last few years, the exclusivity feature of the license agreements has come under sharp antitrust attack in several federal courts [citing *United States v. Sealy*, 388 U.S. 350 (1967) and *United States v. Topco*, 405 U.S. 596 (1972)] . . . To date the Blue Cross and Blue Shield Association has devoted its efforts to defending exclusivity and expects to do so in the future. Thus, an issue for the Assembly is whether to consider – at this time – alternatives which

might be evaluated in the event exclusivity were to be struck down
by the courts.

The White Paper recognized that "[a]s a legal matter, the service marks could be preserved even
if the exclusive service areas were abandoned." As the author of a paper summarizing a meeting
discussing the White Paper stated: "Isn't it too late to assume the continuance of exclusive areas
in the future—shouldn't we be looking instead for other alternatives."

187.    During this process, it was clear that the reason for preserving exclusive Service
Areas was to prevent competition that would otherwise arise among the Blues. According to an
internal report about the Assembly of Plans, "Plans benefit from the exclusive service areas
because it eliminates competition from other Blue Plans. Otherwise there would be open warfare."
And the result of reduced competition was lower payments to providers; according to the same
report, "By enjoying exclusive territories, Plans can bargain aggressively. In turn, national
accounts enjoy local discounts." According to the internal Assembly of Plans report, exclusive
Service Areas create "[l]arger market share because other Blues stay out and do not fragment the
market" and "[s]tronger provider agreements for the same reason."

188.    Despite the significant legal problems with exclusive areas, the Assembly of Plans
considered and rejected proposals to create non-exclusive "primary service areas" or to eliminate
territorial allocation entirely.

189.    Ultimately, through nine meetings of the Assembly of Plans from 1987 through
1989, and despite open acknowledgement that a number of Plans were happily competing with
each other outside their exclusive Service Areas, the Assembly of Plans issued its Final Report on
February 8, 1990. It recommended to the BCBSA approval of new license agreements that would
tie together licensing of the Blue marks and membership in BCBSA (and satisfaction of its
membership standards; prior to this a plan was not required to be a member of BCBSA to obtain

a license to use the Blue marks).

190.     When these license agreements were executed, the BCBSA acquired the ability to enforce exclusive Service Areas by membership restrictions in BCBSA, limitations on use of the BCBS name and marks, and monetary sanctions. This licensure mechanism, which did not exist prior to 1990, continues to the present day to preclude inter-plan competition, even where plans wish to compete with each other across assigned territories.

### 3.     *Defendants Enter Into Unlawful Agreements*

191.     Until 1986, the Blues were tax-exempt. The Tax Reform Act of 1986 revoked this exemption and added Section 833 of the Internal Revenue Code, which treats the Blues as taxable stock insurance companies.

192.     Since 1986, some Blues have converted to for-profit organizations. The largest, Elevance, reported a net income of $5.97 billion in 2024. As described in more detail below, many of the Blues that have remained nominally nonprofit behave like for-profit companies by building up unnecessarily high levels of surplus and paying outsized compensation to executives.

193.     Although the Assembly of Plans eliminated the potential for BCBSA-sanctioned "Blue on Blue" competition in most states, it left open the possibility of competition from non-Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many Blues. After the 1986 revocation of the Blues' tax-exempt status and throughout the early 1990s, the number of non-Blue subsidiaries of Blues increased.

194.     As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some." These subsidiaries continued to compete with the other Blues. As a result, the Member Plans of BCBSA discussed ways to rein in such non-Blue branded competition.

- 61 -

195.    Subsequently, Defendants agreed to restrict the territories in which Defendants would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.

196.    Pursuant to the agreement of Defendants, BCBSA has developed strict rules and regulations that all members of BCBSA must obey, and guidelines that proposed members must adhere to prior to joining BCBSA. These rules and regulations include the License Agreements, the Membership Standards, and the Guidelines. These agreements, some of which were revised or reviewed at least as of 2024, are the agreements at issue in this case.

197.    These License Agreements depart from, and supersede, the previous licensing agreements. For example, the "whereas" clauses of the Blue Cross License Agreements provide that the Plan had the right to use the Licensed Marks "in its service area, which was essentially local in nature," and then state that the Plan "was desirous of assuring nationwide protection of the Licensed Marks," noting that "to better attain such end, the Plan and the predecessor of BCBSA in 1972 simultaneously executed the BCA License Agreement(s) and the Ownership Agreement."

198.    Significantly, however, the License Agreements provide that the "BCBSA and the Plan desire to super[s]ede said Agreement(s) to reflect their current practices and to assure the continued integrity of the Licensed Marks and of the BLUE CROSS system." To accomplish these objectives, these new License Agreements dramatically expand the scope of the license and newly defined Service Areas. The scope of the license is expanded to include the "right to use the Licensed Marks, in the sale, marketing and administration of health care plans and related services in the Service Area set forth and defined in paragraph 5 below." Paragraph 5 sets forth these new Service Areas as "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license."

- 62 -

199.    Despite the expanded scope of the license and the newly defined Service Areas, the License Agreements failed to include the provision—contained in both the 1954 and 1972 Agreements—that required the Plan to treat providers fairly. To make matters worse, an exhibit to the Licensing Agreements limit contracting with providers by specifying that "[o]ther than in contracting with healthcare providers or soliciting such contracts in areas contiguous to a Plan's Service Area in order to serve its subscribers or those of its licensed Controlled Affiliate residing or working in its Service Area, a Control Plan may not use the Licensed Marks and/or Name, as a tag line or otherwise, to negotiate directly with providers outside its Service Area."

200.    In 1990, Defendants developed an amended license agreement that continued to require that all Blue license holders be non-profit entities. At that point, Associated Insurance Companies of Indianapolis, which became Anthem, wished to be a for-profit company and refused to sign the amended license agreement, and when it "bought the giant Dallas-based American General Insurance Company in 1990 . . . it was a 'Sputnik event' for the rest of the [Blue] Plans, according to M. Edward Sellers, a former BCBSA vice president who became President and CEO of BCBS-SC in 1987. Soon the Indiana Plan was competing under another brand name in many other Plans' home markets." *The Blues: A History of the Blue Cross and Blue Shield System* at 241. During the 1990s, in order to end the developing competition, Defendants agreed to restrict non-Blue competition and to develop the Blue Card Program in a highly anti-competitive manner described previously in this Complaint.

201.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic Service Area, which is either the geographical area(s) served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent

license.

202. Under the Guidelines and Membership Standards that were developed in the early- to mid-1990s, each Defendant agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. Each Defendant also agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue-branded business. These agreements have been described by the Blues as the "National Best Efforts" rule. They were adopted in 2005, renewed in 2015, and purportedly terminated in April 2021 in connection with Defendants' settlement of a class action antitrust lawsuit brought on behalf of insurance subscribers.

203. The National Best Efforts rule is a naked output restriction. It was intended to and has limited each Blue's ability to generate revenue from non-Blue branded business and to develop or acquire non-Blue health insurance companies that compete with the Blues. For example, it was a major factor in a 2017 judicial decision to enjoin Defendant Anthem's proposed merger with Cigna, a national non-Blue commercial insurer, which would have caused Anthem to violate the National Best Efforts rule, absent significant conversion of Cigna-branded business to Blue-branded business. Defendant Anthem sought to expand competition outside of its Service Areas, but its membership in BCBSA limited its ability to do so. The limitations the National Best Efforts rule has imposed on non-Blue branded business has lowered THR's and other health care

providers' output of health care goods, services, and facilities. It has created a disincentive for a Blue to contract with health care providers within a Service Area using a non-Blue branded plan, and—of particular relevance to the Market Allocation Conspiracy—a disincentive for a Blue to contract with health care providers *outside* of its Service Area for the purpose of supplying health care goods, services, and facilities to subscribers of non-Blue branded insurance plans also owned or controlled by the Blue. Even in the limited instances in which a Blue offers a competing, non-Blue-branded product within or outside of a Service Area, the revenue restrictions limit investment in the non-Blue branded product, making it less competitive.

204. By means of their membership in BCBSA, each Blue agreed to comply with, and did in fact comply with, the National Best Efforts rule. These agreements have been a part of the Market Allocation Conspiracy and operated to limit the number of commercial insurers who purchase health care goods, services, and facilities from THR and other health care providers and to reduce or eliminate competition for contracts with THR and other health care providers. The effects of the National Best Efforts rule have caused artificially low reimbursement rates to THR and other health care providers.

205. In addition to the National Best Efforts rule, under the Guidelines and Membership Standards, each Blue has also agreed that at least 80% of the annual revenue (as defined by BCBSA rules) that it or its subsidiaries generate from commercial insurance *within* its Service Area must be derived from services offered under the licensed Blue Cross and/or Blue Shield trademarks and trade names. These agreements have been described by the Blues as the "Local Best Efforts" rule. The Local Best Efforts rule was adopted in 1994. Like the National Best Efforts rule, these agreements are also output restrictions that limit the number of commercial insurers who purchase health care goods, services, and facilities from THR and other health care providers and to reduce

or eliminate competition for contracts with THR and other health care providers. Unlike the National Best Efforts rule, the Local Best Efforts rule was not terminated in April 2021. According to Elevance Health, Inc.'s 2023 Form 10-K, Anthem-CA is required to have "substantially all" of its annual combined local net revenue be attributable to health care plans and related services "sold, marketed, administered or underwritten under the BCBS names and marks."

206. Both the National and Local Best Efforts Rules have squarely limited the Blues' revenue-generation from non-Blue-branded business, and thereby limit the ability of each plan to develop non-Blue brands that could and would compete with other Blues.

207. Defendants also agree that they will participate in Inter-plan Programs, including Blue Card, with the billions of dollars of Access Fees providing the *quid pro quo* for the agreements not to compete.

208. Therefore, Defendants have agreed that, in exchange for having the exclusive right to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each Blue will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive, at most, one-third of its revenue from outside of its exclusive area using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

209. Anthem (then known as WellPoint), in its February 17, 2011 Form 10-K filed with the U.S. Securities and Exchange Commission, described the limitations on its business, stating that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions

regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

210.    These agreements drastically limited the Blues' ability to compete.

211.    The rules and regulations also prohibit acquisition of a Plan by a non-Blue entity without the approval of BCBSA. The Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." But, as alleged above, the Member Plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA to obtain control of, or acquire a substantial portion of, the assets of a Member Plan, the other Member Plans can block its membership by majority vote.

212.    The License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a Member Plan's license will terminate automatically: (1) if any institutional investor becomes beneficially entitled to 10 percent or more of the voting power of the Member Plan; (2) if any non-institutional investor becomes beneficially entitled to 5 percent or more of the voting power of the Member Plan; (3) if any person becomes beneficially entitled to 20 percent or more of the Member Plan's then-

outstanding common stock or equity securities; or (4) if the Member Plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the Member Plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent or more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived upon the affirmative vote both of a majority of the disinterested Member Plans and also of a majority weighted vote of the disinterested Member Plans. These restraints effectively preclude the sale of a Member Plan to a non-member entity, absent special approval.

213.     These acquisition restraints reduce competition in violation of antitrust laws because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Blues. To expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area.

214.     Through the acquisition restrictions, the Blues have agreed unlawfully to force competitors to build their own networks and have effectively prohibited those competitors from choosing what is often the more efficient solution of acquiring new networks by purchasing some or all of an existing plan. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and, in some instances, eliminating competition.

215.     Defendants have long been aware that their limits on non-Blue business could constitute an unlawful restraint of trade. A "Blue Cross and Blue Shield Issue Summary" dated

February 4, 1993, which "was assembled by asking several Blue Cross and Blue Shield Plan CEOs to identify issues that they believed were divisive to the Plans and BCBSA," cited unbranded competition as a divisive issue, and stated as one position that "[a]ny attempt to restrict competition between licensees using trademarks other than the Blue marks is a violation of federal and state antitrust laws and subject to criminal and civil penalties. Competition is good for the consumer and that is who we are obligated to serve. It makes the Plans more effective. No harm has ever been demonstrated. It would be impractical to regulate much less unlawful."

216.    One plan wrote in an "Executive Overview" that "[a]ny new restrictions on 'unbranded' activities will be reviewed under the antitrust laws . . . and could be viewed as an agreement among competing Plans and therefore an unlawful horizontal restraint . . . ."

217.    Despite this concern, the Blues eventually imposed restrictions on non-Blue businesses with the stated purpose of restraining competition. In an April 30, 2001, memorandum to the Blues, BCBSA expressed concern about Blues competing under non-Blue brand names. According to BCBSA, growth in non-Blue business came from "the offering, by Plans, of basic health products outside of their licensed service area. Now, Blue-based organizations are competing with each other for core health customers. Each success of an unbranded venture was a loss for a local Blue Plan." For example, "a Plan predominantly devoted to its own national [non-Blue] brand would appear to have incentives to favor that brand in competition with the Blues for a national account."

218.    Several years later, the Blues openly acknowledged the existence and importance of their agreement to collaborate and not compete. In March 2007, a participant in a "Blue Caucus" event in San Francisco stated that "[w]e intend to continue to strive to keep the interest of all Blue plans . . . aligned so the System can remain in a mutually supportive state." It was noted at the

meeting that "[t]he historic success of the System has been driven by the cooperation . . . of member Plans. The future success of the System is dependent on this continued cooperation. The ability of the member Plans to focus on the collective good of the System is critical to our success."

219.    In addition to being an agreement to allocate geographic markets, the restrictions on non-Blue competition facilitated and presently continue to facilitate the Blues' monopsonization and exercise of market power by ensuring that each Blue brings more members, on a branded basis, to negotiations with providers.

220.    The Blue Cross Blue Shield structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition, in addition to the explicit agreements described above.

221.    The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standards. For example, under the Licensing Agreements, each Blue is allowed to contract one county into a contiguous or adjacent Blue's territory.

222.    Nonetheless, many Blues have entered into what they call "gentlemen's agreements" not to compete in those counties. For example, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreements. Likewise, as set forth below, BCBS-OH refused to contract with a hospital in a Pennsylvania county adjacent to Ohio, to allow fellow Blue, Highmark, to force the hospital system to accept lower reimbursement rates.

### 4.    *The Blue Card and National Accounts Programs*

223.    In the 1940s and 1950s, the Blues used the development of employment-based health benefits to advance their bargaining power. As the demand grew over the next few decades for insurance and servicing of health benefit plans that covered the employees of a single employer

- 70 -

across many states, the Blues found a way to use, maintain, and enhance that bargaining power and market share by accessing each other's provider networks, and sharing the benefit of any differentials they had obtained.

224.    During the early- to mid-1990s, as part of their overall agreement to restrict competition, Defendants agreed to develop the Blue Card Program as part of their Inter-Plan and National Accounts Programs. Under the Blue Card/National Accounts Programs, one—and only one—Blue may administer a national or multi-state, employee health benefit plan. The Blue where the national account is headquartered is the Control Plan (or "Control Blue"), while the other Blues are Participating Plans.

225.    The National Accounts Programs further provide that the Control Plan is the only Blue that may bid for the business of the national account unless that Control Plan cedes the right to another Blue, which is then the only Blue that may bid for the business of that national account. In other words, in this area and many others, Defendants agree that they will not compete. Defendants divide the proceeds derived from this anti-competitive scheme either through the Blue Card Program or through separate agreements.

226.    All Blues are required to participate in the Blue Card Program, which applies when a member of the health benefit plan obtains healthcare services outside of the Service Area of the member's Blue plan. The Blue through which the member is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan."

227.    Generally, when a provider treats a patient who is a member of a Blue plan outside the provider's Service Area (the Home Plan), the provider submits the claim to the Host Plan, which is then transmitted to the Home Plan, often resulting in significant delays for processing and

payment of the claim. The provider is paid based on the reimbursement rates or prices in the provider's contract with the Host Plan. But in order to be paid, the provider must comply with the Home Plan's: Provider Manual, which provides information about claims administration and appeals, as well as policies and guidelines around claims submission and payment; Medical Policies, which address the issue of the medical need for certain goods and services; Clinical or Utilization Management ("UM") Guidelines, which focus on facility admission criteria, selection of a provider or facility, length of stay for hospitalizations, and locations where services will be covered; Reimbursement Policies, which explain the claims processing and editing logic that impact the payment made; and, importantly, the coverage requirements of the Home Plan and the employee health benefit plan to which the provider often does not have access. Historically, the Provider Manual, Medical Policies, UM Guidelines, and Reimbursement Policies were paper-based and only given to their contracted, or "in-network," providers. Today, some of these documents are posted online. It remains the case, however, that whether a services, procedure, good, or facility will be covered is dictated by contract or the member's health benefit plan, and that information is not available to out-of-network, or non-contracted, providers.

228.    As a result of the Blue Card Program, providers must comply with over 30 different variations of Provider Manuals, Medical Policies, UM Guidelines, and Reimbursement Policies, creating inefficiencies, adding to administrative costs for providers and the healthcare system, and resulting in many claim denials, in whole or part, based upon the lack of information available to the providers. Coverage rules also include matters such as pre-authorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members. As a result, healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits, and coverage rules, frequently to no avail,

and despite the fact that the providers have made no agreement with the Home Plan. In many instances, a healthcare provider may treat patients who are enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's Service Area.

229. By way of illustration, in an effort to address this highly inefficient process, hospitals in Florida set up weekly telephone calls with Blues to try to learn the requirements of each of the plans for submitting medical records and other coverage requirements. Employees of the hospitals spent hours, week after week, for an extended time to try to learn those requirements. They would obtain inconsistent and incomplete answers to their inquiries. Despite spending significant resources of the hospitals to comply with the Blues' multiple coverage requirements, the hospitals continued to have claims reduced and denied when they innocently failed to comply with one of those requirements.

230. All healthcare providers are required to participate in the Blue Card Program as a condition of their participation in the Blue plan in their Service Area. As noted above, the Blues are not allowed to contract with healthcare providers outside their Service Area unless it is a contiguous area, and many will not even do that. Thus, a healthcare provider treating a patient who is enrolled in a Blue in another Service Area cannot negotiate a separate agreement with that Blue plan. Instead, the Home Plan pays the healthcare provider the discounted rate that the Host Plan has imposed on the provider. Moreover, the Blues do not allow healthcare providers to negotiate clauses in their participation contracts that would allow them to opt-out of the national programs and contract separately with the Blues.

231. The Blue Card and National Accounts Programs are thus agreements to fix prices. Healthcare providers, including THR, providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, receive significantly

lower reimbursement rates than they would receive absent Defendants' agreement to fix prices. In 2002, BCBSA reported that in 2001, the Blue Card Program saved $9 billion. This figure represents the reduction in payments to healthcare providers, including THR, that the Blues were able to obtain by allocating markets and fixing prices.

232.    The Blues share the discounts they are able to achieve through the Blue Card and National Accounts programs. In addition to an administrative fee that purports to cover the cost of processing claims through the Blue Card Program, a standard Blue Card fee is the Access Fee, which is a percentage of the Host Plan's discount that the Host Plan shares with the Home Plan. Some Blues pay each other based on other formulas, but the purpose is the same: for the Blues to reward each other for fixing their prices. For its self-funded accounts, Defendants bill Access Fees to the account as a cost of the medical claim, even though the Access Fee is not paid to the provider.

233.    The Blue Card Program encourages the Blues to fix prices rather than compete, even in the limited contexts in which BCBSA's rules allow them to compete outside their Service Areas. Because of the discounts that the Blues receive through the Blue Card Program, they can lower their payments to providers in counties contiguous to their Service Areas by relying on Blue Card, rather than negotiating and contracting with those providers directly.

234.    By way of example, since the 1980s, BCBS-AL maintained agreements with healthcare providers, including hospitals, in contiguous counties of adjacent states, such as Florida and Mississippi. These out-of-state hospitals were not subject to the same rules as in-state Alabama hospitals, and were not required to submit the "Blue Cross Cost Study" that in-state Alabama hospitals are required to submit as part of their agreement with BCBS-AL. Therefore, BCBS-AL could not force these out-of-state hospitals to accept the lower outpatient payment methodology that it imposed on Alabama hospitals.

235. In 2013, BCBS-AL terminated its contracts with all hospitals in contiguous out-of-state counties. It ultimately terminated the contracts of twenty-nine hospitals in four states: Florida (nine hospitals), Georgia (five hospitals), Mississippi (nine hospitals), and Tennessee (six hospitals). Each of these hospitals remained in-network with its in-state Blue. Therefore, BCBS-AL could leverage the Blue Card Program to maintain access to these hospitals for its subscribers.

236. BCBS-AL identified the "impetus" of the terminations as the significant reduction in payments it could make to these hospitals by taking advantage of the Blue Card Program, rather than directly contracting with these hospitals. This was true, even net of the Access Fees it would be required to pay to utilize the Blue Card Program.

237. In addition to lowering payments for providers, the national programs, including the Blue Card Program and the National Accounts Program, also impose numerous inefficiencies and burdens on them. While the amounts paid for medical services are dictated by the Host or Participating Plan, as explained above, the policies and coverage rules are those of the Home or Control Plan.

238. Further, Blues will even offer commercial health insurance across state lines to healthcare providers, through national accounts or other programs, even where they will not contract with those same individuals or businesses in their capacity as a healthcare provider. For example, at various times HCSC has provided Blue-branded commercial health insurance for Tenant Healthcare, the parent company of several out-of-state healthcare providers. Because of BCBSA's rules, it is barred from contracting directly with the healthcare provider itself for healthcare services. This is, of course, because the arrangement allows the healthcare provider's home state to use its combined market share to extract the maximum discount possible. This sort of approach is common.

239. The national programs, including the Blue Card and National Accounts Programs, are so inefficient that Defendants have established an adjacent county rule that allows them to contract with healthcare providers one county into the adjacent Blue's Service Area. However, Defendants use and abuse the adjacent county rule to reinforce each other's market power, in some instances by refusing to contract with healthcare providers in an adjacent county. For example, when Highmark was attempting to force University of Pittsburgh Medical Center ("UPMC") to accept lower reimbursement rates, UPMC asked BCBS-OH to contract with Harmot Hospital, which is in a county adjacent to Ohio. BCBS-OH refused to have discussions about a contract with Harmot Hospital. This refusal was part of a horizontal agreement under which the Blues attempt to and do reinforce each other's market power.

240. To facilitate the agreements, the Blues and BCBSA have established and own National Account Service Company L.L.C. ("NASCO"), which assists the Blues in processing claims involved in National Accounts and other claims.

241. Per its own marketing brochure, NASCO was formed in 1987 "through a partnership with major Blue Cross and Blue Shield Plans." It has been engaged in activity "for some of the largest Blue Cross and Blue Shield Plans for over 20 years." NASCO establishes "work groups composed of NASCO associates and customers." NASCO also works with Blues to "ensure their compliance with Blue Cross and Blue Shield Association (BCBSA) mandates."

242. Changes to the National Accounts Program pursuant to the MDL Litigation's subscriber class settlement approved on August 9, 2022, which allow certain employers with over 5,000 employees to solicit a bid from a second Blue plan, have not undermined or diminished the harmful effects of these agreements on THR and other health care providers. Indeed, the National Accounts Program continues to limit artificially the number of commercial insurers who purchase

health care goods, services, and facilities from THR and other health care providers, thereby eliminating competition in the manner described above.

243.    To facilitate the agreements, numerous Blues and BCBSA have also established Consortium Health Plans, Inc. ("CHP"). CHP describes itself as a "national coalition of 20 leading BCBS Plans, [which] provides a clear and unified voice, as well as effective central coordination, for the Blue System among national accounts" whose "mission is to position Blue Cross Blue Shield as the preferred choice for national accounts." Through CHP, the Blues share claims data reflecting provider reimbursements on a nationwide basis. The Blues leverage that data and their collective market power to impose deep discounts on reimbursements to providers, which they then market to employer groups and other purchasers of health insurance.

244.    For example, in a marketing brochure for CHP's "ValueQuest" analytical tool, CHP as much as admits that the Blues are able to use their shared claims data and collective market power to reduce reimbursement to providers to levels far below their competitors on the national level. In this regard, the brochure describes the ValueQuest tool as follows:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics. ValueQuest has the ability to compare each carrier's per-member, per-month (PMPM) cost in markets where employees reside.

The brochure further explains that "[t]he ValueQuest data set contains claims and membership data for BCBS nationally. The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."

245.    Another brochure sheds light on the extraordinary breadth of the claims data shared by the Blues through CHP. In this regard, the brochure makes the following claims:

- "ClaimsQuest provides in-network and out-of-network data for all 50 states in three-digit zips and MSAs."

- "The ClaimsQuest methodology is the same for every Blue Cross Blue Shield Plan, and the same data criteria are applied across every state, every MSA, every zip code."

- "The ClaimsQuest model not only works effectively for every Plan in the Blue System, it also applies to other carriers. Applying the ClaimsQuest cost model to all carriers permits an 'apples-to-apples' comparison."

246.    Thus, CHP harnesses claims data for the Blues in every state, metropolitan statistical area ("MSA"), and zip code in the country and, using that data, allows the Blues to impose deep discounts on provider reimbursements in order to use the market power of the Blues to reduce the payments to providers.

## 5.    *Protecting and Increasing "Differentials"*

247.    Defendants have aggressively protected and increased their differentials, which is the difference between healthcare providers' billed charges and what the Blues paid. In August 1983, Defendants had established two projects aimed at increasing the differentials or reducing payments to providers. The first was to identify "priority plans" for increases in the differentials. According to a 1983 letter from the CEO of BCBSA to the CEOs of the Blues, "Every 1% increase in the differential in the priority Plans results in a systemwide increase of .12%. The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important. In addition there would be significant dollar impact in each Plan."

248.    The second project was "Project State Watch," which included states where there were "overt threats" to the large differentials. Project State Watch included a calculation of how much the overall Blue System differential would be reduced by a reduction in the differential in those states. In other words, all the Blues benefited by acting together to decrease provider payments in each state.

249.    The Blues' efforts to establish, maintain, and increase their differentials continue to this day. The CHP brochure described above boasts that "Consultant feedback, client results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of care." As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared BCBS PMPM historical results to a PMPM benchmark of national competitors. ***Results of the most recent study show an 11.3% cost of care advantage for BCBS at the national level.*** This study is the first of its kind to analyze total cost of care among competing health plans based on historical claims data.

(Emphasis added.) Thus, according to CHP, the Blues pay healthcare providers less and therefore enjoy an enormous cost of care advantage over their national competitors. Indeed, as CHP itself says, ***"[n]o other carrier even comes close.***" (Emphasis added.) And while the brochure suggests that factors beyond discounts on provider reimbursements contribute to the Blues' advantage in this regard, it also acknowledges that these discounts are far and away the most significant factor. According to a presentation by Wellmark based on a CHP survey, "Provider discounts remain the #1 criteria of network value for National Accounts."

250.    Indeed, as demonstrated by a brochure for CHP's "ClaimsQuest" analytical tool, the Blues have long recognized that the "size of provider networks" and the "depth of discounts" imposed on the providers in those networks are the two most important factors in lowering their costs.

251.    Despite its claims that it is simply a marketing agent, CHP acts, with BCBSA and the Blues, not just to measure and market discounts, but to unlawfully agree to actively suppress the amounts paid to providers in the name of "differentials." CHP regularly meets with BCBSA and with network contracting executives from plans to identify and develop "action plans" for "critical markets" to help with BCBSA's "corporate obj[ective]" of reducing provider

- 79 -

reimbursement and increasing "discounts." CHP is an active participant in facilitating Defendants' agreements, by actively allowing them to collaborate to reduce provider reimbursements.

252.    Despite enjoying an advantage over their competitors in provider reimbursements, the Blues have higher administrative fees for self-funded plans than their competitors, even before accounting for the access fees the Blues charge as medical costs.

### 6.    *Differences Between Modern Blues and Other Insurers*

253.    The Blues' anti-competitive agreements make them very different from other insurers. If an insurer like UnitedHealthcare wants to establish a provider network, its value proposition to a provider includes its ability to steer its subscribers to that provider. And a provider who is thinking about leaving the network knows that the consequence is the inability to treat UnitedHealthcare's subscribers on an in-network basis.

254.    Each Blue, on the other hand, brings not only its own subscribers, but also the subscribers of every other Blue into negotiations with providers. ("Negotiation" is a bit of a misnomer, as the Blues can offer contracts on a take-it-or-leave it basis.) And a provider who is thinking about leaving the local Blue's network knows that the consequence is not just the inability to treat the local Blue's subscribers on an in-network basis, but the inability to treat all of the Blues' subscribers on an in-network basis. Thus, the Blues are able to use leverage against providers that is unavailable to their competitors.

255.    In addition, the Blues operate less efficiently than their competitors. For example, the rules associated with the Blue Card Program, requiring compliance with each Home Plan's rules, create confusion for providers in a way that does not exist for other major insurers.

256.    Defendants' agreement that they will not contract with providers in other Blues' Service Areas is obviously anti-competitive. That agreement prevents the development of healthcare provider networks and competition among such networks. The agreement also prevents

Blues from developing innovative and collaborative agreements with healthcare providers that would be efficient, improve quality, and lower healthcare costs. The agreement also prevents many of the largest health insurers in the country from developing networks that they could use in competing for national accounts. For example, Elevance, the second largest health insurer in the country, and HCSC, the fifth largest health insurer in the country, must each have national provider networks in order to compete for national accounts.

257.    The Blue Card Program reinforces the other agreements that Defendants have made not to compete and provides the *quid pro quo* in terms of billions of dollars in payments that are made to the Blues. The Blue Card Program is used largely in the administration of health benefit plans including for national and regional employers. Those employers pay the Blue Card access and administrative fees, and the Blues pocket those payments.

### C.    Specific Examples of Defendants' Unlawful Conduct

#### 1.    *The Leading Example: Alabama*

258.    The below history of Blue Cross and Blue Shield entities in Alabama shows how competition could have developed in Alabama but for the Blues' anti-competitive agreements.

259.    The National Labor Relations Act, enacted in 1935, provided the basis for the dramatic growth of employer-based health benefit plans. Health benefits for employees expanded enormously during World War II as a method of increasing competition without increasing wages or salaries because of wage freezes. This expansion continued in the post-war years.

260.    During the period after World War II, Alabama was the most unionized state in the Southeast. Some of the state's largest employers were in the steel industry, and the workers in that industry were represented by the United Steelworkers of America. After the U.S. Supreme Court and the National Labor Relations Board recognized fringe benefits, including pensions and health benefits, as mandatory subjects of bargaining, in 1949 the United Steelworkers of America

demanded employee health benefits in the new collective bargaining agreement.

261. After a strike, the steel industry agreed to include employee health benefits in the collective bargaining agreement, and designated Blue Cross of Western Pennsylvania, now Highmark, as the entity to coordinate those benefits. Because of the territorial restrictions that the Defendants had agreed to, Blue Cross of Western Pennsylvania would not provide those employee health benefits to the many thousands of steelworkers in Alabama.

262. If it had been able to do so, Blue Cross of Western Pennsylvania could have become a major health insurer in Alabama, developed a provider network, and even sold health insurance in the state to compete with BCBS-AL. Instead, BCBS-AL used this event to become the dominant health insurer in Alabama.

263. In *The History of Blue Cross and Blue Shield of Alabama*, written by Clarence Joseph Vance and copyrighted in 1978 by BCBS-AL, the following statement appears: "The enrollment in Alabama in 1950 of the U.S. Steelworkers was a progressive milestone; in terms of increasing enrollment. It was a major breakthrough. Heretofore, Blue Cross Plans had become conditioned to limit their markets to the white-collar workers . . . ." *Id.* at 88–89. "The first step toward national accounts business was taken when Abraham Oseroff convinced the U.S. Steel Corporation and the Congress of Industrial Organizations in Pittsburgh that his Pittsburgh Plan could serve as a syndicate head. Working with the Blue Cross Commission and with Mr. Thompson, the New York Plan's actuary, Mr. Oseroff put together the first syndicate, covering over 1 million steel workers, with an estimated 75,000 in Alabama." *Id.* at 98. As the book notes, this syndicate was still intact at the time of publication in 1978. "The Steel contract has been the most stable piece of business, both locally and nationally." *Id.*

264. These "national accounts" were critical to Blue Cross of Alabama's growth. "Early

in 1950, competing in the national market place with large commercial carriers became a crisis issue." *Id.* at 98. But the individual plans were ill equipped to do this on their own. "The locally autonomous Plans could not reply [sic] upon their loose confederation . . . ."

265.    BCBS-AL experienced a similar increase in enrollment from other unionized industries. For example, the auto workers at the Ford plant in Sheffield became enrolled with BCBS-AL shortly before the Steelworkers, and they would have been covered by another Blue, BCBS-MI, if it were not for the territorial restrictions agreed to by the Defendants.

266.    Thus, BCBS-MI also would have become a meaningful competitor in Alabama if it were not for those restrictions. The addition of the Steelworkers and other unionized workers to BCBS-AL's rolls resulted in its fastest growth in history. "The Corporation's enrollment at the end of the first decade (1946) had reached 160,000 members; however, at the end of the second decade (1947-56) enrollment has reached 668,000, or a 416 percent increase." *Id.* at 194–95. As employee benefit plans expanded, BCBS-AL and the other Defendants used those plans and their anti-competitive system to expand their market shares and market power.

267.    BCBS-AL also acted as a control plan for South Central Bell Telephone Company and International Paper's Southern Kraft Division, and aided other Defendants in developing their market shares and market power.

268.    BCBS-AL's rapid growth in enrollment gave it increased market power when dealing with healthcare providers. As the copyrighted history states, "while the U.S. Steel breakthrough was an enrollment boon, it also brought with it reimbursement problems." *Id*. at 89. BCBS-AL addressed those reimbursement problems by forcing hospitals in Alabama to accept a cost-based reimbursement system. That system is unique and has resulted in hospitals in Alabama receiving among the lowest reimbursement rates in the country. That system remains in place for

hospitals in Alabama, and BCBS-AL requires cost-based reimbursement for hospitals in Alabama each year, including during years since 2008.

269. Today, hundreds of thousands of subscribers of non-Alabama Blues live and work in Alabama. As of 2012, Anthem had approximately 121,000 subscribers in Alabama (and 127,000 as of 2015), Highmark had approximately 40,000, HCSC had approximately 94,000, BCBS-MI had approximately 30,000, and BCBS-TN had approximately 31,000 (and 35,000 as of 2015).

270. Yet the Blues' rules prevent Alabama providers who treat these patients from negotiating with those Blues. Instead, they must accept the low reimbursement rates imposed by BCBS-AL. Moreover, BCBS-AL is free to set its low rates with the knowledge that Anthem (now Elevance), HCSC, and others are prohibited from competing for the business of BCBS-AL's subscribers or negotiating with Alabama providers. As set forth below, BCBS-AL has taken advantage of that market power in a number of ways.

a. *BCBS-AL Stifled Competition Promoted by*
   *the Alabama Health Care Council*

271. In 1985, the CEOs of several major corporations, including Alabama Power, Drummond Company, and SouthTrust Bank, formed the Alabama Health Care Council as a non-profit entity to help Alabama corporations improve the quality and cost of healthcare.

272. In September 1995, in response to rising healthcare costs in Alabama, the council solicited health insurance proposals. It received bids from over twenty companies, and ultimately narrowed the bids to United Healthcare of Alabama and HealthPartners of Alabama, the former insurance arm of then-Baptist Health System. BCBS-AL did not initially submit a bid in response to the council's solicitation.

273. BCBS-AL stood to lose the business of approximately 60,000 employees if the members of the council contracted with another insurer. In an effort to maintain its market share

and delay and block healthcare reforms in Alabama, BCBS-AL offered the council a 20% discount for the next three years, which the council accepted. Pursuant to its agreement with the council, BCBS-AL was further obligated to reduce the costs of healthcare for the council's members once the three-year guarantee expired by better managing the delivery of healthcare services and the administration of health benefit plans in Alabama.

274. Effectuating a 20% savings for the council's members would have required BCBS-AL to significantly change its methods of managing the delivery of healthcare services and administering health benefit plans in Alabama. Instead of making these changes, BCBS-AL financed these discounts by relying on its hundreds of millions of dollars in surplus and increased charges to other consumers.

275. As the three-year savings guarantee came to an end, the council's members learned that if they continued their relationship with BCBS-AL, their healthcare costs in the next year would increase by approximately 35-45%. In September 1999, Drummond Company terminated its contract with BCBS-AL. Drummond subsequently obtained health coverage for its employees through Select Care.

276. As a result of BCBS-AL's use of most-favored-nation clauses ("MFNs"), Drummond encountered significant problems in negotiating favorable rates with hospitals and physicians and establishing satisfactory hospital and physician networks. The best rates that hospitals generally were able to offer Drummond was 15 percent greater than the rates received by BCBS-AL. This example illustrates how BCBS-AL used MFNs to preserve its market power and insulate itself from competition.

277. In May 2000, Drummond filed suit against BCBS-AL in the Northern District of Alabama, in part challenging its use of MFNs. *See Drummond Co. v. Blue Cross & Blue Shield of*

*Alabama*, Civil Action No. CV-00-AR-1354-S. In August 2001, the parties settled the action. As part of the settlement agreement, BCBS-AL agreed to cease the use of MFNs. But, despite the settlement, since 2001, BCBS-AL has engaged in similar conduct that allows it to obtain larger discounts from its providers than its competitors can obtain.

b.  *BCBS-AL Uses Market Power to
Extract Money From Providers Through "Tiering"*

278.    BCBS-AL abuses its market power and the lack of competition in Alabama in other ways as well. In a further effort to depress prices paid to hospitals and gain greater "differentials," BCBS-AL began its "Hospital Tiered Network Program" in 2006. Their stated goal was to "recognize hospitals that have taken action to improve healthcare quality and work with Blue Cross and Blue Shield of Alabama to reduce healthcare costs for our customers."

279.    In its Hospital Tiered Network Program, BCBS-AL ranks hospitals in various categories. BCBS-AL subscribers face higher out-of-pocket responsibility for treatment at hospitals that are ranked in lower tiers.

280.    Initially, the three primary categories of the tiered hospital criteria were fiscal, quality, and patient safety. BCBS-AL states in its program description that the program criteria is evaluated and enhanced each year in an effort to continually pursue high quality healthcare in the State of Alabama. In 2010, BCBS-AL added a fourth category of patient experience.

281.    The Hospital Tiered Network Program has been based on a scoring system that allowed for a maximum of 100 points divided between the categories. To be a Tier 1 hospital you had to score between 80 and 100. For Tier 2 from 60-79 points and Tier 3, when there was a Tier 3 category, 59 or below.

282.    Despite any claims concerning quality or safety, since inception, the fiscal category has always been the primary driver of the tier a particular hospital was placed in, and that, that

fiscal component is always based upon the hospital's acceptance of terms that reduced the amounts or rates that BCBS-AL paid to the hospital.

283. Through 2011, the sole criteria that had to be met to receive any points in the fiscal category was to continue an annual POF/ASC contract whose only purpose was to reduce reimbursement for the hospitals' ambulatory surgery center and other ambulatory services. BCBS-AL has made clear that "[h]ospitals scoring high in this category have entered into financial arrangements with Blue Cross and Blue Shield of Alabama to provide the most favorable discounts for their services."

284. In particular, the fiscal category through at least 2010, required each hospital to accept a reduction in their reimbursement to receive 25 points if it accepted the lower contract reimbursement and zero points for that category if it did not. Therefore, without "accepting" BCBS-AL's even lower fee schedule, a hospital could not qualify to be in Tier 1 in Alabama. A hospital could achieve every other point available under the Hospital Tiered Network Program and would still end up in Tier 2 if it refused to accept the lower reduced reimbursement from BCBS-AL.

285. The quality, patient safety, and patient experience categories are all measured by standard measures which are largely achieved by all the hospitals in the state. As shown above, quality, patient safety, and patient experience are not what ultimately drive a hospital's tier.

286. In the current iteration of the Hospital Tiered Network Program, a facility's rank is determined based on its "costs." A hospital's "costs" are compared to a particular percentage of Medicare and scored for tiering purposes. As with the earlier iterations, it impossible to achieve a Tier 1 ranking without meeting BCBS-AL's lower "cost" thresholds. BCBS-AL itself notes that the new method puts even "greater emphasis on cost."

287.     The new methodology placed 50% weight on "cost" with the thresholds of $ for "costs" under 130 percent of Medicare, $$ for "costs" between 130 and 140 percent of Medicare and $$$ for "costs" above 140 percent of Medicare. Hospitals in the state have sought information from BCBS-AL on how "costs" are determined but have been unable to match BCBS-AL's purported cost calculations or tie them off to the same Medicare percentages. BCBS-AL has refused to provide its internal calculations, essentially treating them as a black box during the initial process.

288.     Further, BCBS-AL personnel have stated that the particular percentages of Medicare used for the "cost" thresholds are supported by a study or other work done for BCBS-AL. BCBS-AL refused to provide the basis for these particular percentages of Medicare as appropriate "cost" thresholds to the hospitals. Defendants have stated that no such studies exist. Based on this, THR must conclude that there is no study that demonstrates that these percentages of Medicare are appropriate measures of costs. Therefore, these percentages of Medicare seem to be arbitrary thresholds designed to lower reimbursements paid by BCBS-AL or to extract payments from the hospitals as part of the Tiering process.

289.     Under the new method, 17 hospitals were pushed from Tier 1 to Tier 2. For instance, in 2016, UAB Hospital was placed in Tier 2. Since UAB Hospital is one of the premier and most advanced hospitals in the state, this relegation to a higher cost tier demonstrates that the quality of the facility is not the driving force behind BCBS-AL's Tier rankings.

290.     In 2016, before the tiering decisions were made public, BCBS-AL told Decatur Morgan Hospital in Decatur that it would be a Tier 2 when the rankings were released. The parties attempted to reach an agreement on payments to Blue Cross that would allow Decatur Morgan to regain Tier 1 status. Decatur Morgan and BCBS-AL were unable to reach an agreement. BCBS-

AL took the tiering rankings public and pushed to the local media in Decatur that Decatur Morgan would be Tier 2 and patients would be subjected to higher patient responsibility at Decatur Morgan in the hopes of driving Decatur Morgan to make a deal.

291. After the rankings were made public, but before the tiering went into effect, Decatur Morgan and BCBS-AL reached an agreement whereby Decatur Morgan would pay BCBS-AL approximately 1.7 million dollars, and BCBS-AL would move Decatur Morgan back to Tier 1 status. Decatur Morgan was therefore moved back into Tier 1 before the new rankings went into effect.

292. In addition to the general ability to force providers to continually lower costs, it is not clear to hospitals how BCBS-AL actually determines the "costs" it uses for tiering purposes or how it calculates the corresponding percentage of Medicare payment rates for purposes of the tiering exercise. Hospitals have asked for information on the calculations that drive these cost measures but are not allowed to see or confirm how these costs measures are actually derived. Essentially, the tiering process is driven by a black-box calculation that determines which hospitals will be favored for steerage by BCBS-AL.

293. Further, under the tiering regime, BCBS-AL's initial cost determinations and tier assignment are used to hold the Tier 2 hospital hostage. To regain Tier 1 status, a "negotiation" unfolds where BCBS-AL extracts certain concessions either with respect to the costs a hospital reported in earlier years, or by reductions in forward-looking reimbursement rates. In some cases, hospitals have been asked to cut checks of over a million dollars to BCBS-AL for cost adjustments from earlier years in order to regain their Tier 1 status.

294. Being placed below Tier 1 is designed to cause extraordinary harm to a hospital. BCBS-AL acts to affirmatively steer patients away from these hospitals by imposing higher costs

on subscribers and actively pushing its subscribers to Tier 1 Hospitals. Thus, when faced with the prospect of losing large portions of their patient base, or paying the ransom, hospitals have no choice but to accept lower rates and pay BCBS-AL so that they can continue to treat the high percentage of BCBS-AL subscribers in this state.

### c. *BCBS-AL Lowers Reimbursements Using "Cost Reporting" Requirements*

295.    Along the same lines, BCBS-AL has required all participating hospitals to submit to cost reporting since 1957. This information has historically provided BCBS-AL an informational competitive advantage over all other commercial insurers. In addition, this reporting requirement introduced a barrier to entry in the sense that every hospital would refrain from negotiating a contract with another insurer since the related costs and revenues would be revealed to BCBS-AL. Consequently, this cost reporting requirement acts, essentially, as a barrier to entry as well as a guarantee that BCBS-AL gets the best rates from hospitals in Alabama.

296.    Regarding hospital outpatient services, BCBS-AL pays each hospital a fixed percentage of its charges. At the end of the year, the hospitals report their costs and BCBS-AL will either true up or true down the payments they made over the course of the year based not on the contracted rates but on the actual costs of the hospitals plus a fixed percentage (11%).

297.    Blue Cross then either takes money back from the hospital if it feels it got charged too much, or pays late amounts due to a hospital that should have been paid previously.

298.    The process is time consuming, administratively inefficient, and difficult for the hospitals, often requiring them to submit to several rounds of auditing. From the hospitals' perspective, the process is costly and arbitrary, and BCBS-AL often relies on classifications of expenses that make no sense to the hospitals. In the end, it often simply becomes another way for BCBS-AL to utilize its market power and drive provider reimbursements lower.

299.    With regard to hospital inpatient services, BCBS-AL pays each hospital a fixed per diem, regardless of the type of procedure performed (i.e., diagnosis related group). BCBS-AL does not true up or true down its payments for inpatient hospital stays. It does, however, change the per diem rates that it pays each hospital throughout the year. THR is not aware of any other commercial health insurer in the country that requires hospitals to submit to this kind of cost reporting. This cost reporting requirement is a remarkable showing of the market dominance BCBS-AL has when compared to other commercial health insurers and relative to providers, even hospitals with whom the Blues purport to have difficulty negotiating.

300.    In addition to these practices, BCBS-AL prohibits hospitals from using the rates that BCBS-AL pays in any other of the hospitals' contracts.

### d. *BCBS-AL Interferes With Competitive Bidding in Birmingham*

301.    BCBS-AL's interference with competitive bidding for health coverage for the City of Birmingham's employees is another illustration of BCBS-AL's use of its market dominance and political influence to obtain business which it would otherwise not have earned through fair competition and to exclude potential competition.

302.    In 2013, United Healthcare brought suit against the City of Birmingham, Alabama, alleging that the city wrongfully directed business away from United Healthcare to BCBS-AL. The lawsuit, *United Healthcare Services, Inc. v. City of Birmingham, Alabama*, No. CV-13-0499-MGG (Cir. Ct. of Jefferson County, Ala.), alleged that, following a bid process, United Healthcare emerged as the lowest responsible bidder for a contract managing the City's employee health coverage. However, in an effort to avoid losing subscribers and allowing United Healthcare to increase its market share in Alabama, BCBS-AL approached the City and offered to provide additional services. The City awarded the contract to BCBS-AL.

303.    A Jefferson County, Alabama court sided with United Healthcare and determined

that the City's actions violated Alabama's Competitive Bid Law. The court ordered the City to restart the bid process and award the contract to the lowest responsible company.

e. *BCBS-AL Spends Heavily on Executive Compensation and Lobbying*

304.    BCBS-AL's executives have profited handsomely from the lack of competition in Alabama. Prior to 2015, the compensation of BCBS-AL executives was publicly available through the Alabama Department of Insurance. In 2013, the last year for which information is available, the compensation of top BCBS-AL executives was as follows: CEO and President Terry Kellogg, $4.84 million; Executive VP Timothy Kirkpatrick, $2.69 million; Chief Administrative Officer Timothy Vines, $1.9 million; Senior VP and Chief Marketing Officer Timothy Sexton, $1.7 million; Senior VP and CFO Cynthia Vice, $1.47 million; Senior VP and CIO Brian S. McGlaun, $1.45 million; Senior VP of Business Operations Dick Briggs III, $1.44 million; Senior VP of Health Care Networks Jeffrey Ingrum, $1.42 million; Senior VP of Enterprise Resources Vickie Saxon, $1.26 million; and Senior VP and Chief Legal Officer Michael Patterson, $1.03 million.

305.    These amounts are inconsistent with BCBS-AL's status as a non-profit entity and suggest that its executives' decisions are motivated by potential personal gain rather than the benefit to BCBS-AL's customers. By point of comparison, BCBS-NC, also a nonprofit, has roughly 3.8 million customers compared to BCBS-AL's 3 million, and its 2013 annual revenue was $6.4 billion, compared to BCBS-AL's $4.1 billion 2013 annual revenue. In 2013, BCBS-NC's CEO, Brad Wilson, earned $2.9 million in total compensation.

306.    In recognition of this inconsistency, BCBS-AL lobbied in support of legislation aimed at keeping its executives' compensation out of the public record. In 2015, the Alabama legislature amended Alabama Code 1975 § 27-2-24, designating the compensation of officers and employees of insurance companies confidential and privileged. The amendment was sponsored by

Sen. Slade Blackwell. In 2013 and 2014, Blackwell received $53,250 in contributions from political action committees that in turn received $336,000 in contributions from BCBS-AL. BCBS-AL also makes payments to family members of legislators.

### 2. *Allowing and Restricting Competition Among the Blues*

307. Despite the Blues' portrayal of Service Areas as essential to the functioning of the Blue System, historical experience reveals that BCBSA has allowed competition between Blues, especially when doing so would avoid a court decision about whether Service Areas violate the antitrust laws. The below examples from Pennsylvania, Ohio, and Maryland show that BCBSA could allow competition, but it chooses not to.

### a. *Allowing and Restricting Competition in Pennsylvania*

308. The Blues refuse to contract in an adjacent Blue's Service Area when the refusal benefits that Blue's market power, as demonstrated in the foregoing example of BCBS-OH's refusal to contract with a University of Pittsburgh Medical Center ("UPMC") hospital in a county in Pennsylvania that borders on Ohio.

309. In addition, there have been other side agreements not to compete. Highmark was formed from the 1996 merger of two Pennsylvania BCBSA Member Plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

310. Prior to this merger, Pennsylvania Blue Shield and IBC, the Blue Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania Blue Shield established in 1986 after IBC rejected its offer to form a joint venture HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an HMO), which IBC

acquired in response to Keystone Health Plan East's entry into the market. In 1991, IBC and Pennsylvania Blue Shield agreed to combine these HMOs into a single, jointly owned venture under the Keystone Health Plan East name, and Pennsylvania Blue Shield acquired a 50 percent interest in an IBC PPO, Personal Choice.

311. When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form Highmark, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and Personal Choice to IBC. As part of the purchase agreement, Pennsylvania Blue Shield (now Highmark) and IBC entered into a decade-long agreement not to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

312. The conduct of Highmark and IBC demonstrates that the noncompetition agreement remains in place, though it putatively expired in 2007. Instead of entering the Southeastern Pennsylvania market at that time, Highmark announced that it and IBC intended to merge. After an exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark and IBC withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition. . . to the detriment of the insurance buying public."

313. Capital Blue Cross presented an expert report from Monica Noether, Ph.D., in the PID merger proceeding. Dr. Noether offered the following opinions:

- "Based on my review of historical data on attempted entry, it is my opinion that the Pennsylvania health insurance market has been difficult to enter successfully even by otherwise successful national firms. Moreover, there has been little or no expansion by the existing competitors of the Blues plans in the Commonwealth."

- "Highmark and IBC would have a post-merger market share in excess of 70 percent. As noted above, in a scenario where entry and expansion are difficult, a firm with as large a share as the combined Highmark-IBC will possess is likely to

be able to exert market power. Indeed, it appears to be the case that the health insurance market in Pennsylvania is characterized by difficulties in entry and expansion."

- "The combination of Highmark and IBC would result in a combined entity with more than 70 percent of the fully- and self-insured commercial health business in the Commonwealth. This is significantly more than the 53 percent share cited by others, which itself is material and well above the safe harbor guideline of 35 percent established by the DOJ and FTC in the Merger Guidelines."

- "Highmark has competed in the past with IBC, could have been competing with IBC since 1997 but for a ten year non-compete agreement between them, and, in my opinion, is the best-positioned to enter Southeastern Pennsylvania to compete with IBC in the future, especially given the absence of successful entry by other insurers."

- "Highmark has competed successfully for business in Southeastern Pennsylvania previously, both as a competitor to IBC and in cooperation with IBC through a joint operating agreement to offer indemnity insurance."

- "Highmark and IBC fail to address or acknowledge that they could have been competing head-to-head in Southeastern Pennsylvania during the last ten years were it not for this ten-year non-compete agreement. As a result, I find their claims that this proposed consolidation is not anticompetitive because they do not compete to be misleading. Highmark and IBC do not compete because they chose not to compete."

- "Absent the proposed merger, it is likely that Highmark would have entered Southeastern Pennsylvania in competition with IBC. In fact, Highmark's CEO has made clear not only his desire for Highmark to compete statewide but also his desire for there to be one single statewide Blue provider in Pennsylvania. Thus, the proposed merger eliminates, in my opinion, the most successful potential entrant into Southeastern Pennsylvania to compete head-to-head with IBC."

- "[T]he national companies, which have enjoyed much success elsewhere, including Aetna, CIGNA, Coventry Healthcare, and UnitedHealth Group, as well as a few local companies, appear to have struggled to enter and expand their shares of health insurance in Pennsylvania."

- "Under the PA IHCA, the relevant geographic market is generally considered to be the entire Commonwealth of Pennsylvania. While healthcare services are often consumed at a more local level, various factors suggest that a statewide analysis is relevant. For example, a statewide analysis is particularly appropriate for national account customers who may have employees residing outside the primary geographic region where the firm's headquarters are located."

- "Based on the history of Highmark's conduct (and its predecessor, Pennsylvania Blue Shield) and the statements made by Highmark representatives, it appears that: (1) Highmark seeks statewide coverage, (2) it prefers to obtain that coverage by eliminating competition from other Blue Cross plans via joint venture or acquisition, but (3) if it cannot do so, Highmark will expand to compete against the local Blue Cross plan by developing its own provider network. Indeed, as previously noted, Highmark's CEO has confirmed not only that Highmark seeks to do business in all parts of the state, but that Highmark's ultimate goal is to be the sole Blue provider in Pennsylvania. Past experience demonstrates Highmark's willingness to enter Southeastern Pennsylvania independently, but **even if Highmark did not immediately enter Southeastern Pennsylvania without this proposed consolidation, the actual or perceived potential competition from Highmark would likely induce IBC to behave more competitively in the already highly concentrated Southeastern Pennsylvania region.**"

(emphasis added).

314. This unlawful, anti-competitive agreement not to compete has reduced competition throughout the state. After the Pennsylvania regulator refused to approve the merger of IBC into Highmark, the two entities began engaging in more joint activity instead of competing. For example, IBC now pays Highmark to process its provider claims. By processing those claims, Highmark has access to the reimbursement rates that IBC uses to pay providers. In addition, Highmark Blue Shield has been involved in similar non-competition arrangements with other Pennsylvania Blues and has purchased Blue Cross of Northeastern Pennsylvania.

315. In a large part of central Pennsylvania, Capital Blue Cross and Highmark compete. In that area and in others where Blues compete including with separate provider networks, reimbursement rates or prices are higher. The same would be true in other Service Areas if Defendants competed with the local Blue including with provider networks. Capital Blue Cross has attempted to operate outside of its Service Area through its non-Blue-branded for-profit subsidiary, Avalon.

316. When Highmark developed a dispute with the largest provider in its Service Area, UPMC, Capital Blue Cross through Avalon attempted to offer subscribers of the Blues a means to

obtain treatment at UPMC on an in-network basis. Highmark objected, and BCBSA prohibited Capital Blue Cross from offering this arrangement. Highmark and BCBSA prevented competition from Capital Blue Cross in the Service Area of Highmark, and Capital Blue Cross agreed to restrict its competition. Were it not for the agreement not to expand outside of each Blue's Service Area, Capital would be operating in the Highmark Service Area.

### b. *Allowing and Restricting Competition in Ohio*

317.    The history of Blue Cross and Blue Shield in Ohio shows that not only is competition possible among the Blues, but also that it occurred with BCBSA's agreement and was seen as beneficial to consumers at the time.

318.    In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), a Blue Cross and Blue Shield licensee based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus.

319.    In September 1985, Community Mutual began operating in areas of Ohio outside its exclusive geographic area. BCBSA subsequently filed a trademark infringement action against Community Mutual in the U.S. District Court for the Northern District of Ohio. On October 18, 1985, that court denied BCBSA's motion for a preliminary injunction. *Blue Cross & Blue Shield Ass'n v. Cmty. Mut. Ins. Co.*, No. C-85-7872 (N.D. Ohio). This decision was affirmed on appeal. No. 85-3871 (6th Cir. 1985). Thereafter, all the Ohio plans began competing throughout Ohio using the Blue marks, and there was competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

320.    In 1986, the number of Ohio Blues went from four to three when Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

321. In 1987, BCBSA agreed to settle its trademark infringement action, allowing all three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers." Joe Hallett, "Settlement Made Among Providers of Healthcare," The Blade (Toledo), May 21, 1987, at 1. In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue available in Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T. Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

322. Competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by 1990 Likewise, healthy competition among the Blues could exist elsewhere but for the Blues' unlawful agreements.

323. Although BCBSA could not get the district court or court of appeals to agree that it could stifle competition in Ohio through exclusive Service Areas, it did help end competition there. In the late 1980s or early 1990s, one of the three remaining Blues, Blue Cross of Central Ohio (which had changed its name to Community Benefits Mutual Insurance Company), decided to stop using the Blue marks, and it left BCBSA in 1993, leaving two Blues: Community Mutual, and BCBS-OH. In 1995, Community Mutual merged with The Associated Group, an Indianapolis-based insurance and healthcare company, forming Anthem Blue Cross and Blue Shield.

324. The next year, BCBS-OH proposed selling its assets and license to use the Blue marks to Columbia/HCA, a company that operates a number of hospitals. BCBSA refused to allow the deal, revoked BCBS-OH's license, and transferred the license to Anthem. By 1997, competition among the Ohio Blues had ended as a result of the Blues' concerted conduct.

c. *Allowing and Restricting Competition in Maryland*

325. As it did in Ohio, BCBSA capitulated when its horizontal territorial allocation was challenged in Maryland, allowing two Blues to compete against each other statewide.

326. As of 1984, BCBSA had divided Maryland between two Blues. GHMSI operated in the Prince George's County and Montgomery County suburbs of Washington, DC, while BCBS-MD operated in the remainder of the state.

327. The State of Maryland filed suit in the U.S. District Court for the District of Maryland against BCBSA, BCBS-MD, and GHMSI, alleging that they agreed to allocate territories in violation of Section 1 of the Sherman Act. *Maryland v. Blue Cross & Blue Shield Ass'n*, 620 F. Supp. 907 (D. Md. 1985). The defendants moved to dismiss on the grounds that their agreement to allocate territory was exempt from antitrust scrutiny under the McCarran Ferguson Act, 15 U.S.C. § 1012. Maryland moved for summary judgment on the same issue. During discovery, BCBS-MD offered testimony that its marketing department expressed interest from time to time in marketing across the boundary separating it from GHMSI's territory, but its CEO determined not to do so in part because it was prohibited by BCBS-MD's agreement with BCBSA.

328. The court denied both the motion to dismiss and the motion for summary judgment. Describing the defendants' agreement as "horizontal market allocation among insurance companies," the court held that material disputes precluded a finding on whether the agreement constituted the "business of insurance" under the McCarran Ferguson Act.

329. Later in the case, shortly before the court was scheduled to rule on whether the case

should be tried on a *per se* theory or under the rule of reason, the defendants settled the case. BCBSA allowed BCBS-MD and GHMSI to compete with each other throughout the state of Maryland until the later of January 1, 1991, or the completion of the Assembly of Plans. Describing the settlement, Maryland's Attorney General stated, "The settlement promotes the purpose of the antitrust laws by ensuring that the business decisions of potential competitors are made independently and without regard to artificial marketing barriers."

330.    As in Ohio, competition was not fatal. In 1993, the Superintendent of Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on Investigations that GHMSI's core business was profitable in 1992. (GHMSI had lost money overall, however, due to ill-considered investments outside its core business and spending by its executives on items such as travel to international resorts, repeated use of the Concorde supersonic jet, and vintage wine.) BCBS-MD reported in 1992 that it had been profitable for the previous three years, even though a Senate investigation found mismanagement of that company as well. GHMSI and BCBS-MD both continued to exist until they merged in 1998 to become CareFirst. The Blues' experience in Maryland again demonstrates that healthy competition among the Blues could exist elsewhere but for Defendants' unlawful agreements.

### 3.    *Improper Use of Trademarks to Restrict Competition for Providers*

331.    It has long been established that a trademark cannot be used as a device to circumvent the Sherman Act. The Trademark Act itself penalizes use of a trademark in violation of the antitrust laws. The agreed-to restrictions on the ability of the Blues to generate revenue outside of their specified Service Areas constitute agreements to divide and allocate geographic markets, and, therefore, are *per se* violations of Section 1 of the Sherman Act, as well as under either a quick look or rule of reason analysis.

332.    Competition among the Blues does not threaten their marks by creating confusion.

In Washington, Idaho, Pennsylvania, and New York, the Blues currently compete using the Blue marks, without consumer confusion. A 1987 BCBSA internal memorandum noted that "Blue Cross of Washington and Alaska is actively competing against every other plan in the state. Not only has Blue Cross written a strategic plan which targets the Blue Shield Plans, but it has developed a full range of products to sell statewide. Yet, despite open competition, consumer confusion has remained minimal."

333. Moreover, the Blues' subscribers carry membership cards that clearly identify the Blue that underwrites or administers that subscriber's plan. The Blues already allow many out-of-state subscribers to carry cards with the names of Elevance, Anthem, and other out-of-state Blues, indicating that the Blues do not believe that the presence of a Blue outside its Service Area will create confusion.

334. The Blues' well-established and widely utilized practice of "ceding" the right to be the Control Plan for National Accounts when doing so will ensure that an account is gained or retained by the Blue system belies their position that their exclusive Service Areas are necessary to protect their local trademarks. For example, BCBS-AR, which is the Control Plan for Wal-Mart, ceded substantial portions of the Wal-Mart business to both BCBS-AL and BCBS-IL to ensure that Wal-Mart remained a Blue account. The Blues' practice of ceding national accounts demonstrates that consumer confusion does not result when a Blue plan other than the local Blue administers their health insurance plan.

335. The possibility of confusion among the Blues is non-existent for providers like THR, who already deal with multiple Blues on a regular basis. If anything, allowing Blues to contract with providers outside their Service Areas would reduce confusion. As described above, providers must comply with the claim processing rules of Blues located outside their Service Area,

often without easy access to those rules. If a provider could contract with these Blues, they would likely be given those rules from the outset and would have fewer claims denied for failure to follow the rules.

336. The Blues observe each other's trademark rights only when it is beneficial to them. When the Blues find it convenient or profitable, they do not enforce their trademark rights.

### 4. *The Market Allocation Agreement*

337. As described above, Defendants allocate geographic markets for healthcare financing and healthcare services by restricting each Blue's activity outside of a designated geographic Service Area. Accordingly, these restrictions insulate each Defendant from competition by other Blues in each of their respective geographic Service Areas, and prevent providers from contracting with Blues in other Service Areas. These restrictions have no economic justification other than protecting Defendants from competition.

338. Defendants' anti-competitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws. Defendants pay in-network providers directly pursuant to provider agreements. Because of Defendants' market power and access to the more than 100 million subscribers of the Blues through the national programs, providers wishing to join the Blue network must accept lower reimbursement rates. In many markets, doctors and other healthcare providers are given offers by the Blues on a "take it or leave it" basis.

339. Numerous Blues and non-Blue businesses owned by Defendants could and would compete effectively in other Service Areas but for the territorial restrictions. The likelihood of increased competition is demonstrated in several ways. First, as set forth above, the restrictions were specifically put in place to eliminate "Blue on Blue" competition. If there were no likelihood of competition, the restrictions would have been unnecessary. In fact, as set forth above, the

restrictions did not initially address competition by non-Blue businesses owned by Defendants; however, when it became evident that such competition was an "increasing problem" the restrictions were revised to address this as well, and those restrictions remained in place until 2021.

340. Second, certain Blues have, in fact, expanded beyond their initial Service Areas by merging with other Blues. For example, WellPoint, which was initially the Blue Cross licensee for California, is currently the BCBSA licensee for fourteen states (under the name Anthem). Prior to its merger with WellPoint, Anthem, which was initially the BCBSA licensee for Indiana, had expanded to become the BCBSA licensee for eight states. Undoubtedly, absent the current restrictions, Anthem (now Elevance) would readily compete in additional Service Areas and, in all likelihood, would compete nationally. Other Defendants, including HCSC, have likewise expanded into other areas and, in all likelihood, would compete nationally but for the restrictions described in this Complaint.

341. Third, various Defendants have demonstrated that, absent the restrictions that each of the Blues agreed to put into the licensing agreement, they would expand into other geographic areas and states. For example, Anthem (now Elevance) has expanded into many states where it is not licensed to operate as a Blue entity, first through Unicare and then through its purchase of Amerigroup. Anthem (now Elevance) also operates Caremore Centers in Arizona, despite the fact that it is not the Blue Cross Blue Shield licensee in Arizona. In addition, BCBS-MI operates outside of Michigan through a subsidiary or division that provides Medicaid managed care services. Other Blues have likewise expanded into other Service Areas in a similar manner. Of course, these expansions are currently extremely limited by the restrictions on competition.

342. Fourth, the Blues' practice of "ceding" accounts, as well as their history of informally competing for National Accounts and accounts located in border areas, which BCBSA

has attempted to eliminate by pressuring the Blues to work together through joint ventures and similar arrangements rather than compete, shows that they are ready and willing to do business outside their Service Areas when they are permitted to do so. While the Blues remain subject to the territorial restrictions of the Licensing Agreements, true competition cannot occur in the market for healthcare services.

343.    Internally, the Blues have noted that Blue-on-Blue Competition has exactly the market effect that the providers have noted. In particular, at least one Blue noted that in areas where more than one Blue competes "it is very difficult to obtain or maintain market share with 'premium' pricing levels" and that such competition creates "enormous downward pressure on premium price levels, and upward pressure on provider contracting."

344.    Absent competition, the Blues have achieved significant market power and domination in the markets in their Service Areas. The territorial restrictions have therefore barred competition from the respective commercial health insurance markets and the market for healthcare services. In a letter written in February of 2016, the AHA summarized the market dominance of the Blue plans as follows (footnotes omitted):

- Blue plans have the largest membership of any insurer. The Blues cover more than 105 million Americans. That is "nearly one in three Americans." Collectively, the Blues are three times bigger than any other health plan.

- Blue plans command the largest share of the commercial fully insured (FI) segment in at least 45 states and the District of Columbia (D.C.); in 35 states, a Blue plan holds 50 percent or more FI market share; in some states, 85 percent of all FI members belong to a Blue plan.

- Blue plans rank first in total membership in at least 43 states and D.C., with a high market share of 97 percent.

- In the Federal Employees Health Benefits Program, the Blue plans command 66 percent of total membership, and control 50 to 90 percent of the membership in 48 states and D.C.

- In the public exchanges, Blue plans dominate. In at least one state, the Blue plan

- 104 -

enrolled 100 percent of the exchange membership in 2015, and other Blue plans acquired membership shares in the forties through nineties in many states.

- Blue plans collectively are significantly larger than any of their rivals on a consolidated basis. Indeed, collectively Blue plans had $244 billion in revenue in 2013, making them larger than all companies on the Fortune 500 except for Walmart and Exxon Mobil.

- The Blue plans of Alabama, Florida, Illinois, Kansas, Minnesota, Montana, Nebraska, New Mexico, North Dakota, North Carolina, Oklahoma, Texas and Wyoming through their jointly owned pharmacy benefit manager acknowledge their "market dominance."

- Blue plans dominate provider networks. In 32 states and D.C., Blue plans have the largest provider networks and, in seven more states, Blue plans have the second-largest provider networks.

- Blue plans contract with 96 percent (more than 5,100) of U.S. hospitals and 92 percent of professional providers, which is more than any other insurer.

Am. Hosp. Assoc. Ltr. to Hon. William Baer, Antitrust Div., U.S. Dept. of Justice (Feb. 29, 2016) at 7-9, *available at* https://www.aha.org/system/files/media/file/2023/12/160229-let-hatton-baer.pdf (last visited July 21, 2025).

345. The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates a territorial restriction faces "[l]icense and membership termination." If a Member Plan's license and membership are terminated, it loses the use of Blue brands, which BCBSA admits on its website are "the most recognized in the healthcare industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to Elevance's February 20, 2025 Form 10-K, there was a "re-establishment fee" of $98.33 per subscriber.

346. The Market Allocation Agreement, wherein Defendants have agreed to limit competition and not to contract with providers based on geographic Service Areas, continues to this day and will continue into the future absent injunctive relief enjoining the unlawful conduct.

347. In an effort to enhance its market power and the market power of the Blues in general, Anthem attempted to purchase Cigna, one of the largest health insurance companies in

the country and one of only four companies that competes in the administration of national accounts. After Anthem entered into the agreement with Cigna, the CEO of Anthem met with CEOs of various other Defendants in a private room in the luxurious Peninsula Hotel in Chicago. In those private meetings, various Defendants developed and agreed to a "Blue Bias Strategy" for the implementation of the agreed merger of Anthem and Cigna. The merger as planned by Anthem and the other Blues was enjoined because it would have been anti-competitive.

### 5. *The Price Fixing and Boycott Agreement*

348. As a result of the Market Allocation Agreement, Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area. As described above, Defendants have reached a horizontal agreement and implemented a Price Fixing and Boycott Agreement through the national programs in order to leverage the low provider pricing they have achieved in each Service Area to benefit all Blues.

349. The horizontal agreement also involves a concerted refusal to deal or collective boycott of healthcare providers outside of each Blue's Service Area. Under the License Agreements, every Blue agrees to participate in each national program adopted by the Members. Those national programs include, without limitation, the Blues' (a) Blue Card Program, (b) National Accounts Program, (c) Transfer Program, (d) Inter-Plan Teleprocessing System, (e) National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and (f) Inter-Plan Medicare Advantage Program, which is similar to the Blue Card and National Accounts Programs, but for members enrolled in Medicare Advantage plans.

350. The Blues commit that other than in contiguous areas, they will not contract, solicit, or negotiate with providers outside of their Service Areas. In other words, each Blue agrees with all other Blues to boycott providers outside of their Service Areas.

351. Defendants achieved the Price Fixing and Boycott Agreement by agreeing that all

Blues would participate in the national programs, including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.

352.    Defendants implement the Agreement collectively through the IPPC, where a number of the Blues decide how the Blue Card Program along with other national programs are designed and implemented. The National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

353.    Each of the Blues either has market power or has otherwise taken anti-competitive action in furtherance of gaining market power. Through the national programs the Blues control more than 100 million patients, something no other health insurance company has access to. These more than 100 million patients provide the Blues a substitute for market power when dealing with providers. In fact, in many places providers treat more patients through the national programs than through the direct subscribers of the local Blue. One example is in central North Carolina, where a majority of the subscribers for Blues come through national programs as opposed to being subscribers of BCBS-NC. When BCBS-NC negotiates with providers in central North Carolina, it uses the many patients in the national programs (which expand its bargaining power and effective market share) to obtain rates that are below competitive rates, and remain low.

354.    The Blues divided funds recouped under the procedures established by the Blues on the IPPC. In making such recoupments, the Blues are following procedures established by the Blues through the IPPC to enforce the Price Fixing and Boycott Agreement.

355.    When one Blue has a contract dispute or issue with a healthcare provider the other Blues, as independent horizontal parties and as horizontal parties through BCBSA, act to reinforce

the market power of each of the Blues. For example, when Highmark refused to pay UPMC reasonable rates and instead was going to allow its contract with UPMC to expire, UPMC wrote to Blues throughout the country, requesting that they separately contract with UPMC. Certain Blues responded directly and refused to negotiate. At the same time, BCBSA coordinated responses for a number of other Blues, and communicated the refusal to negotiate for those other Blues. Other healthcare providers including one or more hospitals in North Carolina have attempted to negotiate contracts with Blues in other states but have received refusals from those Blues, while BCBS-NC continues to reimburse at sub-competitive rates.

356.    Accordingly, Defendants have agreed to fix the prices for healthcare reimbursement within each Service Area. Healthcare providers, including THR, providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area receive significantly lower reimbursement rates than they would receive absent Defendants' agreement to fix prices. The Price Fixing and Boycott Agreement is a *per se* violation of Section 1 of the Sherman Act, as well as a violation under a quick look or rule of reason analysis.

357.    As a result of their Price Fixing and Boycott Agreement, Defendants reduce their payments to healthcare providers by in excess of $10 billion every year. These reductions, of course, are the result of the depressed prices paid to healthcare providers, including THR.

358.    The Price Fixing and Boycott Agreement facilitates the Blues' monopsonization and exercise of market power by increasing the volume of patients each Blue brings to its negotiations with providers. A provider who does not accept the local Blue's terms loses the ability to treat on an in-network basis not only that Blue's subscribers, but all Blues' subscribers.

359.    The Blues' Price Fixing and Boycott Agreement does not constitute a joint purchasing agreement. Defendants have publicly denied that they are engaged in joint purchasing.

Moreover, the Blues' model, in which the Home Plan pays only the rate agreed to by the provider and the Home Plan, is naked price-fixing, not joint purchasing. As the Department of Justice and Federal Trade Commission explained in their 1996 publication Statements of Antitrust Enforcement Policy in Health Care, "[a]n agreement among purchasers that simply fixes the price that each purchaser will pay or offer to pay for a product or service is not a legitimate joint purchasing arrangement and is a per se antitrust violation."[2]

360. Even if the Blues were engaged in joint purchasing, which they are not, their activity would not fall within the "safety zone" that the DOJ and FTC had established in the context of joint purchasing arrangements among healthcare providers. The DOJ and the FTC had stated that they "will not challenge, absent extraordinary circumstances, any joint purchasing arrangement among healthcare providers where two conditions are present: (1) the purchases account for less than 35 percent of the total sales of the purchased product or service in the relevant market; and (2) the cost of the products and services purchased jointly accounts for less than 20 percent of the total revenues from all products or services sold by each competing participant in the joint purchasing arrangement."

361. The Defendants' model also has none of the safeguards that the DOJ and FTC had identified as mitigating concerns associated with joint purchasing. "First, antitrust concern is lessened if members are not required to use the arrangement for all their purchases of a particular product or service." The Blues are required to use the Blue Card Program for all purchases of healthcare services from providers with whom they do not have a contract.

---

[2] See DOJ & FTC, "Statements of Antitrust Enforcement Policy in Health Care" (August 1996), *available at* https://www.justice.gov/atr/media/1378581/dl. These statements were in effect during most of the period covered by this complaint. They were withdrawn by both agencies in February 2023 without any noted dissents.

362.    "Second, where negotiations are conducted on behalf of the joint purchasing arrangement by an independent employee or agent who is not also an employee of a participant, antitrust risk is lowered." The Blues do not do this. "Third, the likelihood of anticompetitive communications is lessened where communications between the purchasing group and each individual participant are kept confidential, and not discussed with, or disseminated to, other participants." Because the Blues do not use a purchasing group, but instead extend the Host Plan's pricing to all Home Plans, this safeguard does not apply.

### 6.    *Other Abuses*

363.    In addition to the harms set forth above, healthcare providers such as THR have been and continue to be harmed in numerous other ways as a result of Defendants' abuse of the significant market power that has resulted from their unlawful agreements.

364.    For example, a number of Blues use MFNs with hospitals and other facilities. According to at least some defense counsel, BCBS-MI says that its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Although the Michigan legislature has made MFNs unlawful, the statement of BCBS-MI also applies to other Blues. The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract. Some Blues' contracts with providers such as THR impose the functional equivalent of an MFN when the Blue, as the dominant health insurer, prohibits the hospitals from using its reimbursement rates in a contract with any other payor.

365.    All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the then-applicable Statement of Antitrust Enforcement Policy in Healthcare issued by DOJ and FTC. By preventing the full

disclosure of price terms of the contracts, Defendants undermine competition.

366.    In addition, Defendants, including CareFirst, require healthcare providers, including THR, to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants refuse to disclose the rates that they pay to other providers. Defendants thereby create asymmetric information in the market for healthcare services, preventing the market from functioning competitively and giving Defendants an advantage in any bargaining that occurs between Defendants and providers.

367.    Defendants, specifically Highmark, have also threatened to utilize their extraordinary and excessive surpluses to enter (and have already done so in some cases) the market as providers of healthcare services if providers do not acquiesce to the far-below-competitive rates offered in a market free from competition from other Blues.

368.    Finally, most Blues refuse to honor consumer or patient assignments of benefits to providers, except when required by state law. BCBSA encourages this policy. For example, BCBSA's Electronic Claims Routing Process ("ECRP") system, which processes provider claims for reimbursement which are exempt from the Blue Card Program, defaults to paying the subscriber rather than the provider when the provider is out-of-network. The Blues refuse to honor assignments of benefits for the express purpose of making collection problematic and increasing accounts receivable for out-of-network providers, thereby discouraging providers from remaining out-of-network or going out-of-network. The Blues further leverage their refusal to honor assignments of benefits as a contracting tactic designed to coerce providers who attempt to be out-of-network into network at sub-competitive rates. The Blues also retaliate against providers who attempt to operate out-of-network. Various Blues have told providers that if they do not remain in network, the Blue will pay the patient the reimbursement check for the provider services and the

provider will then have to chase down the patient. The refusal to honor assignments creates inefficiencies for consumers and providers.

369.    All of this is undertaken in an attempt to further drive down payments to providers and to raise barriers for competing firms to enter these markets.

### 7.    *Defendants' Unlawfully Gained and Supra-competitive Profits*

370.    Defendants' anti-competitive practices have resulted in their collection of supra-competitive profits. Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer. These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace. As Defendant BCBS-MI has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Indicia of supra-competitive profits include high underwriting margins and surpluses well above statutory requirements.

371.    Although the Blues were originally established as non-profits, they soon operated like for-profit corporations. In 1986, after Congress revoked Defendants' tax-exempt status, the Blues began to form for-profit subsidiaries. A number of the non-profit Blues then converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit, as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

372.    The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

373.    Often these holding company systems include both "not-for-profit" and "for-profit" affiliates. The numerous affiliates have "cost sharing" arrangements that are often daunting and

nearly impossible for auditors and regulators to unravel. Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

374. Blues nationwide have many common threads that reach throughout their network. Officers share with each other their otherwise well-kept expense schemes. These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel, and even excess medical claim benefit perks. These perks offer nice privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

375. Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services. Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

376. By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;

- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;

- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;

- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;

- Cost Allocations not arms-length or fair and reasonable;

- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;

- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executives to cover the contributions and related income tax on the additional bonus.

377. The mazes of self-dealing and related and affiliated companies can make it nearly

impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

378.    For instance, Defendants often charge "hidden fees" to long-time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the company or one of its affiliated entities. BCBS-MI was found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

379.    In addition, despite claiming to be "not-for-profit," many of these Blues hold massive excess surplus levels built off the net income spread between the high premiums they charge customers and the sub-competitive payments to providers. Those excessive surplus levels have come at the expense of higher premiums to consumers.

380.    By way of example, HCSC holds huge amounts of capital in excess of applicable requirements. In 2021, HCSC's capital and surplus of $23.1 billion increased by almost 6%, primarily because of net income of more than $1.2 billion. At year-end 2021, HCSC had a risk-based capital ("RBC") ratio of 1,247%. In 2023, HCSC held capital and surplus of $23.4 billion and had an RBC ratio of 1,152%.

381.    Many of the Blues understate their actual surplus substantially by citing only the surplus from the mainline company, but not the general surplus on the companies' combined reporting statements, which accounts for all lines of business.

382.    In South Carolina, for instance, BCBS-SC's net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance. Members of the Board of BCBS-SC "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show." Little was and is required

of members, except to show up to the occasional meeting. But this is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies. BCBS-SC paid executives in the millions of dollars in 2010.

383.     HCSC, a conglomerate of several Blues, posted over $1.4 billion in "net income," what most companies call profit, on its fully insured business alone in 2022 and 2023. This net income does not even account for large blocks of plans it merely administers for the self-insured. In addition, "CEO Maurice Smith, who saw his total compensation rise 26% to nearly $28 million in 2023, according to the Chicago-based company's financial records. . . . Smith's salary was about $1.6 million in 2023, up 9% from the year before, but a $26.3 million bonus skyrocketed his total pay." "Altogether, the 10 highest-paid employees at HCSC received a combined $88.7 million [in 2023], up about 26% from 2022." *See* Crain's Chicago Business, "Top brass at Blue Cross Illinois parent take home big raises" (July 17, 2024), *available at* https://www.chicagobusiness.com/insurance/blue-cross-blue-shield-illinois-execs-notch-big-raises.

384.     Other Blues also pay excessive executive compensation. For example, when Anthem's CEO led the company through the ill-fated merger effort with Cigna that cost the company a break fee of $1.85 billion and perhaps more, Anthem's Board awarded him with a salary increase of $3 million. *See* New York Post, "Anthem CEO's $3M salary hike draws criticism from Wall Street," *available at* http://nypost.com/2017/03/20/anthem-ceos-3m-salary-hike-draws-criticism-from-wall-street/ (last visited July 21, 2025).

385.     The Blues hold significant and unnecessary surpluses created by their sub-competitive reimbursements to providers. These surpluses are far in excess of any requirements under the law or BCBSA's rules. These surpluses have also risen dramatically during the relevant

timer period, and have far outpaced the percentage increases in total liabilities.

386.     While Defendants often claim these surpluses are designed as insurance reserves for future payments, they are more often used as strategic monies allowing acquisitions of competitors, market share, or provider practices.

387.     Likewise, Defendants have implemented large salary increases for executives during the relevant time period, resulting in higher costs to consumers. The supra-competitive profits that feed these salary increases are built on the strength of Defendants' agreement not to compete, their price-fixing Blue Card regime and their market power, in particular their ability to force providers to join their networks at sub-competitive rates. A spokeswoman from BCBS-SA noted that the outrageous increases are priced "to reflect its superior networks." Thus, the market power of the Blues allows them to pay sub-competitive rates to providers. This leads to huge surplus profits for companies supposedly organized as not-for-profit or charitable companies.

### 8.  *The Unlawful Agreements Reduce Healthcare Quality and Increase Healthcare Costs*

388.     Economist J.R. Hicks recognized in 1935 that: "The best of all monopoly profits is a quiet life." J.R. Hicks, The Theory of Monopoly, Econometrica, Vol 3, No. 1 (Jan. 1935), pp. 1-20. Part of the quiet life that a monopolist enjoys is that it does not have to innovate. Defendants' conduct demonstrates the truth of Professor Hicks' writing 90 years ago.

389.     For example, BCBS-TX is a monopolist in the sale of commercial health insurance and in the sale of administrative serves for healthcare plans in Texas and in every geographic area that one could possibly define in Texas. The other Defendants have agreed that they will not compete with BCBS-TX in the sale of commercial health insurance or in the sale of administrative services in Texas. BCBS-TX is a monopsonist in the purchase of healthcare services by commercial insurers in Texas and within every geographic market one could define in Texas.

Under the law, Defendants are unquestionably both a monopolist and a monopsonist.

390.    Innovation in healthcare is essential to preserve and improve quality and to limit and reduce costs. Collaboration between health insurers and providers is one way to encourage innovation in healthcare. When health insurers pay low reimbursement rates to providers, they discourage collaboration and innovation. The evidence and findings in the Anthem merger trial demonstrate the truth of the allegations in this paragraph. Representatives of Cigna, including its CEO, and others testified that Blues such as Anthem pay providers lower reimbursement rates than Cigna, but that through collaboration and innovation Cigna was able to lower the cost of healthcare for employers and consumers while paying providers higher reimbursement rates. Those witnesses also testified that if Cigna reduced its reimbursement rates to the rates paid by Anthem and other Blues, its ability to collaborate and innovate with providers would be diminished.

391.    Defendants' conduct has discouraged innovation in healthcare. One need go no further than an article in Health Affairs to understand how this is happening. "Organizations seeking to create innovative environments need to address a number of factors. These include making available sufficient resources – especially money and space . . . ." D. Bates, A. Sheikh, D. Asch, "Innovative Environments in Healthcare: Where and How New Approaches to Care Are Succeeding," Health Affairs, March 2017, 400, 401.

392.    Defendants pay hospitals among the lowest reimbursement rates in the country. Healthcare providers are therefore deprived of the resources to be able to innovate. One example of the cost of innovation is that tracking patients to make sure they are receiving the best healthcare possible requires expensive IT systems.

393.    The authors in this article further recognized that: "part of the slow pace of innovation stems from the healthcare payment system." Because Defendants have enjoyed the

quiet life of a monopolist they have refused to develop innovative payment systems. The refusal of each Blue as a monopolist/monopsonist to innovate has reduced the quality of healthcare and add to its expense.

394. In order to achieve the best possible outcomes in healthcare at the most reasonable price, one must track the patients and well as the providers, something that is highly inefficient in the Blues' system at least for members being treated under the Blue Card Program. One of the things that Cigna has been doing to improve healthcare at a lower price is to track both the patients who are its health plan members and their providers in its networks. The fact that certain Blues have hundreds of thousands of members for whom they maintain patient healthcare information but who reside in states in which those Blues cannot contract directly with makes the Blue System inefficient and often impossible. This inefficiency adds to the other current inefficiency in the Blues system in which providers must know and comply with the coverage and payment rules of over 30 different Blue license holders while being in network with only one and generally only having ready access to that one Blue's rules.

### D. Market Power and Related Considerations

395. The Blues have market power in many markets over prices or payment rates for healthcare providers. The Blues serve approximately 115 million people—roughly one out of every three Americans. The various plans service 88 of the Fortune 100 companies, including major firms like Wal-Mart, Microsoft, General Motors, and UPS, as well as over seven million people who work for small employers. Combined they are the number one health insurance provider for organized labor, serving 17 million organized workers, retirees, and their families. They also offer coverage through Affordable Care Act insurance exchanges and service millions of Americans through government-supported healthcare programs.

396. The BCBS provider network includes more than 90% of doctors and hospitals

nationwide. BCBS members have access to care from more than 342,000 providers.

397.     Even in markets where the Blues do not have high market concentrations, they have market power or have otherwise exploited anti-competitive actions through the more than 100 million subscribers involved in the Inter-Plan or national programs. This access provides market power beyond what might be suggested by the local enrollment share.

### 1.     *Sale of Health Insurance and Related Products and Services*

398.     This case involves a number of product markets in which Defendants participate. One is the market for the sale of commercial healthcare financing services (excluding Medicare Advantage and managed Medicaid), which includes the various means of paying or reimbursing for healthcare goods and services other than the direct payment by individuals who are not insured or indemnified. The market includes the sale of the full package of healthcare financing services, including insurance, as well as, for self-insured groups, the sale of other healthcare financing services, including access to a network of healthcare providers at reduced prices and the administration of healthcare-related employee benefit plans, which together form a relevant product market. This relevant product market can be described as the market for the sale of commercial health insurance and includes both fully insured plans and Administrative Service Only ("ASO") plans.

399.     The purchasers of commercial health insurance do not have reasonable alternatives. Some employers are required by the Affordable Care Act to offer employee health benefits to their employees. Employers who are required to offer these benefits, as well as employers who are not required to offer these benefits but wish to do so, have no reasonable alternative but to purchase commercial health insurance. For these employers, forgoing coverage or trying to self-supply, in other words managing all aspects of their employees' health benefits on their own, is not feasible. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices

above competitive levels by imposing at least a small but significant and non-transitory increase in price ("SSNIP"). The number of employers or other groups substituting away from commercial health insurance is likely to be insufficient to make the SSNIP unprofitable.

400.    Within the market for the sale of commercial health insurance, Defendants participate in a number of submarkets. These submarkets are alleged in the alternative to be relevant product markets for purposes of THR's claims.

401.    The first submarket is the sale of commercial health insurance to national accounts with 5,000 employees or more, who are spread over more than one state. The relevant submarket can be described as the sale of commercial health insurance to these national accounts and includes both fully-insured plans and ASO plans. There is no reasonable substitute for this product. Large multistate employers have unique needs when seeking commercial health insurance for their employees. They desire a national network, a high degree of plan customization, and sophisticated claims administration, customer service, and data reporting. If faced with a SSNIP, a national account would have only two alternatives: self-supply by handling all aspects of the insurance product themselves, or forgo the purchase of commercial health insurance altogether. Neither is a reasonable substitute. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP.

402.    Because other insurance products, such as those without national networks, do not meet the unique needs of national accounts, the substitution between commercial health insurance for national accounts and other health insurance products is low, as reflected in measures such as a low cross elasticity of demand. Moreover, "national account" is a well-understood term in the health insurance industry. Insurance brokers and benefits consultants generally consider national accounts to constitute a separate line of business. Many of the largest insurers in the country,

including Anthem (now Elevance), manage national accounts separately from their other business. Cigna and Anthem both use 5,000 employees as the threshold for defining national accounts, and that figure is considered to be reasonable by insurance brokers and benefits consultants.

403.    The second submarket is the sale of commercial health insurance to large group employers. The relevant submarket can be described as the sale of commercial health insurance to large group employers and includes both fully insured plans and ASO plans. "Large group" is defined as an employer with more than 50 employees. This is the threshold established by the Affordable Care Act for "large employers." 42 U.S.C. § 18024(b)(1). There is some overlap between this submarket and the submarket for the sale of commercial health insurance to national accounts. The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. Large group insurance is subject to less stringent regulation, and it permits more customization and differentiation. Insurers can profitably target large groups—in other words, engage in price discrimination—because they can easily identify large groups; prices for large-group products are negotiated individually; and arbitrage is impossible. There are no reasonable substitutes for commercial health insurance sold to large groups. A large group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) somehow morph into small groups.

404.    Forgoing health insurance is not a reasonable substitute because virtually all large employers offer health coverage to their employees. Handling all aspects of the insurance product is impractical. And large groups are not in a position to reduce their numbers of benefits-eligible employees below state-law thresholds. In other words, the substitution between large group

insurance and other healthcare financing options is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market would likely raise prices above competitive levels by imposing at least a SSNIP.

405.     The third submarket is the sale of commercial health insurance to small group employers. The relevant submarket can be described as the sale of commercial health insurance to small group employers and includes both fully insured plans and ASO plans. "Small group" is defined as an employer with 50 employees or fewer. This is the threshold established by the Affordable Care Act for "small employers." 42 U.S.C. § 18024(b)(2). The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. There are no reasonable substitutes for small group insurance. A small group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) hire enough new employees to become a large group.

406.     Forgoing health coverage is not a reasonable substitute because health coverage is considered to be an important benefit. Handling all aspects of the insurance product is impractical. And hiring more employees for the sole purpose of being able to purchase different insurance is impractical. In other words, the substitution between small group insurance and other healthcare financing options is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP.

407.     For the relevant product markets described above, the State of Texas, for example, is a relevant geographic market. Sellers of commercial health insurance compete for the business

of employers, in part, by offering attractive provider networks in the geographic areas where employers' employees live and work. Individuals tend to get their healthcare services in locations near to where they live and work. If the hypothetical monopolist of commercial health insurance in Texas were to implement a SSNIP, employers in Texas would not substitute commercial health insurance in other states because their employees in Texas value access to providers in Texas. For employers in Texas, there are no reasonable substitutes to commercial health insurance in Texas. Further, in response to a SSNIP, employers will not move their employees to other states. In other words, the substitution between commercial health insurance in Texas and commercial health insurance outside Texas is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these product markets in Texas would likely increase prices above competitive levels by imposing at least a SSNIP.

408. In the alternative, for the relevant product markets described above, Texas Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets. "Core-Based Statistical Areas" is a term used by the United States Office of Management and Budget to encompass Metropolitan Statistical Areas and Micropolitan Statistical Areas. Metropolitan Statistical Areas especially are used in the ordinary course of business in the insurance industry when examining local markets. Defining markets for commercial health insurance as local is consistent with the desire of employers to provide health plans with networks of local providers, specifically providers located near where their employees live and work. In other words, the substitution between commercial health insurance in an employer's local area and commercial health insurance outside the employer's local area is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these product markets in Texas Core-Based Statistical Areas, and

counties or combinations of counties not part of one of these areas, likely would increase prices above competitive levels by imposing at least a SSNIP.

409.    The relevant geographic markets for each of the other Blues is defined in the same way as the relevant geographic markets alleged in the preceding two paragraphs, except that the outer boundary of each Blue's relevant geographic markets is the same as the boundary of that Blue's Service Area.

## 2.    *Purchase of Products and Services from Healthcare Providers*

410.    In addition to the market for commercial health insurance, Defendants participate in the market for the purchase of goods and services from healthcare providers. Outside of payments by the government, the vast majority of those goods and services are paid through or by health insurance companies, with the over 30 independent Blues being the largest collection of those companies. Of the goods and services of healthcare providers that are paid for by health insurance companies, the vast majority are provided through in-network contracts.

411.    The purchase of goods and services from healthcare providers by commercial buyers (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid) is a relevant product market. Prescription drugs are excluded from this relevant market because they are largely purchased indirectly, through pharmacy benefit managers. These commercial buyers are the companies in the business of selling commercial health insurance or administering commercial health plans for private employers or other groups.

412.    These companies have separate business units dedicated to contracting for the purchase of goods and services from healthcare providers. For healthcare providers, there is no reasonable alternative to contracting with these commercial buyers in order to be in-network providers for the health plans sold to private employers or groups. Sellers of healthcare goods and services are not in a position to forgo sales to commercial buyers, in favor of patients who pay out

of pocket, a group that essentially does not exist.

413. Nor can they obtain enough Medicare or Medicaid patients, insured either under the government's traditional programs or managed care programs, to replace the volume they would lose from dropping commercial insurance. Further, the prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are lower than the prices paid for the commercial health plans of private employers or groups. In other words, for providers, the substitution between commercial buyers and other payors is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in this market likely would lower prices paid to providers below competitive levels by imposing at least a small but significant and non-transitory reduction in price ("SSNRP").

414. The prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are different than the prices paid for the commercial health plans of private employers or groups. Also, some healthcare providers have separate contracts for Medicare Advantage and managed Medicaid, and some insurers have separate contracting teams for these products.

415. This market need not be segmented by the type of provider at issue. Healthcare providers participate in what is known as two-stage competition; first they compete for inclusion in the provider networks of insurers' plans, and then they compete for patients within a plan. This market relates to the first stage of that competition. For a healthcare provider, the fundamental question in defining this product market is not, "Who will my patients be?" but "Who are the payors with whom I can contract?" The answer is the same, regardless of who the provider is—the Blues, the few non-Blue commercial insurers with a presence in the state, and government programs including traditional Medicare, Medicare Advantage, Medicaid, and managed Medicaid.

All providers, regardless of their type, face these options. Moreover, multiple types of providers can form a "cluster market," a concept widely accepted in healthcare antitrust cases and scholarly economic analyses.

416.    In the alternative, three submarkets within this market are relevant product markets. These are the purchase of goods and services from healthcare professionals, the purchase of goods and services from healthcare facilities, and the purchase of durable medical equipment ("DME"), all by commercial buyers of healthcare goods and services who are the companies in the business of selling commercial health insurance or administering commercial health plans (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid).

417.    Practical indicia support the segmentation into three submarkets. For example, the industry recognizes distinctions among healthcare professional services, healthcare facility services, and DME, and insurers often differ in the reimbursement methodologies they employ for each of these groups. For example, many commercial buyers reimburse healthcare facilities for inpatient services based on diagnosis-related group codes instead of paying for each good or service individually.

418.    Commercial buyers' contracting teams and processes also differ among these submarkets. Nonetheless, providers of healthcare professional services and providers of healthcare facility services face the same options for the purchase of their goods and services described above. As a result, in each of these submarkets, the substitution between commercial insurance and other payors is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in these submarkets would likely lower prices paid to providers below competitive levels by imposing at least a SSNRP.

419.    For the relevant product markets described above, other than DME, Texas's

Metropolitan Areas are relevant geographic markets. In the alternative, for the relevant product markets described above, other than DME, the State of Texas is a relevant geographic market. Healthcare providers, who have built their patient base and have invested in physical assets located in Texas, are unlikely to respond to a SSNRP by moving their practice out of the state. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the State of Texas would likely reduce prices below competitive levels by imposing at least a SSNRP.

420.    Also in the alternative, for the relevant product markets described above, other than the market for DME, Texas Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets. Healthcare professionals and healthcare facilities usually provide services to patients living or working in relatively close proximity to their offices or other facilities. Healthcare professionals and healthcare facilities have invested in physical capital in their local geographic areas and invested in their human capital (reputation and referral patterns) that is specific to their local geographic areas. Therefore, they are unlikely to respond to a SSNRP by moving their practice out of their local area.

421.    The disincentive to moving is even more compelling in the real world than in the world of the hypothetical monopsonist because providers cannot contract with out-of-state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the provider's local area makes little difference unless the provider is willing to leave the state entirely. In other words, in the product markets for the purchase of healthcare services, the substitution between commercial buyers in the local geographic markets identified above and commercial buyers outside the local geographic markets identified above is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the geographic markets identified above would likely

reduce prices below competitive levels by imposing at least a SSNRP.

422. The relevant geographic markets for each of the other Blues is defined in the same way as the relevant geographic markets alleged in the preceding three paragraphs, except that the outer boundary of each Blue's relevant geographic markets is the same as the boundary of that Blue's Service Area. Each of the relevant product markets discussed above also exist within these geographic boundaries.

423. In the alternative, for the product market defined as the purchase of goods and services from healthcare facilities by commercial buyers (excluding prescription drugs their purchases for Medicare Advantage and managed Medicaid), Dartmouth Atlas Hospital Referral Regions and Dartmouth Atlas Hospital Service Areas are relevant geographic markets. The Dartmouth Atlas of Healthcare is produced by the Dartmouth Institute for Health Policy and Clinical Practice. Hospital Referral Regions represent regional healthcare markets for tertiary medical care that generally requires the services of a major referral center. Hospital Service Areas are local healthcare markets for hospital care. Healthcare facilities, including hospitals, treat patients from these areas and have invested in physical capital and built goodwill in these areas. Therefore, they are unlikely to respond to a SSNRP by moving their facilities.

424. The disincentive to moving is even more compelling in the real world than in the world of the hypothetical monopsonist because providers cannot contract with out-of-state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the facility's Hospital Referral Region or Hospital Service Area makes little difference unless the facility is willing to leave the state entirely. In other words, the substitution in the relevant product markets between commercial buyers in these geographic markets and commercial buyers outside these geographic markets is low, as reflected in measures such as a low cross elasticity of demand.

Therefore, a profit-maximizing hypothetical monopsonist in this product markets in these geographic markets would likely reduce prices below competitive levels by imposing at least a SSNRP.

425.    Because DME can be shipped across state lines, the geographic market for DME is national.

426.    THR reserves the right to further refine its definitions of the relevant product markets and relevant geographic markets as more data and expert analysis become available.

### 3.    *State-Specific Market Share Information*

427.    The figures in the paragraphs below are taken from the AMA's 2024 Competition in Health Insurance study, which includes Kaiser Permanente ("Kaiser"). *See* Am. Medical Assoc., "Competition in Health Insurance: A Comprehensive Study of U.S. Markets, 2024 Update," *available at* https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf (last visited June 3, 2025). In most markets where Kaiser is active in the health care financing market, it owns hospitals and ambulatory surgery centers and contracts for doctor services only with the Permanente Medical Group and does not purchase nonemergency medical services from other healthcare providers. As a result, for most healthcare providers Kaiser is not a close or reasonable substitute for the Blues when those healthcare providers decide whether to contract with one of the Blues. This can cause the Blue's market share to be understated.

428.    Defendant BCBS-AL has market power throughout the State of Alabama in the healthcare financing market and in every geographic area within Alabama. It also has market power in the State of Alabama and in every geographic area within Alabama in the health services market. In Alabama, BCBS-AL's market share in the entire state was 86%. Its highest market share is 92% in the Anniston-Oxford area. It also maintains a 91% market share in the Tuscaloosa area, a 89% share in the Montgomery area, a 85% market share in the Huntsville area, and a 85% share

in the Birmingham-Hoover area.

429. Defendant Premera Blue Cross has market power throughout the State of Alaska in the health care financing market and in every geographic area within Alaska. It also has market power in the State of Alaska and in every geographic area within Alaska in the health services market. In Alaska, the Blue has a 46% market share in the entire state. Its lowest market share is 50% in the Fairbanks area. Its highest market share is 51% in the Anchorage area.

430. Defendant BCBS-AZ has market power at least in certain areas in Arizona in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Arizona in the health services markets and may have market power in the entire state. For example, it has a 69% market share in the Flagstaff market and a 59% market share in the Prescott area. Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Arizona. The Blue uses those subscribers to increase its market power.

431. Defendant BCBS-AR has market power at least in certain areas in Arkansas in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Arkansas in the health services markets and may have market power in the entire state. For example, it has a 49% market share in the Jonesboro market, a 63% market share in the Pine Bluff area, and a 47% market share in the Hot Springs area.

432. Defendant Elevance has market power at least in certain areas in California in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of California in the health services markets and may have market power in the entire state. For example, it has a 58% market share in the Chico area, a 37% market share in the Bakersfield area, a 30% market share in the Fresno area, a 42% market share

in the Hanford-Corcoran area, a 35% market share in the Madera area, a 58% market share in the Merced area, a 35% market share in the Oxnard-Thousand Oaks-Ventura area, a 45% market share in the Salinas area, a 53% market share in the San Luis Obispo-Paso Robles area, a 49% market share in the Santa Maria-Santa Barbara area, a 31% market share in the Santa Cruz-Watsonville area, a 60% market share in the Visalia area, and a 45% market share in the Yuba City area. If Kaiser is removed from markets where the prices for non-Kaiser healthcare providers are determined, BC-CA would be the largest health insurer in California. These percentages are presented only for Defendant BC-CA; Defendant BS-CA has somewhat lower market share percentages, but it and all other Blues are acting pursuant to their unlawful agreement with BC-CA and their combined market share is even more substantial.

433.   Defendant BCBS-CO, a subsidiary of Defendant Anthem, has market power at least in certain areas in Colorado in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Colorado in the health services markets and may have market power in the entire state. In Colorado, Kaiser has a significant presence. If Kaiser is excluded from the economic analysis, the Anthem market share will increase significantly.

434.   Defendant Elevance has market power at least in certain areas in Connecticut in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Connecticut in the health services markets and may have market power in the entire state. For example, it has a 37% market share in the State of Connecticut generally, a 38% market share in the New Haven-Milford area, and a 42% market share in the Hartford-East Hartford-Middletown area. It also maintains market power in portions of the state of Rhode Island. Elevance maintains a 48% market share in the Norwich-New London CT-RI area.

435.    Defendant Highmark has market power throughout the State of Delaware in the health care financing market and in every geographic area within Delaware. It also has market power in the State of Delaware and in every geographic area within Delaware in the health services market. In Delaware, the Blue has a 56% market share in the entire state. Its highest market share is 62% in the Dover area.

436.    Defendant CareFirst, through Defendant GHMSI, has market power in the District of Columbia in the health care financing market and in every geographic area within the District of Columbia in the health services market. CareFirst has a 31% market share in the District of Columbia.

437.    Defendant BCBS-FL has market power at least in certain areas in Florida in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Florida in the health services markets and may have market power in the entire state. For example, it has a 66% market share in the Crestview – Fort Walton Beach – Destin area, a 44% market share in the Deltona-Daytona Beach-Ormond Beach area, a 69% market share in the Gainesville area, a 58% market share in the Ocala market, a 49% market share in the Naples-Marco Island, FL area, a 73% market share in the Panama City area, a 61% market share in the Pensacola-Ferry Pass-Brent area, a 44% market share in the Port St. Lucie area, an 85% market share in the Tallahassee area, and a 60% market share in the Sebastian-Vero Beach area. Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Florida. The Blue uses those subscribers to increase its market power.

438.    Defendant Elevance has market power at least in certain areas in Georgia in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Georgia in the health services markets and may have market

power in the entire state. For example, it has a 56% market share in the Warner-Robins area, a 50% market share in the Albany area, 50% market share in the Athens-Clarke County area, a 51% area share in the Columbus GA-AL area, a 57% market share in the Valdosta area, and a 42% market share in the Hinesville area. Kaiser has some presence in Georgia and exclusion of it will affect some of the market share percentages.

439. Defendant BCBS-HI has market power throughout the State of Hawaii in the health care financing market and in every geographic area within Hawaii. It also has market power in the State of Hawaii and in every geographic area within Hawaii in the health services market. In Hawaii, the Blue has a 63% market share in the entire state and has a 66% market share in the Honolulu area. If Kaiser is excluded from the analysis, then its market share will be even greater.

440. Defendant BC-ID has market power throughout the State of Idaho in the health care financing market and in every geographic area within Idaho. It also has market power in the State of Idaho and in every geographic area within Idaho in the health services market. In Idaho, the Blue has a 42% market share. Its highest market share is 54% in the Pocatello area. It also maintains a 39% market share in the Boise City area, a 38% share in the Coeur d'Alene area, 49% market share in the Idaho Falls area, and a 40% share in the Twin Falls area.

441. Defendant BCBS-IL, a division of Defendant HCSC, has market power at least in certain areas in Illinois in the healthcare financing market and may have market power in the entire state. It has market power at least in certain areas in Illinois in the health services markets and may have market power in the entire state. For example, it has a 63% market share in the entire state. It also has a 61% market share in the Chicago/Naperville/Elgin area, a 61% share in the Bloomington area, a 72% market share in the Decatur area, a 69% market share in the Kankakee market, a 53% share in the Carbondale-Marion, and a 72% market share in the Rockford area.

442.     Defendant BCBS-IN, an Elevance subsidiary, has market power throughout the State of Indiana in the health care financing market and in every geographic area within Indiana. It also has market power in the State of Indiana and in every geographic area within Indiana in the health services market. It has a market share of 56% in the entire state. Its highest market share is 68% in the Terre Haute area. It also maintains a 63% market share in the Bloomington area, a 62% share in the Columbus area, a 65% share in the Elkhart-Goshen area, a 66% share in the Evansville IN-KY area, a 49% share in the Fort Wayne area, a 57% share in the Lafayette-West Lafayette area, a 56% share in the Indianapolis-Carmel-Anderson area, a 64% share in Kokomo, a 56% share in the Michigan City-LaPorte area, a 55% share in the Muncie area, and a 49% share in the South Bend-Mishawaka, IN-MI area.

443.     Defendant BCBS-IA has market power at least in certain areas in Iowa in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Iowa in the health services markets and may have market power in the entire state. For example, it has a 47% market share in the entire state. It also has 63% market share in the Iowa City area, a 52% market share in the Cedar Rapids area, a 39% share in the Des Moines area-West Des Moines, a 63% market share in the Ames area, a 32% share in the Sioux City IA-NE area, and a 43% market share in the Dubuque area.

444.     Defendant BCBS-KS has market power at least in certain areas in Kansas in the health care financing market and may have market power in the entire state. Since Blue Cross and Blue Shield of Kansas and Blue Cross and Blue Shield of Kansas City have separate Service Areas within Kansas, the statewide market share percentages do not tell a complete story of market shares. It has market power at least in certain areas in the State of Kansas in the health services markets and may have market power in the entire state. For example, it has a 75% market share in

the Topeka area, a 76% share in the Manhattan, Kansas area a 50% share in the Wichita, Kansas area, and a 55% market share in the Lawrence area.

445.     Defendant Elevance has market power at least in certain areas in Kentucky in the health care financing market and may have market power in the entire state. It also has market power at least in certain areas in Kentucky in the health services markets and may have market power in the entire state. For example, it has a 67% market share in the entire state, a 69% market share in the Owensboro area, a 68% share in Elizabethtown-Fort Knox area and a 66% market share in the Bowling Green area.

446.     Defendant BCBS-LA has market power throughout Louisiana in the health care financing market and in every geographic area within Louisiana. It also has market power in the State of Louisiana and in every geographic area within Louisiana in the health services market. For example, it has a 66% market share in the entire state, a 67% market share in the Alexandria area, a 69% market share in the Houma-Thibodaux area, a 67% market share in the Monroe area, a 68% market share in the Shreveport/Bossier City area, a 70% market share in the Lafayette area, a 70% market share in the Baton Rouge area, a 61% market share in the New Orleans-Metairie area, and a 68% market share in the Lake Charles area.

447.     Defendant Elevance has market power throughout Maine in the health care financing market and in every geographic area within Maine. It also has market power in the State of Maine and in every geographic area within Maine in the health services market. For example, it has a 43% market share throughout the state, a 45% market share in the Bangor area, a 40% market share in the Lewiston-Auburn area, and a 40% market share in the Portland-South Portland area.

448.     Defendant CareFirst has market power throughout the State of Maryland in the

health care financing market and in every geographic area within Maryland. It also has market power in the State of Maryland and in every geographic area within Maryland in the health services market. For example, it has a market share of 43% of the entire state of Maryland. It also has a 52% market share in the California-Lexington Park area, a 31% Cumberland MD-WV area and a market share of 49% in the Baltimore-Towson area.

449.    Defendant BCBS-MA has market power at least in certain areas in Massachusetts in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Massachusetts in the health services markets and may have market power in the entire state. For example, it has a market share of 35% throughout the entire state. It also has a 43% market share in the Pittsfield area, a 32% share in the Boston-Cambridge-Newton, MA-NH area, and a 33% share in the Worcester, MA-CT area.

450.    Defendant BCBS-MI has market power at least in certain areas in Michigan in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in Michigan in the health services markets and may have market power in the entire state. For example, it has a 67% market share in the entire state. It also has an 75% market share in the Lansing/East Lansing area, a 74% market share in the Niles area, a 74% market share in the Battle Creek area, a 78% market share in the Bay City area, an 80% market share in the Ann Arbor area, a 72% market share in the Saginaw area, a 73% market share in the Monroe area, a 75% market share in the Jackson area, a 68% market share in the Kalamazoo-Portage area, a 71% market share in the Flint area, a 62% market share in the Muskegon area, and a 70% market share in the Detroit-Warren-Dearborn area.

451.    Defendant BCBS-MN has market power at least in certain areas in Minnesota in the health care financing market and may have market power in the entire state. It has market

power at least in certain areas in the State of Minnesota in the health services markets and may have market power in the entire state where it has at least a 38% market share. For example, it has 56% market share in the Rochester area, a 37% share of the Duluth, MN-WI area, a 56% share of the Mankato, area, and a 43% market share in the St. Cloud area.

452. Defendant BCBS-MS has market power at least in certain areas in Mississippi in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Mississippi in the health services markets and may have market power in the entire state. For example, it has a market share of 50% throughout the entire state. For example, it has a 52% market share of the Gulfport-Biloxi area, a 51% share of the Hattiesburg area, and a 61% market share in the Jackson area.

453. Defendant BCBS-Kansas City has market power at least in certain parts of the states of Missouri and Kansas and the Kansas City area for the health care financing market and may have market power in the entire area. It has market power at least in certain areas in the State of Kansas and Missouri in the health services markets and may have market power in the entire Kansas City area. For example, it has a 52% market share in the St. Joseph MO-KS area.

454. Defendant Elevance has market power at least in certain areas in Missouri in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Missouri in the health services markets and may have market power across the entire state. For example, it has market power of 47% of the Cape Girardeau, MO-IL area, 62% of the Jefferson City area, and 49% of the Joplin area.

455. Defendant BCBS-MT, a division of Defendant HCSC, has market power at least in certain areas in Montana in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Montana in the health

services markets and may have market power in the entire state. For example, it has a market share of 61% in the Great Falls area.

456.    Defendant BCBS-NE has market power throughout the State of Nebraska in the health care financing market and in every geographic area within Nebraska. It also has market power in the State of Nebraska and in every geographic area within Nebraska in the health services market. For example, it has a 45% market share in the entire state. It also has 50% market share in the Lincoln area.

457.    Defendant Elevance has market power at least in certain areas in Nevada in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Nevada in the health services markets and may have market power in the entire state. For example, it maintains a market share of 27% in the Reno area.

458.    Defendant Elevance has market power at least in certain areas in New Hampshire in the health care financing market and may have market power in the entire state where it has a 48% market share. It has market power at least in certain areas in the State of New Hampshire in the health services markets and may have market power in the entire state. For example, it has a market share of 50% in the Manchester-Nashua area.

459.    Defendant BCBS-NJ has market power at least in certain areas in New Jersey in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in New Jersey in the health services markets and may have market power in the entire state. For example, it has a 77% market share in the Atlantic City-Hammonton area, a 74% market share in the Ocean City area, and a 64% share of the Vineland-Bridgeton area.

460.    Defendant BCBS-NM, a division of Defendant HCSC, has market power at least in certain areas in New Mexico in the health care financing market and may have market power in

the entire state. It has market power at least in certain areas in the State of New Mexico in the health services markets and may have market power in the entire state. For example, it maintains a 61% market share in the Las Cruces area.

461.     Defendants Highmark and Elevance each have market power at least in certain areas in New York in the health care financing market. They have market power at least in certain areas in the State of New York in the health services markets. For example, Elevance has a 25% market share in the Glens Falls area, and a 21% market share in the Kingston area. Highmark has a 41% market share in the Buffalo-Cheektowaga area.

462.     Defendant BCBS-NC has market power throughout North Carolina in the health care financing market and in every geographic area within North Carolina. It also has market power in every health services market. For example, it has a market share of almost half (48%) of the entire state. It also has a market share of 75% in the Goldsboro area, a market share of 76% in the Greenville area, a market share of 70% in the Rocky Mount area, a market share of 57% in the Hickory-Lenoir-Morganton area, a 46% market share in the Burlington area, a 48% market share in the Durham-Chapel Hill area, a 45% share in the Greensboro-High Point area, a 51% share in the Wilmington area, a 46% share of the Winston-Salem area, and a 43% market share in the Asheville area.

463.     Defendant BCBS-ND has market power at least in certain areas in North Dakota in the health care financing market. It has market power at least in certain areas in North Dakota in the health services markets. For example, it has a 48% market share in the entire state.

464.     Defendant Elevance has market power at least in certain areas in Ohio in the health care financing market. It has market power at least in certain areas in the State of Ohio in the health services markets. It has a market share of 52% in the Cincinnati area, but since that area borders

on Kentucky where Defendant Elegance (formerly Anthem) also has the Blue, it likely has market power through its combined operations.

465.    Defendant BCBS-OK, a division of Defendant HCSC, has market power at least in certain areas in Oklahoma in the health care financing market. It has market power at least in certain areas in the State of Oklahoma in the health services markets. For example, it has a market share of 57% in the entire state. It also has a market share of 49% of the Tulsa area and a 54% share of the Oklahoma City area.

466.    Defendant BCBS-OR, a Cambia subsidiary, has market power at least in certain areas in Oregon in the health care financing market. It has market power at least in certain areas in Oregon in the health services markets. For example, it has a market share of 37% in the Corvallis area; and a market share of 37% in the Bend area. If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, Cambia would have a larger share in many areas of Oregon.

467.    Defendant Highmark, the parent of Defendant Highmark Health, has market power at least in certain areas in Pennsylvania in the health care financing market. It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 52% market share in the Johnstown area, a 46% market share in the Altoona area, a 56% market share in the Erie area, a 55% market share in the Scranton/Wilkes-Barre area, a 46% market share in the Williamsport area, a 45% market share in the Pittsburgh area, a 46% share of the Harrisburg-Carlisle area, a 55% share of the Lebanon area, a 33% share of the Reading area, a 49% share of the State College area and a 40% of the York-Hanover area.

468.    Defendant IBC has market power at least in certain areas in Pennsylvania in the health care financing market. It has market power at least in certain areas in the Commonwealth

of Pennsylvania in the health services markets. For example, it has a 36% market share in the Philadelphia area.

469. Defendant Triple-S of Puerto Rico has market power in the health care financing market or markets in Puerto Rico. It also has market power in the health service markets in Puerto Rico. While the AMA Study does not contain data on Puerto Rico, data from the National Association of Insurance Commissioners and from Triple-S itself indicate a total market share between 32-36% across Puerto Rico. Triple-S of Puerto Rico is the largest health insurer in Puerto Rico.

470. Defendant BCBS-RI has market power at least in certain areas in Rhode Island in the health care financing market. It has market power at least in certain areas in the State of Rhode Island in the health services markets. For example, it has a market share of 42% across the entire state.

471. Defendant BCBS-SC has market power throughout the State of South Carolina in the health care financing market and in every geographic area within South Carolina. It also has market power in South Carolina and in every geographic area within South Carolina in the health services market. In South Carolina, BCBS-SC has a 59% market share in the entire state. Its highest market share is 59% in the Sumter market. It also maintains a market share of 55% in the Greenville-Anderson area, a 62% share in the Charleston-North Charleston area, a 63% share of the Columbia area, a 57% share of the Florence area, a 39% share of the Myrtle Beach-Conway-North Myrtle Beach SC-NC area, and a 61% share of the Spartanburg area.

472. Defendant BCBS-SD has market power at least in certain areas in South Dakota in the health care financing market. It has market power at least in certain areas in the State of South Dakota in the health services markets. For example, BCBS-SD has a 44% market share of the

Rapid City area.

473. Defendant BCBS-TN has market power at least in certain areas in Tennessee in the health care financing market. It has market power at least in certain areas in Tennessee in the health services markets. For example, it has almost half of the market for the entire state of Tennessee. It also has a 35% market share of the Nashville-Davidson-Murfreesboro area, a 40% market share in the Jackson area, a 36% market share in the Chattanooga TN-GA area, a 46% share of the Cleveland area, a 60% share of the Johnson City area, and a 56% share of the Morristown area.

474. Defendant BCBS-TX, a division of Defendant HCSC, has market power at least in certain areas in Texas in the health care financing market. It has market power at least in certain areas in the State of Texas in the health services markets. For example, it has a 72% market share in the Laredo area, a 72% market share in the Wichita Falls area, a 63% market share in the San Angelo area, a 67% market share in the Odessa area, a 65% market share in the McAllen/Edinburg-Mission area, a 69% market share in the Midland area, a 67% market share in the Brownsville-Harlingen area, a 60% share in the Tyler area, a 60% market share in the Lubbock area, a 57% share in the Texarkana area, a 64% market share in the Longview area, a 54% market share in the Waco area, a 70% market share in the College Station-Bryan area, a 51% share in the Corpus Christi area, a 53% share of the Sherman-Denison area and a 54% market share in the Beaumont-Port Arthur area.

475. Defendant BCBS-UT, a Cambia subsidiary, has the Blue Service Area for Utah. Discovery will determine whether it has market power in any health services markets.

476. Defendant BCBS-VT has market power at least in certain areas in Vermont in the health care financing market. It has market power at least in certain areas in the State of Vermont in the health services markets. For example, it has a market share of 59% in the Burlington-South

Burlington area.

477.    Defendant Elevance has market power at least in certain areas in Virginia in the health care financing market. It has market power at least in certain areas in the State of Virginia in the health services markets. For example, it has an 66% market share in the Staunton area, a 65% market share in the Blacksburg-Christiansburg area, a 63% market share in the Harrisonburg area, a 58% market share in the Roanoke area, a 62% market share in the Lynchburg area, a 47% market share in the Winchester area, a 51% market share in the Virginia Beach-Norfolk-Newport News area, a 60% market share in the Richmond area, and a 41% share of the Charlottesville area. CareFirst has the Blue Service Area in the northern part of the state near the District of Columbia, but THR does not yet have data for the market share in that Service Area.

478.    Defendant Premera has market power at least in certain areas in Washington in the health care financing market. It has market power at least in certain areas in the State of Washington in the health services markets. For example, it has a 47% market share in the Wenatchee area. Kaiser also has a significant presence in Washington, and as stated above, may need to be excluded from the analysis of whether Premera or Regence BlueShield (WA) has market power over providers in Washington or markets for health care services in that state. There may also be other managed care companies or health insurance companies operating in Washington that should be excluded from the market power analysis. Especially if Kaiser is excluded, Regence BlueShield (WA) has market power in markets for health care services in Washington.

479.    Defendant BCBS-WV, a Highmark subsidiary, has market power at least in certain areas in West Virginia in the health care financing market. It has market power at least in certain areas in West Virginia in the health services markets. For example, it has a market share of 52% in the entire state of West Virginia, 56% of the Charleston, WV area, and a 55% share of the

Morgantown area.

480.     Defendant BCBS-WI, a subsidiary of Defendant Anthem, has the Blue Service Area for the State of Wisconsin. Discovery will determine whether it has market power in any health services markets.

481.     Defendant BCBS-WY has the Blue Service Area for the State of Wyoming. Discovery will determine whether it has market power in any health services markets.

482.     Discovery may also show that other Blues have market power in certain of these areas, or that the Blues listed above possess market power in other geographic areas not mentioned. THR reserves the right to present that evidence.

### 4.     *Other Relevant Considerations*

483.     As described above, the Blues have more subscribers than any health insurance or managed-care company in the country. Two of the five largest health insurance companies in the country, and five of the largest ten, are Blues.

484.     If individual Blue plans were allowed to enter and compete, the market share for the largest health insurance companies would likely become much less. It would also be expected that market power for any one company would diminish. Likewise for every other state, the District of Columbia, and Puerto Rico: But for the Defendants' Market Allocation Agreement and Price-Fixing and Boycotting Agreement, the market shares of the top health insurance companies, and the Herfindahl-Hirschmann Market Concentration Indices that measure market concentration, would likely be lower in every relevant market across the country.

485.     Having fewer competitors in any market generally gives the players in that market more access to market power, and a greater ability to use market power, all else being equal.

486.     The Blues engage in a number of anti-competitive practices to increase their market power and to ensure that any competitors that do exist are marginalized or are unable to effectively

compete. Through the agreements alleged in this Complaint, the Blues have exclusive access to more than 100 million subscribers of the Blues. The Blues use those subscribers to diminish the prices they pay in the markets that set prices for healthcare providers.

487.     Healthcare providers have essentially no choice but to be part of the networks of the Blues in order to remain in business. The Blues have a general policy of refusing to honor assignments from subscribers to providers as a part of their overall effort to coerce providers to be in network. The Blues also structure and implement out-of-network benefits for subscribers in a way that discourages them from using those benefits. The Blues either eliminate or cap out of network benefits so that it costs subscribers significantly more to use their out-of-network benefits. If providers attempt to limit the out-of-pocket costs of subscribers who use their out-of-network benefits, the Blues retaliate against those providers. When providers believe their patients are better served by using an out-of-network facility, the Blues retaliate by threatening to terminate the providers from the Blue networks.

488.     As the expert economist for Capital Blue Cross explained in a merger proceeding before the Pennsylvania Insurance Department, there are significant barriers to entry for the healthcare financing market and, therefore, to be a payor for healthcare goods, services and facilities in the markets where prices are determined for healthcare providers. One of the barriers is the development of a provider network.

489.     Some of the Blues have imposed MFNs to create additional barriers to entry. An MFN is both an indicator and a source of market power because it excludes competitors. Other Blues that do not have express MFNs in their contracts have the functional equivalents that operate in the same manner.

490.     The Blues' restraints have anti-competitive effects. The Blues' express agreements

with respect to the Service Areas are anti-competitive on their face: they prevent the Blues from competing with each other.

491.    The Blues' agreement to limit the amount of non-Blue business they may conduct in another Blue's Service Area is anti-competitive on its face.

- The agreement puts an artificial limit on competition.

- The agreement reduces the incentive for the Blues to develop business out of their Service Areas because they know that the potential for that business is limited.

492.    The Blues would compete to an extent with each other, but for their unlawful agreements and conduct.

- Historically, Blue-on-Blue competition happened in certain places such as Ohio, North Carolina, and Illinois.

- Blue Cross and Blue Shield organizations competed against each other for many years and still do to a limited extent in certain places, including Washington, Idaho, and Central Pennsylvania.

- The Ohio Blues litigation, *BCBSA v. Community Mutual Insurance Co.*, resulted from one Blue's desire to compete outside of its Service Area; BCBSA ultimately agreed to allow all of Ohio's Blues to compete with each other, which they did.

- BCBSA settled the Maryland Blues litigation by allowing the D.C.-area Blues to compete against each other.

- Blues compete against each other in a limited way with respect to healthcare providers in areas covered by the one-county rule.

- Anthem (now Elevance) and other Blues have large numbers of subscribers in Illinois through their National Accounts.

- Many of the Blues, especially the larger ones, such as Anthem and HCSC, have expanded into other territories through their non-Blue business, but in a limited way because of the limits on that business.

- The BCBSA prevents Blues from expanding into other Service Areas.

- The Blues administer National Accounts of companies headquartered outside their Service Areas through "ceding" arrangements.

493.    The Price Fixing and Boycott Agreement and the national programs, including the

Blue Card Program and the National Accounts Programs as well as the Inter-Plan Medicare Advantage Program, are anti-competitive because they prevent providers from negotiating with out-of-state Blues on the rate of reimbursement for treating their patients.

494.    Provider reimbursements are lower, and output of quality healthcare services is reduced, when the market for healthcare financing is highly concentrated, as is the case here.

495.    The Blues' agreements not to compete with each other, in addition to the other unlawful means of suppressing competition described in this complaint, constitute an agreement to monopsonize the market for healthcare services. In some areas, the Blues have successfully monopsonized the market for healthcare services, while in others, the Blues have a dangerous probability of success.

496.    The Blues' outrageous levels of capital show that they have used their market power to earn supra-competitive returns.

497.    The Blues' agreements contain enforcement mechanisms. For example, a Blue that disobeys the restriction on competition can have its license revoked. In addition, non-Blue companies that might favor competition effectively cannot buy a Blue because the BCBSA board must approve an applicant for a license.

498.    The Blues' restraints offer no procompetitive benefits.

499.    The BCBSA agreement does not create a new product. The Blues cannot define the "new product" as a Blue system that competes with nationally integrated insurers is not a new product. Many other insurers have figured out how to offer nationwide coverage to their subscribers without participating in territorial market allocation, price-fixing or boycott.

500.    The Blues do not need exclusive Service Areas to compete with national insurers. The Blues include several of the largest insurers in the country, which operate in several states and

would operate more broadly including nationwide but for the Market Allocation Agreement. Other Blues have more than held their own against national insurers.

501.    Exclusive Service Areas do not enhance efficiency by allowing the Blues to remain focused on their local areas. Without exclusive Service Areas, Blues could still focus on their local areas if they choose. In fact, the Blues used to be more locally focused, but BCBSA required them to merge and operate statewide. The existence of large multi-state Blues like Anthem and HCSC also belies the argument that Service Areas enhance efficiency.

502.    Nor are Service Areas necessary to prevent free riding, because there are less restrictive ways to prevent free riding, such as ensuring that all Blues comply with certain standards and invest in the development of the brand.

503.    Service Areas are not necessary to prevent customer confusion. Blues compete with each other in several parts of the country, and BCBSA allowed the Blues to compete in Ohio and Maryland when Service Areas were challenged there. Moreover, the restrictions on competition with healthcare providers have no relevance to consumer confusion.

504.    Limiting the Blues' ability to compete outside of their Service Areas without using the Blue marks has no plausible procompetitive benefit.

505.    MFNs offer no procompetitive benefits.

506.    The national programs, including the Blue Card Program and National Accounts Programs, result in many inefficiencies that increase costs to healthcare providers and reduce consumer welfare. The fact that the Home or Control Plans establish the coverage rules but then do not allow providers in Host or Participating Plans to be in-network providers create many of those inefficiencies as described in more detail above. Any alleged procompetitive effects of these programs are far outweighed by the anti-competitive effects that they create. Moreover, there is no

justification for the price-fixing aspects of these programs.

507.     The Blues do not need to engage in the Price Fixing and Boycott Agreement to offer health insurance or healthcare financing on a regional or national basis. Other health insurance companies or managed care companies offer health insurance or healthcare financing on a regional or national basis without engaging in such unlawful agreements.

### E.     Antitrust Injury

508.     Defendants' historical and continuing violations of the Sherman Act have and continue to directly and proximately cause harm to competition. cause harm to competition in a manner that the state antitrust laws were designed to prevent, including in a manner that has resulted in antitrust injury to THR.

509.     The effect of Defendants' unlawful agreements and conduct has been and is to prevent a network of allegedly independent health insurance providers, including two of the largest five, and five of the largest ten, health insurance or managed care companies, from competing across Service Area lines, thereby reducing competition throughout the country in various ways, including by increasing market concentration and health insurer power over healthcare providers, including THR.

510.     As a direct and proximate result of Defendants' unlawful agreements and conduct, THR suffered antitrust injury in the form of lower reimbursement rates, the imposition of unfair contracting terms, and a reduction in the output of healthcare services, equipment, supplies, and facilities, as follows:

- Defendants have agreed that the Blues will not compete across Service Areas by restricting each Blue from selling insurance and from contracting with THR outside of a designated geographic Service Area. By allocating the markets in which the Blues may operate, Defendants have restrained competition in the relevant product markets in those

markets.

- The number of commercial insurers and of Blue-branded and non-Blue branded health insurance plans has been reduced, reducing competition among commercial health insurers for the reimbursement rates offered to THR and other healthcare providers and leading to lower reimbursements paid to THR and other healthcare providers.

- The Blues' restraints on competition have also enabled them to impose unfair, inefficient, and burdensome contract provisions that the Blues use to delay and reduce reimbursements to THR and other healthcare providers.

- The Blues have agreed to jointly impose unlawful output restrictions, including the so-called Best Efforts Rules, by restricting the Blues' ability to operate under non-Blue brands within and across their Service Areas, which has also caused antitrust injury to THR. By agreeing that each Blue would limit its revenue from non-Blue branded business in their Service Areas, Defendants have directly reduced the amount of competition among the Blues and other commercial insurers in the relevant markets and submarkets. Absent these output restrictions, the Blues would conduct more health insurance business apart from and in competition with their Blue-branded insurance business.

- As a direct and proximate result of Defendants' unlawful price fixing agreements in which they set pre-determined reimbursement rates and mechanisms using national programs like the BlueCard and National Accounts Program, and by exchanging confidential reimbursement data to set prices, Defendants have fixed reimbursement rates paid by Blues to THR and other healthcare providers, rather than let those rates be set by competition. As a result, the rates imposed upon and paid to THR as reimbursement for healthcare goods, services, and facilities provided to their commercially-insured patients

have been artificially low.

511.    In light of each Blue's ill-gotten market power resulting from the anti-competitive agreements and conduct alleged herein, THR and other providers are or have been faced with non-negotiable, sub-competitive reimbursement rates provided by their local Blue during contract renewal periods. In these instances, the Blues often provide no alternative to the rates they dictate, other than termination or expiration of the parties' agreement. Defendants' activities have therefore forced THR to accept such rates, for fear of being put out of business, resulting in them receiving lower reimbursements than they would absent the Defendants' unlawful agreements.

512.    Defendants have the power to control prices and exclude competition, and their agreements not to compete, along with the other actions described in this Complaint, prevent or exclude competition. Defendants have harmed the competitive process, and by contributing to the lack of providers, have harmed consumers as well as providers. The consumer welfare is best protected by a competitive marketplace for purchasing provider services.

513.    Defendants have created and increased barriers to entry for other health insurers, have kept other health insurers out of markets, and have limited the ability of other health insurers to compete in other relevant markets. Defendants have suppressed prices for provider goods, services and facilities; increased healthcare costs; and by lessening competition, deprived providers of choices in the marketplace for healthcare insurers with whom to contract and likewise depriving patients of choices in the marketplace for both healthcare insurers and healthcare providers. Defendants' agreements have also prevented Blues from developing and entering into innovative and collaborative agreements with providers that would be efficient, improve quality, and lower healthcare costs.

514.    Additionally, because most Blues are monopolists in the healthcare financing and

health insurance markets, in addition to being monopsonists in the health services markets, it does not stand to reason that lower reimbursement rates necessarily lower consumers' premiums. The monetary, and other, losses THR suffered from Defendants' conduct substantially enhanced Defendants' wealth and reflect a healthcare provider-to-insurer transfer.

515.    The Blues' monopsony power gained by virtue of their unlawful agreements have resulted in substantial injury to providers such as THR, in addition to harming patients across the United States. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices the Blues pay. The United States already faces a critical shortage of primary care and other physicians, but currently many more providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens imposed by Defendants. [3] Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants. According a 2024 survey by McKinsey, 35% of respondent physicians said they planned on leaving the practice of medicine in the next five years, blaming low compensation. According to the 2024 Annual Report of the American Association of Medical Colleges, there will be a shortage of nearly 90,000 physicians across all specialties by 2036. Consumer choices also have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments, because hospitals and other facilities are closing and/or

---

[3] *See* Am. Med. Assoc., "AMA president sounds alarm on national physician shortage" (Oct. 25, 2023), *available at* https://www.ama-assn.org/press-center/press-releases/ama-president-sounds-alarm-national-physician-shortage ("The physician shortage that we have long feared—and warned was on the horizon—is already here"); Assoc. of Am. Med. Colleges, "New AAMC Report Shows Continuing Projected Physician Shortage" (Mar. 21, 2024), *available at* https://www.aamc.org/news/press-releases/new-aamc-report-shows-continuing-projected-physician-shortage ("According to new projections published today by the [Association of American Medical Colleges], the United States will face a physician shortage of up to 86,000 physicians by 2036").

consolidating. The loss of these hospitals and other healthcare providers also affects these communities' ability to keep jobs and to attract new business and residents.

516. Further, the Blues' extraordinary market power and lack of a significant threat of competition in many markets has stifled their innovation and the development of new payments models that would benefit providers, consumers, and the market in general strictly to the benefit of their bottom line.

517. The agreements among Defendants have the effect of stifling innovation in the marketplace. For example, providers have asked certain of the Blues to switch their payment model for providers, in particular hospitals, to a value-based or risk-based approach in which the providers are paid commensurate with the value they provide to the plan and share in the risk if they cannot effectively manage the patient population. This type of payment model can benefit efficient low-cost providers and can reward them for their efficiencies and higher quality care. Further, it can reward patients by rewarding more efficient and effective healthcare. The Blues rebuffed such requests, demonstrating that not only are they not interested in undertaking potential efficiency-creating methods of contracting, but also that they are unwilling to innovate in this way. Because they face no threat of competition from other Blues, the Blues have no interest or incentive to innovate.

518. Competition stimulates innovation and the lack of competition stifles innovation. There is no opportunity for providers to engage in more efficient healthcare management techniques unless the Blues embrace such efficiency-enhancing innovations.

519. THR also suffers because agreements not to compete restricts its choices in the market. Because the other Blues agree not to compete in other Service Areas, providers, including THR, are not offered the opportunity to contract directly with any Blue other than the Blue in the

providers' Service Area. The exclusion of these potential participants in the health services financing market has the effect of depressing payments in the market for healthcare services, whether or not the provider is in-network with the local Blue.

520. The Blues implement new fee schedules for providers, generally on an annual basis. Those new fee schedules are lower than they would have been without Defendants' anti-competitive conduct. The new fee schedules have created incrementally larger antitrust injuries and damages for the healthcare providers over the relevant time period.

521. When the Blues *have* faced innovative competitors, their anti-competitive agreements set forth herein have allowed them to take those competitors out of the market. For example, when Cigna developed innovative programs with providers that involved paying providers higher reimbursement rates than Anthem and other Blues pay, but collaborating with providers to reduce the overall cost of healthcare, Anthem attempted to purchase Cigna and then after secret meetings with the CEOs of other Blues in Chicago, Anthem and the other Blues developed the Blue Bias Strategy to prevent the on-going implementation of the innovative programs that Cigna had developed with providers. Instead, Anthem and the other Blues continue to follow their strategy of paying low reimbursement rates to hospitals and other providers to maintain their differentials between the Blues reimbursement rates and those paid by companies like Cigna, and those low reimbursement rates undermine and prevent efforts at innovation and collaboration with providers like THR.

522. Absent the Defendants' anti-competitive agreements and conduct alleged herein, there would be more competition among commercial insurers and for the reimbursement of healthcare goods, services, and facilities purchased from THR and other healthcare providers. This competition would increase the reimbursement rates available to THR.

523. Defendants' unlawful activities have resulted in concrete antitrust injury to THR, including (a) lost revenues resulting from anti-competitively low prices for goods, services, and facilities that THR provided to patents insured by the Blues; (b) lost revenue resulting from decreased use of THR's services and facilities; and (c) threatened future harm to THR's business and property, all as a result of Defendants' unlawful conduct.

524. Defendants' unlawful agreements and conduct pursuant thereto have existed and have been continuously ongoing at least since 2008 and continue through the present. Although the Defendants purported to formally terminate the so-called Best Efforts Rule in 2021 in connection with the settlement of antitrust litigation brought by their subscribers, the economic effects of that output restriction, and relating harm to THR and other healthcare providers, have been carrying on and will continue to carry on for many years.

### F. Necessity of Injunctive Relief and Judicial Oversight

525. As set forth above, the Blue Card Program reinforces the agreements that Defendants have made not to compete and in many ways is the glue that holds the Blues' anti-competitive system together. In order to remedy that coercion and abuse of market power, providers should be allowed to opt-out of the Blue Card System with no threat of retaliation. In the long run, that opt-out right will restore market condition and encourage the positive development of the Blue Card System so that it functions in as efficient a manner as possible. To the extent that providers wish to remain in the Blue Card Program, they can do so. In order to correct the adverse effects that Defendants have had on the market, the Court should impose an affirmative obligation on all Defendants to bargain in good faith with providers who wish to negotiate with them, and maintain that obligation until the adverse effects of Defendants' conduct have been fully remedied.

526. In addition, the Blues' current prohibition against the use of non-Blue rental

networks should be enjoined. Other health insurers, including United, Aetna, and Cigna used such rental networks to supplement their networks when necessary. Consumers and providers should have the ability to access such non-Blue rental networks for Blues just as they do for other health insurers.

527. The anti-competitive conduct of Defendants over a significant period to time will require meaningful injunctive relief. Even with that relief, the conduct and market conditions created by Defendants will not be remedied over-night. The Court will require reporting and judicial oversight for a significant period of time to ensure that the remedies are adequate and effective. The Court should use the resources of the Special Master who has developed expertise in this case and rapport with the parties to it to make sure that the remedies are proceeding in an effective and efficient manner.

## VI. PUTATIVE PROVIDER CLASS ACTION SETTLEMENT

528. On or about July 24, 2012, a putative class of health care providers filed a complaint against Defendants. *See In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, N.D. Ala., Case No. 2:13-cv-20000-RDP (the "MDL Litigation"), seeking relief from the same anti-competitive conduct alleged in this Complaint.

529. On or about October 14, 2024, counsel for the putative class and counsel for defendants in the MDL Litigation filed a notice that they had reached a settlement.

530. THR has filed timely exclusion requests and validly opted out of this provider settlement class in the MDL Litigation. THR "preserve[s] absolutely [its] right to litigate" by opting out of the settlement class. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 385 (1996). THR is not seeking to alter or interfere with the injunctive relief in the provider class settlement in the MDL Litigation.

## VII. STATUTE OF LIMITATIONS AND TOLLING

531.     THR's claims are timely under the tolling rule established in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny. The statute of limitations began tolling on July 24, 2012, when the first provider class action was filed.

532.     THR was included within the scope of this first-filed provider class action, which asserted similar antitrust claims against BCBSA and the Blues or their predecessors in interest, based on the same market allocation and price-fixing conspiracy at issue in this lawsuit.

533.     The provider case was later consolidated into the MDL Litigation, where tolling continued throughout the pendency of the provider track proceedings.

534.     Even if THR's claims were not tolled by the provider class action, Defendants' market allocation and price-fixing conspiracy is ongoing and continues to harm THR through suppressed reimbursement rates and restricted competition in its operating markets. Defendants also continue to actively enforce their agreements through the Blue Card Program and exclusive Service Area restrictions, preventing THR from negotiating competitive rates.

535.     Each underpayment to THR is a new overt act that restarts the statute of limitations, making these claims timely.

536.     THR's claims further remain timely under the continuing violation doctrine, as Defendants' anti-competitive conduct did not cease and continues to this day. The nature of Defendants' violations of the antitrust laws described herein is a continuing violation in which each reimbursement agreement negotiated with THR and each under-reimbursement of a claim paid to THR was (i) a new and independent act in furtherance of the unlawful agreements and (ii) inflicted a new and accumulating injury to THR in the form of anti-competitive reimbursement rates and unfavorable contract terms for the duration of each new contract and beyond. Defendants' actions to continually make and enforce new, anti-competitive contractual terms under the

- 157 -

unlawful agreements is an exception to the governing statute(s) of limitations.

## VIII.  VIOLATIONS OF LAW

### COUNT I

### Claim for Injunctive Relief, 15 U.S.C. § 26

537.     THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

538.     This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

539.     As explained in Counts II through VII, Defendants' Market Allocation Agreement and their Price Fixing and Boycott Agreement constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 under a *per se*, quick look, or rule of reason analysis.

540.     As explained in Counts VIII through X, Defendants' conduct constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

541.     Defendants' unlawful conduct threatens to continue to injure THR. THR seeks a permanent injunction prohibiting Defendants and all others acting in concert from continuing either of their unlawful agreements and to take appropriate remedial action to correct and eliminate any remaining effects of either of the unlawful agreements.

542.     THR reserves the right to seek preliminary injunctions as necessary.

### COUNT II

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (*Per Se* Market Allocation)

543.     THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

544.     THR brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for

threefold or trebled damages and interest.

545.     Defendants have engaged in a Market Allocation Agreement that represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

546.     Defendants have agreed to divide and allocate the geographic markets for the financing of healthcare into a series of exclusive areas for each of the BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined. By so doing, BCBSA members have agreed to suppress competition and to increase their profits by decreasing payments to healthcare providers in violation of Section 1 of the Sherman Act. Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide. Defendants' market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

547.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anti-competitive agreement.

## COUNT III

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (*Per Se* Price Fixing and Boycotting)

548.     THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

- 159 -

549.    THR brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

550.    The Price Fixing and Boycott Agreement operates in addition to and reinforces the Market Allocation Agreement. The Agreement alleged in this Count also represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act and is a *per se* violation of the Act.

551.    Through the Price Fixing and Boycott Agreement, the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs. By so doing, Defendants have agreed to suppress competition by fixing and maintaining payments to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act. Defendants' Price Fixing and Boycott Agreement through the national programs is *per se* illegal under Section 1 of the Sherman Act.

552.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anti-competitive agreement.

553.    THR seeks money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT IV

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Quick Look Claim for Market Allocation)

554.   THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

555.   THR brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

556.   Under a quick look analysis, Defendants' Market Allocation Agreement violates Section 1 of the Sherman Act.

557.   "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). The arrangements also have an anti-competitive effect on healthcare providers and reduce output by healthcare providers.

558.   The Market Allocation Agreement prevents the Blues, including many of the largest participants in the relevant product markets defined above, from competing nationally, regionally, or in the relevant geographic markets defined above.

559.   The Market Allocation Agreement has no pro-competitive effect. The restrictions that Defendants have imposed on their relationships with healthcare providers are not related to the trademark rationales offered by Defendants and have nothing to do with any issue related to consumer confusion.

560.   Defendants have not offered any new product. Moreover, they would increase competition if they provided healthcare financing without the anti-competitive agreements that they have reached and pursuant to which they are acting.

561.   Because a "quick look" shows that the Blues' arrangements are anti-competitive,

no inquiry into market power is required.

562.　As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anti-competitive agreement.

563.　THR seeks money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT V

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Quick Look Claim for Price Fixing and Boycotting)

564.　THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

565.　THR brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

566.　Under a quick look analysis, Defendants' Price Fixing and Boycott Agreement violates Section 1 of the Sherman Act.

567.　"[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). The arrangements also have an anti-competitive effect on healthcare providers and reduce output by healthcare providers.

568.　The Price Fixing and Boycott Agreement has the same effect and also results in price fixing because it prohibits any Blue Defendant but the Host or Participating Plan from

negotiating the price the goods and services in the relevant markets described above. *See Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

569.     The Price Fixing and Boycott Agreement has no pro-competitive effect. The restrictions that Defendants have imposed on their relationships with healthcare providers are not related to the trademark rationales offered by Defendants and have nothing to do with any issue related to consumer confusion.

570.     Defendants have not offered any new product. Moreover, they would increase competition if they provided healthcare financing without the anti-competitive agreements that they have reached and pursuant to which they are acting.

571.     Because a "quick look" shows that the Defendants' arrangements are anti-competitive, no inquiry into market power is required.

572.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anti-competitive agreement.

573.     THR seeks money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VI

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Rule of Reason Claims for Market Allocation)

574.     THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

575.     THR brings these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

576.     Defendants' Market Allocation Agreement violates Section 1 of the Sherman Act under a rule of reason analysis and gives rise to damages to healthcare providers in markets throughout the country.

577.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anti-competitive agreement.

578.     THR seeks money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Rule of Reason Claims for Price Fixing and Boycotting)

579.     THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

580.     THR brings these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

581.     Defendants' Price Fixing and Boycott Agreement violates Section 1 of the Sherman Act and gives rise to damages to healthcare providers in geographic markets throughout the country.

582.     As a direct and proximate result of Defendants' continuing violations of Section 1

of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anti-competitive agreement.

583. THR seeks money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VIII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Monopsonization)

584. THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

585. THR brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

586. Defendants have engaged in conduct by which they have created or maintained monopsony power in the relevant product markets and geographic markets described above. For purposes of this Count, these Defendants are the ones identified as having a market share of 70% or more in at least one geographic area, although THR reserves the right to amend the list of Defendants subject to this Count if discovery into Defendants' market power warrants. This monopsony power has been durable, lasting for decades.

587. These Defendants' creation of monopsony power was willful. An express purpose of Defendants' conduct was to prevent Defendants from competing with each other, and thus interfering with each other's monopsony power.

588. By willfully creating or maintaining monopsony power, these Defendants have

violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

589.    As a direct and proximate result of Defendants' continuing violations of Section 2 of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anti-competitive agreement.

590.    As alleged above, Defendants' use of their market power has also reduced the output of healthcare services.

## COUNT IX

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Attempted Monopsonization)

591.    THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

592.    THR brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

593.    Defendants have engaged in conduct by which they have attempted to create or maintain monopsony power in the relevant product markets and geographic markets described above.

594.    These Defendants specifically intended to create monopsony power. An express purpose of Defendants' conduct was to prevent Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.

595.    By attempting to create or maintain monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well. Even when Defendants have not yet created or maintained monopsony power, their conduct has created a dangerous risk of success.

596.    As a direct and proximate result of Defendants' continuing violations of Section 2 of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anti-competitive agreement.

597.    As alleged above, Defendants' use of their market power has also reduced the output of healthcare services.

## COUNT X

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(Conspiracy to Monopsonize)**

598.    THR incorporates the allegations set forth in the foregoing paragraphs as though set forth herein.

599.    THR brings this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

600.    Defendants have agreed to restrict competition among themselves in the relevant product markets and geographic markets described above, and thus to create monopsony power. Defendants specifically intended to create monopsony power. An express purpose of their agreements was to prevent Defendants from competing with each other, and thus interfering with

each other's attempts to create monopsony power. All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them. This conspiracy has affected a substantial amount of interstate commerce.

601.    By conspiring to create or maintain monopsony power, Defendants have conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

602.    As a direct and proximate result of Defendants' continuing violations of Section 2 of the Sherman Act, THR has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but Defendants' anti-competitive agreement.

603.    As alleged above, Defendants' use of their market power has also reduced the output of healthcare services.

## IX.    <u>REQUEST FOR RELIEF</u>

WHEREFORE, THR requests that this Court:

a.    Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

b.    Adjudge and decree that Defendants have violated Section 2 of the Sherman Act;

c.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete;

d.    Permanently enjoin Defendants from continuing with the Market Allocation Agreement and to remedy all effects or vestiges of that Agreement;

- 168 -

e.      Permanently enjoin Defendants from utilizing challenged national programs including the Blue Card Program, and the National Accounts Program, to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

f.      Permanently enjoin Defendants from continuing with the Price Fixing and Boycott Agreement and to remedy all effects or vestiges of that Agreement;

g.      Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

h.      Permanently enjoin Defendants in the same manner and to the same extent Defendants have stipulated to being enjoined in any other action with respect to the conduct alleged herein;

i.      Require ongoing periodic reporting on compliance by Defendants, monitoring by the Special Master and the Court, and a process through which THR will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants have corrected the effects of their illegal conduct;

j.      Award THR damages in the form of three times the amount of damages suffered by THR as proven at trial;

k.      Award costs and attorneys' fees;

l.      Award prejudgment interest;

m.      For a trial by jury; and

n.      Award any such other and further relief as may be just and proper.

## X.      JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Date: July 21, 2025

Respectfully submitted,

/s/ Ryan P. Phair

Renato Mariotti
Michael Morrill
**PAUL HASTINGS LLP**
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
renatomariotti@paulhastings.com
michaelmorrill@paulhastings.com
Telephone: (312) 499-6000

Ryan P. Phair
Michael F. Murray (*pro hac vice forthcoming*)
Carter C. Simpson (*pro hac vice forthcoming*)
Christopher C. Brewer (*pro hac vice forthcoming*)
Emma Hutchison (*pro hac vice forthcoming*)
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, DC 20036
ryanphair@paulhastings.com
michaelmurray@paulhastings.com
cartersimpson@paulhastings.com
chrisbrewer@paulhastings.com
emmahutchison@paulhastings.com
Telephone: (202) 551-1751

James M. Pearl (*pro hac vice forthcoming*)
Navi S. Dhillon (*pro hac vice forthcoming*)
Kiaura Clark (*pro hac vice forthcoming*)
**PAUL HASTINGS LLP**
1999 Avenue of the Stars, Fl. 27
Los Angeles, CA 90067
jamespearl@paulhastings.com
navidhillon@paulhastings.com
kiauraclark@paulhastings.com
Telephone: (310) 620-5700

Stephen J. McIntyre (*pro hac vice forthcoming*)
**PAUL HASTINGS LLP**
515 South Flower Street, Fl. 25
Los Angeles, CA 90071
stephenmcintyre@paulhastings.com
Telephone: 213-683-6110

Barry G. Sher (*pro hac vice forthcoming*)
Avi Weitzman (*pro hac vice forthcoming*)
**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
barrysher@paulhastings.com
aviweitzman@paulhastings.com
Telephone: (212) 318-6000

*Attorneys for Texas Health Resources*